Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILSON AEROSPACE LLC,<br><br>                              Plaintiff,<br><br>vs.<br><br>THE BOEING COMPANY,<br><br>                              Defendant. | Civil Action No. 2:23-CV-00847-JHC<br><br>PLAINTIFF'S SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff, Wilson Aerospace, LLC, by and through its attorneys of record, brings this Second Amended Complaint against The Boeing Company, and respectfully alleges as follows:

## I.  INTRODUCTION

1.      Plaintiff, Wilson Aerospace, LLC ("Wilson"), is a family-owned aerospace design and manufacturing company based in Fort Collins, Colorado. For nearly three decades, Wilson developed, established, and maintained business relationships throughout the space and aerospace industry by providing innovative critical tools, components, and mechanical solutions for the National Aeronautics and Space Administration's ("NASA") projects including the

1

International Space Station ("ISS"), CST-100 Starliner, Hubble Space Telescope, and to support the Russian space station *Mir*.

2.      Wilson's passion and focus has been specifically directed toward supporting the needs of Defendant, The Boeing Company, ("Boeing") and NASA in achieving NASA's mission of advancing science, technology, aeronautics, and space exploration.

3.      The custom-built solutions Wilson designed for Boeing over the years solved many of NASA's most challenging and difficult engineering requirements, many of which involved safety and structural integrity issues.

4.      Despite its long-standing commitment to finding innovative solutions for Boeing's needs, Boeing rewarded Wilson's efforts by brazenly stealing Wilson's intellectual property relating to four iterations of Wilson's flagship product, the Fluid Fitting Torque Device ("FFTD®"), along with other tools Wilson invented, violating a litany of intellectual property laws along the way.

5.      At the same time, Boeing covered up its wrongful acts, which exacerbated Wilson's harms.

6.      Boeing targeted Wilson because of Wilson's storied history in the aerospace and commercial aviation industry.

7.      As confirmed by the company's multiple awards, NASA recognitions, and the honorary D.Sc. doctoral degree awarded by the University of Colorado to Wilson's founder, Dr. David Wilson, Wilson successfully created, developed, and maintained business relationships throughout the space and aerospace industry through its ability to provide innovative critical tools, components, and mechanical solutions on an expedited basis.

2

8.     Boeing's theft of Wilson's intellectual property enabled it to capture incredible sums in unlawful revenue on aerospace contracts with NASA and commercial aviation projects.

9.     Worse, because Boeing covertly stole Wilson's intellectual property without receiving the full instructions on how to properly build, install, and use Wilson's intellectual property, several of the aerospace and aviation products built by Boeing are pockmarked with critical safety flaws that put lives at risk. This includes the astronauts, pilots, crews, and passengers who come aboard without knowledge of the unsafe equipment and vehicles manufactured by or at the direction of Boeing.

10.    In 2015, Boeing was dangerously close to losing billions of dollars in future revenue from NASA, because it could not figure out how to install the engines on the Space Launch System ("SLS").

11.    The SLS project began in 2011 after authorizations from Congress and is the most high-profile rocket development in the history of NASA[1]:



**America's Rocket for Deep Space Exploration**

NASA's Space Launch System, or SLS, is a super heavy-lift launch vehicle that provides the foundation for human exploration beyond Earth's orbit. With its unprecedented power and capabilities, SLS is the only rocket that can send Orion, astronauts, and cargo directly to the Moon on a single mission.

Offering more payload mass, volume capability, and energy, SLS, the world's most powerful rocket, can carry more payload to deep space than any other vehicle. The SLS rocket is designed to be evolvable, which makes it possible to fly more types of missions, including human missions to the Moon and Mars and robotic scientific missions to places like the Moon, Mars, Saturn, and Jupiter.

12.    Despite Congress' original expectations, the SLS project has faced repeated and ongoing delays and substantial cost overruns due to Boeing's inability to install the engines onto the rocket. As indicated below by the red circle, the engines attach to the bottom of the SLS rocket:

Block 1 - Initial SLS Configuration

---

[1] NASAFACTS, *Space Launch System*, https://www.nasa.gov/sites/default/files/atoms/files/sls_fact_sheet.pdf (last visited Mar. 13, 2023).

13.     Because this space is narrow and confined, Boeing was unable to find a way to safely attach the engines to the SLS with the precise amount of torque.

14.     After trying to resolve this issue for several years without success, Boeing approached Wilson in 2014 in search of a solution. **ECF No. 1-1 (under seal cover sheet); ECF No. 3 (sealed exhibit)**.

15.     With the third generation of its flagship product, the FFTD-3, a unique wrench designed and manufactured for exactly this type of situation, along with 105 proprietary accessories and a high-tech torque tester, Wilson offered Boeing an answer to its ongoing problem that would permit a safe, efficient installation of the engines onto the SLS rocket.

16.     Wilson worked with Boeing for two years (from March 2014 to March 2016) on the SLS expecting its important work on the project to be seen through to completion. Instead, after Boeing gained access to and downloaded Wilson's proprietary information, it abruptly and without explanation cancelled Wilson's involvement on the SLS.

17.     Boeing then began to willfully misappropriate and infringe Wilson's intellectual property, and to erase and expunge all records showing any relationship between Boeing and Wilson, despite documentation and witnesses who can easily and readily verify that Boeing and Wilson had a historical working relationship on a variety of projects other than the SLS engine installation.

18.      Around the very same time Boeing was searching for a solution for the SLS engine installation dilemma, Boeing testified in a 2014 United States Senate hearing and demanded that thieves of intellectual property be held accountable—at least where Boeing's technology is concerned. In Boeing's own words, the theft of trade secrets is "a crime" that must be punished and deterred with increased penalties by "law enforcement" officials:

Boeing's significant contribution to the U.S. economy today and for the past 100 years is a result of the ingenuity of our highly skilled employees. Innovating each step of the way, they develop the most sought-after products and technologies in the world. Boeing's *cutting-edge technology takes years to develop at an enormous expense*, approximately $3 billion of research and development spent per year.

And *the bulk of our innovations are protected as trade secrets*. Because of this, *trade secret protections are vital to securing Boeing's intellectual property*…. Once publicly disclosed, rights and trade secrets may be lost forever, *investments wiped out in an instant along with the competitive advantage those trade secrets provided*.

Of course, Boeing is on constant guard to prevent theft of our trade secrets, but *today companies cannot simply lock their trade secrets in a safe*. The vast majority of our business and engineering information is stored electronically. The digital age has brought great gains in productivity but also has increased risk.

. . . Fear of trade secret theft is not a concern just for Boeing. Middle- and *small-sized companies that rely on trade secrets have as much or more to fear as big companies, particularly if their survival depends on a single product or service. Given the risk U.S. companies face every day, more needs to be done to deter thieves from stealing our trade secrets. This theft is a crime, and we must send a clear message that we will not stand by as thieves harm our businesses, hurt our economy and steal our jobs*. Thus, we strongly support your efforts, Chairman Whitehouse, and also the efforts of Ranking Member Graham to *call attention to the issue and to provide law enforcement with additional tools to deter trade secret theft*.[2]

19.     As Boeing itself has boldly proclaimed, a "clear message" should be sent to thieves that engage in conduct that causes harm to businesses, hurt the economy, and steal jobs.[3]

20.     Boeing correctly testified that when it comes to IP theft, the very "survival" of smaller companies is on the line. The American economy is dependent on small businesses, like Wilson, which "account for over 99 percent of American businesses and employ more than 46

---

[2] Statement of the Boeing Company by Peter J. Hoffman, *Hearing of the Crime and Terrorism Subcommittee of the Senate Judiciary Committee, Economic Espionage and Trade Secret Theft*, FEDERAL NEWS SERVICE TRANSCRIPTS, 2014 WLNR 13068537 (May 13, 2014) (emphasis added).

[3] *Id.*

6

percent of all private-sector employees, according to the U.S. Small Business Administration (SBA)."[4]

21.     Regrettably, Boeing does the opposite of what it says regarding intellectual property protections, which Mitchell Frye acknowledged in a September 2020 email to Wilson, expressing that Boeing's "misuse" of Wilson's intellectual property had damaged Wilson and created "a safety concern for on-orbit hardware."

22.     As alleged herein, the schemes Boeing used to deceive Wilson are part of a long-ranging and open-ended pattern of intellectual property theft, fraud, and deception. Because of its size, resources, status, and political influence, Boeing routinely muscles around and takes advantage of smaller suppliers like Wilson by stealing and infringing their most sensitive intellectual property, using false pretenses and deception to gain access to their proprietary information.[5]

23.     Boeing has become especially brazen in its theft because contracting work with NASA and the military involves highly sensitive, top-secret technology that is hidden. Adding even more obfuscation, Boeing over-classifies and aggressively stamps all the resulting tools it makes, and products it sells to NASA or the military under special security and military

---

[4] Skye Schooley, *Small Businesses' Importance to the Economy & Big Business*, BUSINESS NEWS DAILY, Sept. 29, 2023, available at: https://www.businessnewsdaily.com/15359-importance-of-small-business.html
[5] *See, e.g.*, Daniel Seiden, *Boeing Loses Bid for Rehearing on Trade Secrets Claim Decision*, BLOOMBERG LAW, Apr. 21, 2002 ("Boeing Co. failed to convince an appeals court to reconsider the revival of a claim that could expose the company to up to $100 million in damages for allegedly misappropriating trade secrets when it worked with Alabama Aircraft Industries Inc. on a U.S. Air Force contract bid, according to an Eleventh Circuit order.").

protections (including the International Traffic in Arms Regulations),[6] which makes the discovery of intellectual property theft in this context exceedingly difficult—by design.

24.     This lawsuit seeks to hold Boeing accountable for the repeated and deliberate misappropriation and infringement of Wilson's intellectual property, and to prevent Boeing from doing the same to other victims. Unfortunately, like it has done so many times before, Boeing refuses to acknowledge the critical safety risks that it has created, and it continues to deny and deflect attention from its misconduct. This lawsuit, therefore, is necessary to shine a light on the dangers and risk to lives that Boeing's conduct has caused, and to remedy the financial ruin that Boeing inflicted on Wilson by stealing its intellectual property and slandering Wilson throughout the aerospace industry.

25.     Plaintiff Wilson Aerospace LLC seeks redress for the following: (1) Copyright Infringement; (2) Trade Secret Misappropriation regarding the FFTD-3; (3) Trade Secret Misappropriation regarding the Dreamliner Bolting Tool; (4) Trademark Infringement regarding counterfeit FFTD-1 products; (5)Civil RICO; (6); Civil Conspiracy; (7) Fraud; (8) Negligent Misrepresentation (plead in the alternative); (9) Tortious Interference with Prospective Advantage; and (10) Breach of Contract.

## II.     PARTIES

26.     Plaintiff Wilson Aerospace, LLC, is a limited liability company organized and existing under the laws of Colorado and with its principal place of business in Fort Collins,

---

[6] United States Department of State, *The International Traffic in Arms Regulations (ITAR)*, https://www.pmddtc.state.gov/ddtc_public?id=ddtc_kb_article_page&sys_id=24d528fddbfc930044f9ff621f96198 7 (last visited Mar. 13, 2023).

Colorado. Wilson is in the business of designing, developing, and manufacturing custom-built tooling solutions for a range of industries, including aerospace, space, aviation, and defense. Wilson, the company, is comprised of Dr. Wilson, his son, and his wife.

27.     Defendant The Boeing Company is a corporation organized and existing under the laws of Delaware with its principal place of business in Arlington, Virginia. It previously was based in Seattle, Washington, and Chicago, Illinois. Boeing is in the business of designing, manufacturing, and selling airplanes, rotorcraft, rockets, satellites, telecommunications equipment, and missiles throughout the world.

### III.     JURISDICTION AND VENUE

28.     This is a civil action seeking damages and injunctive relief under the Copyright Act of the United States, 17 U.S.C. §101, *et seq.*, trade secret misappropriation claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) *et seq.*, and other related state law claims. This Court has federal subject matter jurisdiction under the respective federal statutes at issue, along with 18 U.S.C. § 1331. This Court also has supplemental jurisdiction over Wilson's state law claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case and controversy.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to Wilson's claims occurred within this District, and Boeing has substantial and continuous ties to this District, as confirmed by the 2012 and 2014 Proprietary Information Agreements between the parties, which includes a Washington choice of law clause.

### IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

9

30.     Precision is paramount in the aerospace and aviation industries, and Wilson's consistent work product and proven track record earned it a reputation for designing and building complex, reliable, state-of-the-art mechanisms for space and aerospace application—and doing so efficiently and on time with meticulous supporting documentation to ensure traceability which is of critical importance in the space, military, and commercial aircraft industries.

31.     Wilson invented and built numerous tools for Boeing over the years, many of which were designed for use in tightening fittings and valves to the optimum degree of tightness as specified by the fitting manufacturer and approved by NASA to avoid unnecessary damage and the potential for dangerous leaks and releases of toxic and explosive fluids in aircraft and space vehicles.

32.     Wilson depends on the innovative tools it designs, develops, and manufactures to generate profits, and Wilson's copyright, trade secret, and trademark protections deter competitors and would-be thieves from profiting off Wilson's work without Wilson's express permission.

33.     On October 29, 2012, and August 29, 2014, Boeing entered into non-disclosure and proprietary information agreements ("PIA") with Wilson whereby Boeing agreed not to publish, disclose, or allow to be disclosed, any of Wilson's proprietary and trade secret information without Wilson's express written consent. **ECF No. 1-2**; **ECF No. 1-3**.

34.     The 2012 PIA governed the exchange of information "related to torque tools used in manufacturing."

35.     The 2014 PIA governed the exchange of information relating to "NASA's next generation launch vehicle(s) including but not limited to Space Launch Program."

10

36.     Boeing drafted and prepared the PIAs, as confirmed by the number assigned to the PIA at the top of each document, which relates to Boeing's contract numbering, not Wilson's.

37.     The 2012 and 2014 PIAs each contained a choice of law provision stating that any disputes between the parties are governed by Washington state law. At the time of the events of this case and in 2012 and 2014, Boeing was headquartered in Seattle, Washington. Boeing later pulled out of Washington and moved its headquarters across the country.

38.     Although Boeing paid Wilson for some of its work over the years, Boeing's primary approach was to steal Wilson's intellectual property through deception and other illegal means, rather than to compensate Wilson for its work on the SLS project, the ISS project, and a commercial aircraft project.

39.     Boeing stole Wilson's intellectual property both on its own and in concert with others involved in interstate commerce. In the process of working with Wilson (and other suppliers on other projects), Boeing has followed a pattern throughout its SLS, ISS, and commercial aircraft divisions by:

    i.    Requesting Wilson's confidential information under the protection of a PIA;

    ii.    Baiting Wilson to get started with the prospect of lucrative, future work;

    iii.    Disseminating Wilson's work to co-conspirators for development while taking credit for the derived design/manufacturing and receiving compensation for the work;

    iv.    Covering up and concealing its intellectual property theft by expunging Wilson's involvement in numerous Boeing projects as a pretext to eliminate Wilson as a qualified supplier of critical parts and tools; and

    v.    Generating hundreds of millions of dollars in revenue based on the intellectual property stolen from Wilson.

40.     Boeing's theft of Wilson's intellectual property rights for tools intended to support the SLS project resulted in mismatching Wilson's designed components with components designed by Boeing and its co-conspirators which led to inferior products being used to tighten fittings and valves.

41.     On information and belief, the mismatched tools have caused some fluid leaks that continually delayed the SLS launch, costing NASA hundreds of millions of dollars while unjustly enriching Boeing through its cost-plus or incentive based contract with NASA. **ECF No. 1-4**.

A.   **Overview of the Unique Tools Wilson Designed and Created**

42.     Wilson invented, designed, and created multiple tools that were used or intended for use in interstate commerce by Boeing, NASA, and other companies.

43.     Among the products at issue are four iterations of Wilson's specialty tooling lineup called the Fluid Fitting Torque Device ("FFTD-1", "FFTD-1 Second Generation", "FFTD-2", and "FFTD-3"), a family of tools Wilson invented for the specific purpose of tightening and loosening fittings. One of the most notable uses for the FFTD® has been installing Gamah and other fittings located in cramped, difficult to access areas on spacecraft such as the ISS and the SLS.

44.     As one example, approximately 600 Gamah fittings can be found on the ISS, many of which are frequently attached and detached, including those associated with coupling the ISS with space vehicles like the now retired Space Shuttle and Starliner, other commercial vehicles, and reconfiguring experiments on the ISS.

45.     Like the ISS, the Columbia Space Shuttle also utilized Gamah fittings as part of the construction of the "SPACEHAB" – an experimental module that was integrated into the

Columbia so astronauts could conduct experiments about the behavior of fire in a weightless environment. **ECF No. 1-5**.

46.     The FFTD-1 Second Generation is a stronger version of the FFTD-1, designed and manufactured by Wilson in 2019.

47.     The *FFTD-1* is a tool designed and developed using Wilson's proprietary technology which was supplied to Boeing to enable astronauts to install fittings inside the ISS while in orbit. **ECF No. 1-6 (under seal cover sheet); ECF No. 4 (sealed exhibit).**

48.     The *FFTD-2* is a set of 2 tools Wilson created for Boeing to install a critical hydrogen vent line on the outside of the ISS to support the replacement of an oxygen concentrator – a critical component of the Environmental Control and Life Support System (ECLSS). **ECF No. 1-7 (under seal cover sheet); ECF No. 5 (sealed exhibit).**

49.     The *FFTD-3* is Wilson's high performance fitting installation tool invented as a state-of-the-art successor to the FFTD-1, capable of delivering high-torque in small, confined spaces. **ECF No. 1-8 (under seal cover sheet); ECF No. 6 (sealed exhibit)**.

50.     To broaden the applications for the FFTD-3, Wilson developed over 105 accessories for it.

51.     The *Torque Tester* is a custom designed, table mounted precision "beam balancer" style torque tester, which uses heavy duty components to minimize torque deflection and distortion error to provide highest fidelity results possible for critical applications. The *Torque Tester* uses precision calibration and is traceable to National Institute of Standards and Technology ("NIST") with dual onboard computers for real time torque measurement and the ability to download testing results to an external computer or server for statistical plotting, or quality assurance archiving. It is used to verify and calibrate the torque on the FFTD-3, among

other tools. **ECF No. 1-9 (under seal cover sheet); ECF No. 7 (sealed exhibit).**

52.     The *Capture Latch* is equipment that Wilson co-developed with Boeing. It is used to dock space vehicles on the ISS. **ECF No. 1-10 (under seal cover sheet); ECF No. 8 (sealed exhibit).**

53.     The *Switch Tester* is a testing apparatus Wilson designed and demonstrated to Boeing which synchronized the timing of the four limit switches on the *Capture Latch* equipment. **ECF No. 1-11 (under seal cover sheet); ECF No. 9 (sealed exhibit).**

54.     The *Spring Compressor* is a tool Wilson designed and demonstrated to Boeing during its work on the *Capture Latch* project. The Spring Compressor is used to install high power springs for assembly of the Capture Latches.

55.     The *Dreamliner Bolting Tool* is a series of tools Wilson designed and proposed to Boeing to install bolts and fasteners on commercial aircraft. One tool concept was to redesign mechanical components on existing Boeing hardware. The second concept was to re-engineer the tool while retaining overall dimensions of the existing tool. **ECF No. 1-12 (under seal cover sheet); ECF No. 10 (sealed exhibit).**

56.     The *Gearbox* is an assembly for the nose cone cover of the Boeing CST-100 *Starliner*. **ECF No. 1-13 (under seal cover sheet); ECF No. 11 (sealed exhibit).**

**B.   Boeing's Pattern of Stealing Intellectual Property and Cheating the Government**

57.     Founded in Seattle in 1916, Boeing has contributed major innovations to America's aviation and aerospace industries, propelling the growth of NASA and the defense industry of the United States.

58.     Unfortunately, in the last two decades, Boeing has demonstrated a willingness and propensity to engage in deception, infringement, and theft of intellectual property to satisfy its appetite for increased corporate profits and quarterly revenues.

59.     The consequences of Boeing's wrongful conduct are significant and notable. In 2006, the United States Department of Justice ("DOJ") announced "a record $615 million settlement to resolve criminal and civil allegations that Boeing improperly used competitors' information to procure contracts for launch services worth billions of dollars from the Air Force and the National Aeronautics and Space Administration."[7]

60.     As the *New York Times* explained at the time, this DOJ settlement was reached to avoid criminal charges, and Boeing assured Congress and the American public that Boeing affirmatively "does accept full responsibility for the actions of its employees."[8]

61.     Boeing's theft of intellectual property was so significant that a United States Senate hearing held on August 1, 2006, was devoted solely to this topic and the subsequent settlement that Boeing and its lawyers convinced the DOJ to accept in lieu of indicting Boeing for the many intellectual property crimes it openly committed.

62.     In this 2006 Senate hearing, Senator John Warner asked: "how does a company with the pride and prestige of Boeing produce employees that are capable of this kind of criminal behavior? Companies doing business with the United States Government are expected to adhere

---

[7] DEP'T OF JUSTICE, *Boeing to Pay United States Record $615 Million to Resolve Fraud Allegations*, (June 30, 2006) https://www.justice.gov/archive/opa/pr/2006/June/06_civ_412.html.

[8] Leslie Wayne, *Boeing to pay $615 Million to avoid trial*, NEW YORK TIMES, (May 16, 2006), https://www.nytimes.com/2006/05/16/business/worldbusiness/16iht-boeing.html.

to the highest legal and ethical standards. We would expect nothing less from a company of Boeing's stature and rich heritage."[9]

63.     Senator Warner pointed to "a cultural climate at Boeing, both past and present, that has fostered criminal misconduct by some of its employees."[10] Senator Jack Reed added, "We need the goods and services that Boeing provides, but we cannot purchase them at the expense of our legal and ethical standards."[11]

64.     In response to the lengthy description of Boeing's misconduct and criminal theft of intellectual property, Boeing's CEO at the time, Mr. McNerney, assured Congress:

> We take full responsibility for the wrongful acts of the former employees who brought dishonor on a great company and caused harm to the U.S. government and its taxpayers.  Boeing is accountable for what occurred…. This settlement is tough but fair. It has been widely reported as probably the largest monetary settlement of its kind, a sad distinction we must live with and learn from.[12]

65.      Boeing's promise to take responsibility for the "wrongful acts" of its employees was a material condition to this DOJ settlement. It is therefore estopped in this case and in all others from trying to pin the blame for its intellectual property crimes on "rogue" employees. In any event, Boeing is responsible if its employees' unlawful actions were taken to benefit Boeing.

---

[9] *The Boeing Company Global Settlement Agreement: Hearing before the S. Comm. on Armed Services*, 109 Cong. [page 2] (2006) (statement of Senator John Warner).

[10] *Id.*

[11] *The Boeing Company Global Settlement Agreement: Hearing before the S. Comm. on Armed Services*, 109 Cong. [page 10] (2006) (statement of Senator Jack Reed).

[12] *The Boeing Company Global Settlement Agreement: Hearing before the S. Comm. on Armed Services*, 109 Cong. [page 40] (2006) (statement of James W. McNerney, Jr., Chairman, President and Chief Executive Offices, the Boeing Company) (emphasis added added).

66.     In 2006, Mr. McNerney continued to promise Congress that Boeing's criminal liabilities and public embarrassment "have caused an immense amount of introspection at Boeing. How could a company with a history of reliability and a self-image of unquestioned integrity have made these mistakes? This introspection set us on a course of building one of the most robust ethics and compliance programs in corporate America. That is the lasting legacy and silver lining of this dark cloud in our history."[13]

67.     Over 15 years later, that "lasting legacy" has yet to be created and realized as little has changed since 2006. Today, Boeing has repeatedly found itself back in the news for significant safety issues[14], its deception of the government, and its singular role in causing the 737 Max airplane crashes in 2019, which took the lives of over 300 passengers, its and its cost over-runs on other contracts.[15]

68.     For the past several years, Boeing has stayed in the crosshairs of Congress (and law enforcement agencies and prosecutors at the DOJ) because of a "cascade of errors, shortcuts and management failures[.]"[16]

69.     In 2021, the DOJ again offered a special deal to Boeing, this time permitting Boeing to enter a deferred prosecution agreement after it had been caught and admitted to

---

[13] *Id.*

[14] On January 5, 2024, a Boeing 737-9 operated by Alaska Airlines, returned to Portland International Airport, Portland, Oregon, after the left mid exit door (MED) plug departed the airplane leading to a rapid decompression during which time seven passengers and one flight attendant were injured. National Transportation Safety Board, *In-Flight Mid Exit Door Plug Separation,* https://www.ntsb.gov/investigations/Pages/DCA24MA063.aspx (last visited Aug. 19, 2024).

[15] FORTUNE 500, *Boeing*, https://fortune.com/company/boeing/fortune500/ (last visited Mar. 13, 2023).

[16] Scott Cohn, CNBC, *One year after the 737 Max's return, Boeing is still trying to get back on course* (Jan. 24, 2022) (available at https://www.cnbc.com/2022/01/24/the-737-max-may-be-back-but-boeing-is-still-trying-to-get-back-on-course.html).

"conspiring to defraud regulators"—again allowing Boeing to avoid criminal charges (and this time by striking a secret deal without consulting the families of the victims of the crash).[17]

70.     As it falsely promised in 2006, Boeing today claims the 2019 crashes led to "fundamental reforms[.]"[18] But, once again, "that didn't happen."[19]

71.     Unfortunately, Wilson, like many others, relied on Boeing's assurances and acted in good faith to deliver what Boeing requested, unaware that Boeing was secretly stealing, misappropriating, and infringing its intellectual property at the same time.

72.     Boeing's *modus operandi* is evident: target a smaller company such as Wilson, and entice them with the possibility of lucrative contracts, then steal the smaller company's intellectual property while concealing evidence of the misdeeds.

73.     Notably, the thefts of intellectual property in this case are part of a broader pattern of criminal behavior by Boeing, which has previously been accused of stealing the innovations and intellectual property of its competitors and its suppliers:

- ▪ Theft of trade secrets from Lockheed Martin in 2006 and a $615 million DOJ settlement in 2006 for criminal theft of intellectual property and fraud upon the United States government;[20]

---

[17] Michael Laris, *Judge Rules DOJ violated rights of Boeing Max victims in prosecution deal*, Washington Post, Oct 21, 2022.

[18] Scott Cohn, CNBC, *One year after the 737 Max's return, Boeing is still trying to get back on course* (Jan. 24, 2022) (available at https://www.cnbc.com/2022/01/24/the-737-max-may-be-back-but-boeing-is-still-trying-to-get-back-on-course.html).

[19] *Id*. (quoting U.S. House Transportation and Infrastructure Committee Chairman Peter DeFazio (D-Oregon)).

[20] Jill Aitoro, *Secrets and files*, WASH. BUS. JOURNAL, 2013 WLNR 17695535 (July 19, 2013) ("A scandal 10 years ago involved The Boeing Co., which allegedly outbid Lockheed Martin Corp. for $2 billion in contracts for rocket-launching vehicles after two former Lockheed employees stole more than 25,000 pages of trade secrets and switched companies. While Boeing the company was not prosecuted, the Air Force canceled about $1 billion of the company's contracts and suspended Boeing from competing for rocket work for 18 months.").

- Theft of allegedly $100 million in trade secrets and breach of non-disclosure agreement against Alabama Aircraft, a small supplier that Boeing preyed upon;[21]
- Theft of trade secrets in Aviation Finance Insurance Consortium in 2018, when Boeing allegedly "waited until their need for those trade secrets became critical—and then misappropriated them"[22]

74.    Consistent with its *modus operandi*, Boeing covertly engaged in a wide-ranging pattern of schemes to misappropriate, steal, and infringe Wilson's intellectual property, along with plans to erase Wilson and the modest prices charged by Wilson from all documents and records so that Boeing and its confederates—but not Wilson—would receive the massive compensation that was awarded from the contracts Boeing had lined up with NASA and other companies.

75.    In doing so, however, Boeing terminated its contracts and communications with Wilson before all of the specifications, instructions, and design details ("the complete and critical information") could be shared with Boeing and NASA, including, in the case of the FFTD-3,the internal workings within the housing, friction reducing coatings, material selections, manufacturing techniques, assembly procedures, testing processes, software for optimizing gear performance, and software to interface tools with torque testers. **ECF No. 1-14 (under seal cover sheet); ECF No. 12 (sealed exhibit).**

76.    The complete and critical information was necessary to properly manufacture the tools and devices needed for NASA to install the engines on the SLS rocket and by terminating

---

[21] Blake Brittain, REUTERS, *U.S. appeals court says Boeing must face contractor's trade-secret claims* (Feb. 14, 2022) ("Aerospace giant Boeing Co has to defend itself for a second time from accusations that it stole trade secrets from a contractor that it allegedly bankrupted, a U.S. appeals court ruled Monday.").

[22] LEEHAM NEWS, *Boeing, insurance firm stole trade secrets, lawsuits charge* (Sept. 11, 2018), https://leehamnews.com/2018/09/11/boeng-trade-secrets/ ("This isn't the first time Boeing was on the receiving end of a trade secrets theft complaint.").

its contracts and communications with Wilson, Boeing lacked the knowledge and information needed to design tools that could offer superior quality and performance.

77.     Boeing's mismatched tools of inferior quality were a cause of the leaks experienced in the SLS projects, and likely caused leaks in equipment of Boeing's joint venture partners and licensees, which discovery will uncover.

78.     On top of this, Boeing has blamed Wilson for design failures, causing irreparable reputation damage and loss of future business opportunities to Wilson, which requires, at the very least, that Boeing publicly clear Wilson's name and alert NASA and others of the true cause of the problems underlying the ISS, Columbia - SPACEHAB, SLS, and other failures.

79.     Boeing's premature and calculated termination of communications with Wilson not only has led to multiple problems that can be traced to Boeing's theft and incompetent manufacturing and installation, but it also created signature defects that—this time—Boeing cannot erase or delete from its files. Indeed, Wilson can show Boeing stole its intellectual property by pointing to the features that Boeing's products *do include* while simultaneously showing the features that Boeing's products *don't include*—because Boeing cut off communications with Wilson before the details of these features could be transmitted by Wilson. Upon information and belief, it is the absence of these essential features that has caused or contributed to the defects, leaks, and other failures experienced by NASA in the SLS project as well as incredible cost overruns at the expense of the US taxpayer.

**C.   The Theft of Wilson's Intellectual Property and Boeing's Coverups**

80.     Boeing's theft of Wilson's intellectual property included tools designed for use on the ISS project, the SLS project, and in Boeing's aircraft division.

81.     The SLS project has been in development since 2011. Congress set the goal of having a fully operational launch and rocket capability by the end of 2016.

82.     The first SLS rocket launch finally occurred on November 16, 2022, six years behind schedule and notwithstanding dangerous leaks from fittings that caused damage to the launch pad and rocket hardware.

83.     Despite the significant delays and cost overruns the SLS project experienced, Boeing has been paid billions of dollars in revenue from its work on the SLS project much of which Boeing would not have ever realized without gaining access to and then stealing or infringing Wilson's intellectual property.

84.     In 2014 and 2015, Boeing's involvement in the SLS had reached a bottleneck: Boeing's work—and revenue—were going to be cut off by NASA if Boeing could not figure out how to install the engines on the SLS rocket.

85.     With billions of dollars of future revenue hanging in the balance and its reputation with Congress and NASA on the line, Boeing turned to Wilson for help.

**D.  The Theft and Counterfeiting of the FFTD-3**

86.     During its work on the SLS project, Boeing reached out to Wilson in March 2014 after learning Wilson had created the FFTD-3, which had the ability to precisely install high-torque fittings and flare nuts in tightly confined spaces.

87.     In approaching Wilson, Boeing acknowledged in emails that it did not have any tools or tool concepts with those capabilities despite its repeated efforts to find such a solution. **ECF No. 1-15 (under seal cover sheet); ECF No. 13 (sealed exhibit).**

88.     Boeing was up against a significant obstacle: interfacing the RS-25 engines, modified from previous use on the retired space shuttle, onto the new Artemis I rocket. Without

21

the engines installed and fitted perfectly, the rocket could not launch. This was an existential threat to the entire SLS project and especially to Boeing's continued involvement in the lucrative project.

89.     Boeing had not yet figured out a way to attach all the components because the tight, confined spaces at the "boat tail" of the rocket did not permit the use of Boeing's existing tools; nor did any other tools calibrate the torque needed with the extreme precision required by NASA for the SLS program.

90.     It was Wilson's FFTD-3 that uniquely offered both the ability to operate in tight, narrow spaces, and to deliver torque with precision that was unparalleled. In short, Wilson could solve both problems at the same time, offering Boeing its only path to continue forward on the SLS project. **ECF No. 1-16 (under seal cover sheet); ECF No. 14 (sealed exhibit).**

91.     After Boeing reached out to Wilson in March of 2014 regarding the FFTD-3, Wilson and Boeing engaged in multiple meetings and conference calls to discuss what was needed to solve the engine installation barrier on the SLS project. **ECF No. 1-17 (under seal cover sheet); ECF No. 15 (sealed exhibit).**

92.     The parties also signed a 2014 PIA to protect Wilson's intellectual property related to the SLS project. The 2014 PIA is focused on the SLS project, and it included five years of protection to Wilson for its intellectual property during that time period.

93.     Wilson reasonably relied on the PIA signed and provided by Boeing, and Wilson proceeded in good faith, under the terms of the PIA, expecting Boeing to honor the agreement, along with state and federal laws, given the reality that the SLS project involved significant government contracts, the status of which would be jeopardized should Boeing engage in fraud or other misconduct on this high-profile NASA project.

94.     Leading up to and during the era of the 2014 PIA, Wilson undertook reasonable care to protect its trade secrets, including transmitting confidential information in encrypted form, keeping drawings and other confidential information in a locked safe, restricting access to its shop, insisting on signed proprietary information agreements, marking documents confidential, and installing firewalls in its computers.

95.     Wilson's intellectual property covered by the 2014 PIA includes a variety of copyright-protected design information, including computer software code that generates three-dimensional computer-aided design (CAD) drawings of the FFTD-3 (**ECF No. 1-18 (under seal cover sheet); ECF No. 16 (sealed exhibit)** as well as technical drawings of the FFTD-3 (**ECF No. 1-22**); a detailed written description of accessories and procedures for SLS application (**ECF No. 1-19 (under seal cover sheet); ECF No. 17 (sealed exhibit)** written pricing and cost information (**ECF No. 1-20 (under seal cover sheet); ECF No. 18 (sealed exhibit)**), written material selection (**ECF No. 1-21 (under seal cover sheet); ECF No. 19 (sealed exhibit)**); written description of computer-controlled angle tools, written description of statistical process control data logging; written planetary ratio combinations; and written geartrain selections (**ECF No. 1-22 (under seal cover sheet); ECF No. 20 (sealed exhibit)**).

96.     On or about October 1, 2014, and under the protection of the 2014 PIA, Wilson met with Boeing at the request of Michael Bailey (a member of the SLS – Stages – Engine Section of Boeing's Structural Design and Integration Unit) who was identified in the PIA as the contact person for the project.

97.     Bailey reached out to Wilson by email on March 28, 2014, telling Wilson that the "Human Factors engineers as well as the Manufacturing engineers" at Boeing had "shown

interest in the self-reacting torque tool" (the FFTD-3) and wanted to discuss this solution with Wilson. **ECF No. 1-23 (under seal cover sheet); ECF No. 21 (sealed exhibit)**.

98.     Wilson followed up in June 2014 by email to Boeing's William Raby, who responded on June 19, 2014, by email and said: "Yes – we still need this tooling." **ECF No. 1-24 (under seal cover sheet); ECF No. 22 (sealed exhibit)**.

99.     In his communications to Wilson, Boeing employee Terry McGee requested in-person demonstrations of the FFTD-3 along with a detailed description of Wilson's technology. **ECF No. 1-25 (under seal cover sheet); ECF No. 23 (sealed exhibit)**.

100.     Continuing its tradition of assisting Boeing, Wilson agreed to Mr. McGee's request and ultimately provided a live demonstration to 21 individuals identified as Boeing personnel on or around October 2014 (the "live presentation") and thereafter attended several meetings with the alleged Boeing employees in Boeing's facilities located in Huntsville, Alabama. **ECF No. 1-26 (under seal cover sheet); ECF No. 24 (sealed exhibit)**.

101.     During the live presentation, Wilson allowed the individuals present who were held out to Wilson as Boeing personnel, to handle and operate the FFTD-3, demonstrating and describing in depth the tool's full capabilities and cutting-edge functionality—all confidential and proprietary information that Wilson would never have shared outside the umbrella of the 2014 PIA.

102.     Although Boeing and the individuals present at the live presentation did not reveal it at the time, Wilson later learned that at least seven of those in attendance for the live presentation were external to Boeing and were, at the time, employees of Wilson's direct competitors (the "Bogus Boeing Employees"). This fact was concealed from Wilson who was deceived by Boeing and the Bogus Boeing Employees into giving the presentation by falsely

24

suggesting to Wilson that everyone was a Boeing employee and therefore subject to the 2014 PIA.

103.    Upon information and belief, those external to Boeing and in direct competition with Wilson included David Grant, Charles Krampert, Dennis Lascola, James Murray, Paul Protos, Jason Allen, and John Salisbury (hereinafter "Bogus Boeing Employees"). At the time of this presentation, these individuals were employed as follows:

- David Grant was a Senior Engineer at Geocent, a company that provides information technology and aerospace engineering services.
- Charles Krampert was a Design Engineer for Kord Technologies, which markets itself as providing engineering and business services in support of NASA's SLS Program by having its team of engineers and analysts deliver product design, analysis, manufacturing, and tooling expertise to Boeing in support of the SLS Core Stage.
- Dennis Lascola was employed by United Launch Alliance, which is a spacecraft launch service provider.
- James Murray was a Tool Integration Project Manager for GeoLogics Corporation, which provides specialized R&D and engineering services and technical contributions supporting the aerospace defense industry.
- Paul Protos was employed by Kord Technologies (described, *supra*).
- Jason Allen was a Mechanical Engineering Associate at RS&H, which provides engineering and architectural services to the defense and transportation industry, including aerospace.
- John Salisbury was a Senior Systems Engineer at Jacobs ESTS Group, which provides technical leadership and support to NASA's Space Launch System Program.

104.    Unbeknownst to Wilson, the Bogus Boeing Employees' employers were Wilson's direct competitors and were never explicitly identified to Wilson as being external to Boeing.

105.    On the heels of the live presentation, Boeing's Steven Rice followed up by email to Wilson on October 8, 2014, copying all or most of the attendees and maybe others (all with Boeing email addresses), stating: "Thank you for the tool demonstration. Very well done." **ECF No. 1-16 (under seal cover sheet); ECF No. 14 (sealed exhibit).**

106.     Mr. Rice further stated in his October 8th email that Wilson's FFTD-3 tool would "solve several of the problems" Boeing was encountering on the SLS engine installation. He went on to request an extensive amount of sensitive information from Wilson, including 3D data "for all the tools you showed in the presentation today." He even requested specific file types that Wilson should use to send this confidential information to Boeing.  **ECF No. 1-16 (under seal cover sheet); ECF No. 14 (sealed exhibit).**

107.     The Bogus Boeing Employees were carbon copied on the October 8th, email from Mr. Rice, and each of these employees had a Boeing email address. **ECF No. 1-16 (under seal cover sheet); ECF No. 14 (sealed exhibit).**

108.     At no point did Mr. Rice, or anyone from Boeing, reveal that anyone copied in the October 8th email chain was not actually a Boeing employee.

109.     Nor did Mr. Rice, or anyone from Boeing, ever claim that Boeing was working on its own or with any other company to independently "solve" the problems Boeing was facing on the engine installation and that it had requested Wilson provide a solution for.

110.     Had Boeing truthfully disclosed that it was actually having Wilson demonstrate and reveal its most sensitive commercial data so that Wilson's own competitors could take its intellectual property and build products for Boeing at a fraction of the price (because they could skip all the research and design costs and not have to spend the same time or money developing the product or the intellectual property), Wilson never would have engaged in this demonstration or in the SLS project with Boeing.

111.     On or about October 22, 2014, in response to Boeing's request from Mr. Rice (**ECF No. 1-16**), Wilson provided Boeing detailed models and specifications of the FFTD-3 in an encrypted CAD software package covered and protected pursuant to the provisions contained

in the 2014 PIA. **ECF No. 1-18 pg. 6**

112.    The encrypted CAD software package Wilson provided Boeing was marked as "Confidential Trade Secret" information. **ECF No. 1-27 (under seal cover sheet); ECF No. 25 (sealed exhibit)**. Wilson also presented an extensive description of 105 of its proprietary accessories for use with the FFTD-3 to access specific locations on the SLS rocket. **ECF No. 1-19 (under seal cover sheet); ECF No. 17 (sealed exhibit).**

113.    At Boeing's request, Wilson also provided its FFTD-3 cost, pricing, and engineering information. **ECF No. 1-33**.

114.    Wilson shared all of the aforementioned proprietary information under the 2014 PIA.

115.    Once Boeing had Wilson's proprietary information in hand and had received an in-person demonstration and explanation of the FFTD-3's features, including the computer source code and CAD models, Boeing was able to replicate what it believed to be the full FFTD-3 tool. The cost to do so was far less than it would have cost had Boeing purchased this from Wilson, because Boeing and its confederates incurred no costs or expenses in designing and creating the FFTD-3.

116.    In doing so, Boeing acted without authorization and covertly misappropriated and infringed Wilson's intellectual property, including its trade secrets and its copyrighted material.

117.    Boeing was facing a critical design review ("CDR") with NASA in 2015 regarding the SLS project. If Boeing didn't pass the CDR, it could not proceed on the SLS project.

118.    In fact, well over half, and potentially as much as 70%, of Boeing's revenue on the SLS project amounting to billions of dollars, was paid after the 2015 CDR.

119.    With the unauthorized use of Wilson's intellectual property, and in violation of

the PIA, Boeing created documents and materials for distribution to NASA without Wilson's knowledge or permission, and Boeing failed to mark Wilson's intellectual property or models as proprietary and confidential.

120.    In mid-2015, Boeing submitted and delivered presentations to NASA that integrated the FFTD-3 into the design model for the SLS project without marking derivative documents as proprietary and confidential. Boeing presented this model to NASA to pass the 2015 CDR, which included NASA's "Human Factor" standards and evaluated the tool's ability to prevent human-caused damage to the equipment and the SLS mission. **ECF No. 1-28**.

121.    In the 2015 CDR presentation to NASA (**ECF No. 1-29 (under seal cover sheet); ECF No. 26 (sealed exhibit)**, Boeing did acknowledge that the solution to the rocket installation relied on Wilson, and it stated on a slide entitled "Purpose" that Wilson's tool contained a "unique feature" that would allow the engines to be installed precisely and safely in the tight, narrow spaces on the bottom of the SLS rocket:

> The purpose of this evaluation is to determine if the existing *Wilson Aerospace Torque tools* are sufficient to cover the wide variety of tubing applications present *during SLS assembly, installation, and R&R procedures*. The *unique feature of these tools is that they combine a torque wrench with a backup wrench in one tool, making it self-reacting*. (ECF No. 26, Design Review Presentation) (sealed exhibit) (emphasis added).

122.    Boeing's submissions to NASA in 2015—which extensively misappropriated and depended entirely on Wilson's intellectual property—were successful, and Boeing was allowed to proceed on the SLS project. **ECF No. 1-30**.

123.    Boeing continued to express interest in working with Wilson throughout 2015-16, even as it misappropriated Wilson's intellectual property.

124.    On August 10, 2015, Bradley Schmidt of Boeing emailed Wilson: "*I wanted to inform you that the project is still active*; I have had preliminary discussion with Boeing Tooling Engineer Ed Baglioni and will be working with him on the procurement." He continued: "I look forward to working with Wilson Aerospace and working this project *to a successful conclusion. Thank you for your support!*". **ECF No. 1-31 (under seal cover sheet); ECF No. 27 (sealed exhibit)** (emphasis added).

125.    These statements were false and misleading and lulled Wilson into continuing to work with Boeing. At the time Mr. Schmidt's email was written, Boeing had already misappropriated Wilson's intellectual property and made the decision not to credit Wilson with solving the SLS engine installation problems.

126.    Indeed, on October 6, 2015, Ed Baglioni of Boeing emailed Timothy Walters and Mark Fischer, asking for help internally within Boeing in obtaining the materials that would be needed to replicate Wilson's FFTD-3: *"We want to build a type of wrench that can torque the B-nuts out of one of the listed materials and want to make sure there is no issue touching flight hardware. See attached presentation for explanation of use in engine section."* **ECF No. 1-32 (under seal cover sheet); ECF No. 28 (sealed document)** (emphasis added).

127.    Boeing never disclosed to Wilson at any point that it was entertaining other options or that it would take Wilson's intellectual property and use another supplier to build the solution it needed for the SLS engines. With the 2014 PIA in place, Wilson reasonably believed that the discussion was strictly between Boeing and Wilson only, especially because the FFTD-3 was proprietary, and Boeing had told Wilson that the solution it was providing was unique.

128.    Wilson was unaware and had no reason to believe that Boeing had secretly been including other companies to help steal Wilson's intellectual property and build a cheaper

solution. Boeing concealed these facts from Wilson as part of its scheme to defraud Wilson and to transmit Wilson's intellectual property to its direct competitors.

129.    As 2015 proceeded, Boeing asked for further financial and cost information from Wilson. On or about October 27, 2015, Boeing's Sophie Floyd requested and received Wilson's sensitive cost and pricing information. **ECF No. 1-33 (under seal cover sheet); ECF No. 29 (sealed document)**

130.    Boeing's Ed Baglioni (the SLS Tooling Project Manager for Boeing) approved Boeing's order of a $3.1 million kit from Wilson (for the entire tooling package for the FFTD-3), and emailed Wilson on Dec. 1, 2015, requesting even more detailed information for Wilson to supply. **ECF No. 1-34 (under seal cover sheet); ECF No. 30 (sealed document)**

131.    Boeing's Sophie Floyd authorized Wilson to proceed with the FFTD-3 order by sending an Authority to Proceed Letter on December 18, 2015. **ECF No. 1-35 (under seal cover sheet); ECF No. 31 (sealed document)**

132.    Abruptly, in February 2016, however, Boeing sent a stop work order to Wilson regarding the FFTD-3. No defensible explanation for this reversal in course was provided by Boeing. **ECF No. 1-36 (under seal cover sheet); ECF No. 32 (sealed document)**

133.    The next month, on March 3, 2016, Mr. Baglioni emailed Wilson and stated: "I was directed to have you address all calls or questions to Sophie Floyd or Greg Emmons" because, he stated, he lacked "Procurement Authority" to bind "the Boeing Company" and "there is no contract in place" for Boeing to purchase the FFTD-3. Mr. Baglioni further stated in this March 3 email that "*even though we have a pressing technical need for this tool*, I do not want to get it any trouble with Boeing." **ECF No. 1-37** (emphasis added).

134.    Boeing then attempted to convince Wilson to sign away the rights to the FFTD-3 and to pay Wilson less money than the parties had agreed upon, which Wilson refused to do. Boeing's Sophie Floyd, continued to push Wilson around and try to get it to release the rights to FFTD-3 to Boeing, but to no avail as Wilson held firm and refused to do so.

135.    Not only did Boeing steal Wilson's intellectual property, but it also directed all future work on the SLS project to Wilson's competitors, who spent no time or resources developing the solution Wilson alone had designed and created. On information and belief, two of the Bogus Boeing Employees, Charles Krampert and Paul Protos of Kord Technologies, received awards for their contributions to installing the SLS tubing system.

136.    In 2015, Charles Krampert of Kord Technologies was honored as a Responsible Engineer for the SLS Engine Section subsystem tubing. **ECF No. 1-38**.

137.    In 2016, Paul Protos of Kord Technologies was named Lead Tool Engineer for the Engine Section Assembly and Integration on the SLS program.  **ECF No 1-39**.

138.    Kord Technologies is a Boeing Silver and Gold Supplier and has been since 2012. **ECF No. 1-40**.

139.    Boeing's theft, misappropriation, and infringement of Wilson's intellectual property was discovered pursuant to an investigation Wilson commenced and confirmed following a telephone call from a Boeing employee, James Tansey, in January 2021.

140.    Wilson learned in its investigation that Mr. Baglioni was credited with an award in 2020 with being the Project Manager for the SLS Project, including the "Self Reacting Torque Tools for B-Nuts." **ECF No. 1-41**.

141.    Wilson also discovered that it is listed by NASA as a small business that contributed to the success of the SLS project, even though Wilson was never paid any money for

its work, Boeing cancelled all work orders and contracts with Wilson for this project, and Boeing denied any connection whatsoever to Wilson, telling Wilson it is not in Boeing's computer system. **ECF No. 1-42**.

**E.  The Theft of the Torque Tester Intellectual Property**

142.    Boeing not only misappropriated and infringed Wilson's intellectual property on the FFTD-3, but it also did the same thing regarding the Torque Tester.

143.    Wilson met Boeing's Ed Baglioni in Huntsville to discuss providing Boeing with a state-of-the-art Torque Tester to minimize the potential for leaking fittings installed, particularly fittings on the SLS project.

144.    Boeing's Sophie Floyd authorized Wilson to proceed to build its Torque Tester by issuing an Authority to Proceed Letter on December 18, 2015. **ECF No. 1-35 (under seal cover sheet); ECF No. 31 (sealed document)**.

145.    The 2014 PIA between Boeing and Wilson was in effect, therefore Wilson proceeded and disclosed proprietary information to Dwight "Chip" Link about the Torque Tester and provided photographic information explaining its use.

146.    Boeing's Don Chippeaux and Timothy Ditch downloaded Wilson's encrypted proprietary material, including information about the Torque Tester. **ECF No. 1-43**.

147.    On information and belief, and in violation of the 2014 PIA, Boeing designed a torque testing device using Wilson's trade secrets, but it had insufficient information to design a state-of-the-art torque tester with the technical capabilities of Wilson's.

148.    To this end, despite authorizing Wilson to proceed, and only after Wilson provided its trade secret information to Boeing, Sophie Floyd abruptly canceled the order with Wilson for the SLS project.

149.    Without justification, Ms. Floyd's superior, Greg Emmons, refused Wilson's request for an explanation for the cancellation.

150.    Sophie Floyd then requested that Wilson send the 90% completed Torque Tester to Boeing. Wilson declined to do so and saw the Torque Tester through to completion at its own expense.

151.    Boeing never paid Wilson for the Torque Tester project or for the revenue it obtained by stealing Wilson's intellectual property.

**F.    Discovering Boeing's Prior Theft and Infringement of Wilson's Intellectual Property**

*1.    The ISS Project: FFTD-1*

152.    In 1997 and 1998 Boeing signed a purchase contract with Wilson to implement Wilson's technology for the purpose of installing fittings inside the ISS.

153.    In entering into the purchase contract, Wilson believed its trade secrets and intellectual property would be protected by the PIAs and respected by Boeing.

154.    Wilson designed the FFTD-1 to meet the fitting manufacturer's pre-approved and exacting specifications supplied by Boeing and agreed with by NASA.

155.    One of NASA's exacting specifications was a tightening limitation of no more than 69 ft/lbs. of torque for its largest Gamah fitting and Wilson relied on representation that tool would be used to tighten fittings not more than 69 ft/lb.

156.    Through the use of its own technology, Wilson created a product that met NASA's exact specifications; for example, the FFTD-1 could deliver 69 ft/lbs. of output torque for the largest fitting with an input of approximately 4 ft/lbs. of torque.

157.    The FFTD-1's designed torque ratio is critically important on the ISS's cramped and weightless environment because it: (1) minimizes the effort required by astronauts who are

the tool's ultimate end users; and (2) reduces stress placed on fittings, valves, and associated tubing and equipment.

158.     Although the FFTD-1's primary use is on the ISS, it has many other potential applications throughout the space, military, and other commercial industries.

159.     After Boeing supplied NASA's specifications to Wilson, Boeing approved a non-conforming design and manufacturing change without Wilson's knowledge and, on information and belief, without NASA's knowledge. This undisclosed change required the FFTD-1 to be forced to provide an output torque of 210 ft/lbs. on the largest fitting.

160.     Counterfeit tools using Wilson's design were produced and according to Boeing's Chip Link the tool was onboard the final flight of the Columbia shuttle.

161.     As a further consequence of this non-conforming design and manufacturing change, the FFTD-1 would thus be used to tighten fittings on the ISS to levels several times beyond its designed limits, creating the potential for leaks of dangerous fluids or threatening an astronaut's ability to maintain the fittings. **ECF No. 1-44 (under seal cover sheet); ECF No. 33 (sealed document)**.

162.     Frequent fitting leaks had occurred on the ISS and leaks were similarly reported on Columbia's final flight with the SPACEHAB onboard.

163.     Frequent use of the FFTD-1 in a manner that is non-conforming with its original design also resulted in an occurrence known as a "trapped fitting" on the ISS, which occurs when the nut on one end of the fitting becomes distorted to the point it becomes stuck and cannot be disengaged.

164.    A trapped fitting prevents the FFTD-1 from functioning properly and affects the installation, adjustment, and maintenance of a fitting, and creates a dangerous condition if the stuck FFTD-1 interferes with access to important equipment in its vicinity.

165.    A trapped fitting incident occurred during the November 18, 2015, installation of an Airlock Installation Kit on the ISS, and the stuck FFTD-1 was abandoned in place. **ECF No. 1-45 (under seal cover sheet); ECF No. 34 (sealed document).**

166.    A Boeing manager blamed Wilson for the November 18, 2015, trapped fitting incident in a lecture given to a professional group of aerospace engineers at the 2016 International Conference of Environmental Systems in Vienna. Materials for this presentation also placed blame on Wilson for the trapped fitting incident, and these materials were disseminated to those in attendance at the Conference. The written report is still publicly available online through the Texas Tech University's library website. These oral and written statements damaged and have continued to damage Wilson's business reputation and goodwill.[23]

167.    Instead of notifying Wilson what actually caused the trapped fittings, Boeing remained silent for years while its employees publicly made false and disparaging statements in many public forums by placing blame on a design flaw in the FFTD-1 which was attributed to Wilson when in fact the cause was Boeing's falsified calibration instructions to the astronauts which resulted in over-torquing the fittings.

---

[23] Wilson did not attend this conference and was unaware of Boeing's comments until much later when Wilson commenced its investigation of Boeing. **ECF No. 1-46**.

168.    NASA representative Michelle Fitzgerald, in reliance on Boeing's condemnation of Wilson's design, republished Boeing's false statements and attributed the trapped fittings to Wilson. **ECF No. 1-47**.

169.    Over time, the trapped fittings problem became well known within the space industry, as demonstrated by a 2008 communication to the ISS where NASA referred to the FFTD-1 as the "dreaded FFTD." **ECF No. 1-48**.

170.    In an effort to defend and restore its reputation, and in reliance on Boeing's misrepresentations, Wilson spent considerable amounts of time and resources investigating and modifying the FFTD-1 under the mistaken belief that its original design caused the trapped fittings.

171.    While Wilson investigated the cause of the FFTD-1's purported design problem, Boeing deliberately failed to reveal that the true cause was Boeing's unilateral and secret change in fitting torque requirements and refused to provide Wilson with information that would have enabled Wilson to determine its cause.

172.    As Wilson's investigation continued to uncover potential explanations for the trapped fittings, Wilson drafted and sent four written warnings to Boeing's head management for the ISS project in Huntsville, Alabama. **ECF No. 1-49 (under seal cover sheet); ECF No. 35 (sealed exhibit)**. After Wilson's participation in a Boeing proposed meeting regarding safety was cancelled, and management ignored its written warnings, Wilson contacted Boeing's supplier quality inspector, Mitchell Frye, in September 2020 and provided him with the warnings. **ECF No. 1-50; ECF No. 1-51**.

173.    After their last warning, Mitchell Frye, Boeing's supplier quality inspector, told Wilson that he was investigating Boeing's traceability paperwork issues, and he requested

Wilson's help. **ECF No. 1-52 (under seal cover sheet); ECF No. 36 (sealed document)**. In addition, Mitchell Frye attempted to arrange a meeting between Wilson and the manufacturers of the fittings, following which attempts he told Wilson that "Boeing's legal shut him down", which ultimately prevented Wilson from interviewing key personnel that could shed light on critical safety concerns.

174.    Boeing never replied to Wilson's warnings and Wilson is unaware of which Boeing employees were made aware of the warnings or whether the warnings were communicated to NASA.

175.    For years, Wilson requested information regarding the procedure used by Boeing to calibrate the torque on fittings (the "procedure"), which requests were repeatedly denied by Boeing employee, Chip Link.

176.    Unbeknownst to Mr. Link, the information regarding the procedure was provided by Boeing's Craig Parsons in September 2019. With such information, Wilson finally began to understand that the trapped fittings were caused by Boeing's undisclosed design change and not by the FFTD-1 design.

177.    In 2020, third-party testing replicating Boeing's procedures with National Institute of Standards traceable equipment confirmed that Boeing's tightening procedure forced the FFTD-1 to provide over four times[24] the torque specified by the fitting manufacturer.

---

[24] For one of the examples provided.

178.    In January 2021, Wilson obtained a copy of the "Calibration Card" kept aboard the ISS, which falsely represented to astronauts and ground crew that the output/input ratio of the FFTD® was 7:1 rather than the designed ratio of 20:1.

179.    For many years, Wilson had requested a photograph of the trapped tool which requests were repeatedly denied by Boeing's Chip Link. Unbeknownst to Mr. Link, the photograph was ultimately provided to Wilson by Boeing's Brandon Dick in July 2020. **ECF No. 1-45 (under seal cover sheet); ECF No. 34 (sealed document)**.

180.    While the counterfeit tool was inferior in quality to Wilson's tool, it was not the inferiority of the tool but rather the over-torqued fitting resulting from Boeing's false calibration that caused it to be trapped.

181.    Not only was the problem with its trapped fittings falsely attributed to Wilson's FFTD-1 tool, but Wilson further discovered in January of 2021 that the trapped tool was a counterfeit tool built by a competitor of Wilson's that bore Wilson's part number and trademark. **ECF No. 1-37 (under seal cover sheet); ECF No. 37 (sealed document)**.

182.    After discovering Boeing's fraud, deception, coverups, trademark infringement, and misrepresentations to NASA, Wilson began an investigation into all of the prior projects for which Wilson was engaged by Boeing ("Wilson Investigation").

### 2.    *The ISS Project:  FFTD-2*

183.    Having received the benefit of the FFTD-1, in 2005 Boeing re-engaged Wilson to design and create a tool to connect and disconnect a critical piece of life support equipment aboard the ISS known as the oxygen concentrator system.

184.    Pursuant to Boeing's request, Wilson invented the FFTD-2 tools which enabled NASA astronauts to assemble and disassemble a Gamah fitting on the oxygen concentrator

system on the exterior of the ISS. **ECF No. 1-54 (under seal cover sheet); ECF No. 38 (sealed document)**.

185.    After designing the FFTD-2, Wilson provided the tool sets and its designs to Boeing.

186.    After receiving Wilson's FFTD-2 designs, Boeing falsified the drawings by wrongfully substituting its name in place of Wilson's as the FFTD®'s inventor and design engineer; Subsequently, Boeing submitted the falsely represented drawings to NASA. **ECF No. 1-55 (under seal cover sheet); ECF No. 39 (sealed document)**.

187.    In the paperwork submitted to NASA, Boeing falsely claimed it designed and manufactured the FFTD-2 when in fact Wilson was the true designer and manufacturer.

188.    Boeing removed Wilson's logo that appeared on the actual FFTD-2 Wilson-created designs and ultimately sold the FFTD-2 to NASA without crediting Wilson.  **ECF No. 1-56 (under seal cover sheet); ECF No. 40 (sealed document)**.

189.    Boeing's trademark infringement was discovered in 2021 pursuant to the Wilson Investigation.

190.    Upon completion of Wilson's design and building the FFTD-2, Boeing's James Tansey delivered six bankers boxes containing large professionally folded blueprints of Wilson's FFTD-2 designs and requested that Wilson store the boxes in a secure location for use in case of a Defense Contract Management Agency (DCMA) audit, which never occurred. The boxes were never opened until the Wilson Investigation whereafter it was discovered that the Wilson name as designer and manufacturer was erased from the drawings and Boeing's name was substituted in its place. Further investigation revealed that Boeing's Larry Gamblin was credited for the

engineering while Chip Link and Larry Gamblin were given NASA awards for the tool. **ECF No. 1-57**.

### 3.      The Second Generation FFTD-1 Counterfeits

191.      Oakridge Tool & Engineering built at least five FFTDs using Wilson's design as well as Wilson's trademark.

192.      Oakridge Tools Serial numbers ("S/N:") S/N:004 and S/N:005 were damaged and, in 2018, Boeing asked Wilson to diagnose the problem. A prior email that accompanied the request was copied to Boeing personnel working in Boeing's Commercial Aircraft and SLS Divisions, suggesting that the Tools may have been used by those divisions. **Ex. A (Haddad); Ex. B (Other Uses for FFTD); Ex. C (Profiles); Ex. D (SLS Reference); ECF No. 1-42; ECF No. 1-52 (under seal cover sheet); ECF No. 36 (sealed exhibit).**

193.      Wilson reported that it appeared that the tools were overstressed, and they were improperly assembled and were defectively manufactured. **Ex. E (Tribute Report)**. Boeing blamed the problem on Wilson's design, even though the problem was in fact Boeing's false calibration procedure.

194.      In the process of diagnosing the broken S/N:004 and S/N:005 tools that were produced by Oakridge, Wilson noticed that its trademark was on Boeing's purchase contract, Oakridge's Certificate of Conformance, and the fraudulent Acceptance Data Package ("ADP"). The ADP contained Wilson's drawings which were distributed to numerous third parties. Moreover, only one ADP was used for the two serialized tools.

195.      Wilson's trademark suffered negative publicity, (Dreaded FFTD, Balky Tool, Abandoned Tool). Wilson notified Boeing and marked the tools as scrap before returning them to Boeing, in order to prevent any future use of the counterfeit tools. **Ex. F (Marked as Scrap).**

196.     In 2019 Boeing requested Wilson to build an FFTD. Wilson agreed to do so at a loss and under duress because it was falsely accused by Boeing of designing a defective product. The FFTD-1 Second Generation S/N:008 when delivered to Boeing had Wilson's trademark on the shipping documents, packaging, and the containers. **Ex. G (FFTD Photos).**

197.     Boeing overstressed the S/N:008 during testing and returned the damaged tool to Wilson, again accusing Wilson of faulty design. Wilson reported to Boeing that the breakage was likely due to overstress caused by Boeing's false calibration, which prompted Wilson's first safety warning to Boeing.

198.     When the damaged S/N:008 was returned to Wilson in 2019, the shipping documents falsely indicated that Oakridge was the manufacturer and also indicated Oakridge's pricing rather than Wilson's pricing. **Ex. H (DD1149 Shipper Doc).**

199.     Against Wilson's advice, Boeing demanded that the S/N:008 be repaired rather than replaced.  The repaired tool bore serial number 009 ("S/N: 009"). Boeing's order of S/N: 009 did not include a requirement that an Acceptance Data Package ("ADP") accompany delivery of the SN:009 Tool, presumably because Boeing designated it a repair. **Ex. I (Purchase Contract).**

200.     Boeing's records indicate that when S/N:009 was delivered to NASA it was represented to be a new tool when in fact, it was an old tool that was repaired. **Ex. J (RIP Email).** This misidentification meets the definition of a counterfeit according to FAR (Federal Acquisition Regulation) definition 52.246-26 as well as in Boeing's own contract for SN:009.

201.     Since a new tool must be accompanied by an ADP, and since Wilson did not provide an ADP for S/N: 009, the paperwork that Boeing supplied with the tool must be counterfeit. The ADP is of particular importance because only five percent of the parts from S/N:

008 were used in the "repair". Ninety-five percent of the parts were new. This fraudulent ADP, which was not prepared by Wilson, resulted in the complete loss of traceability that is critical to parts used in space, military, and commercial vehicles for safe operation of the vehicles and the safety of people onboard. **Ex. K (Loss of Trace).**

202.    Boeing undertook additional acts to hide Wilson's involvement in design and building the S/N: 009 tool and the price that it charged Boeing, therefore. The purchase contract has the wrong part number. The statement that accompanied the check for the S/N: 009 had an incorrect supplier invoice number, no part number, and the purchase order amount indicated zero dollars. **Ex. I (Purchase Contract).**

203.    The acts of counterfeit and trademark infringement perpetrated by Boeing and Oakridge were designed to hide Wilson's involvement in tool design and manufacture from NASA, thus interfering with Wilson's perspective advantage vis-à-vis future NASA work.

204.    Boeing represented that the S/N:009 would only be used on the ISS project. Boeing was advised by Wilson that the S/N:009 was not fit for use on the SLS project because it was not designed for the higher torque values required by the SLS project. On information and belief, the S/N:009 was used on the SLS project.

### 4.    *The Dreamliner Bolting Tool*

205.    In September 2012, Boeing requested that Wilson design tools to install bolts on the 787 Dreamliner during assembly of carbon fiber wing components. The tools Boeing was using at that time were self-destructing due to the high torque required to install the bolts ("Defective Tools").

206.    Wilson's founder, Dr. Wilson, met with Boeing engineers in Seattle on September 20, 2012, to discuss the problem Boeing was experiencing with the Defective Tools **ECF No. 1-**

**58**. After the meeting, Boeing supplied Wilson with Defective Tool and bolt samples **ECF No. 1-59**.

207.    Notwithstanding Wilson's extensive history supplying products to Boeing commercial before the year 2003, on October 25, 2012, Ray Kroll of Boeing told Dr. Wilson that Wilson was not listed in Boeing's vendor system at the time, but further explained that Casey Hanson, a Boeing buyer, would fast-track Wilson back into the system.  **ECF No. 1-60**.

208.    Dr. Wilson advised Boeing they would require robust clutch feature integrated into the tool to prevent the tool's self-destruction and consequential damage to the airplane components. Kroll told Dr. Wilson that Boeing would eventually need two hundred such tools, and that the development and production of these needed to be quickly implemented because Boeing had a critical need for them.

209.    Incentivized by the quantity and urgency of Boeing's need, Wilson began designing the new tools.

210.    By December 2012, Wilson designed and engineered a dual offset inline planetary torque multiplier ("PTM") and explained Wilson's approach and function to Kroll. A notable benefit of the PTM was its broad application to many aircraft beyond the 787 Dreamliner.

211.    In connection with a January 2, 2013, telephone conference, Kroll requested more information about Wilson's proprietary information. Engineering sketches used by Dr. Wilson during the call show the internal concepts that were explained by Dr. Wilson to Kroll. **ECF No. 1-61 (under seal cover sheet); ECF No. 41 (sealed document)**.

212.    On January 12, 2013, Wilson provided its analysis, explanation, and proposal to Kroll demonstrating two torque tool concepts. **ECF No. 1-62 (under seal cover sheet); ECF No. 42 (sealed document)**.

213.    After the foregoing information was provided to Kroll, Boeing abruptly cut off communications with Wilson, notwithstanding Wilson's repeated attempts to contact Kroll thereafter.

214.    On June 18, 2013, Kroll advised Wilson by email that the type of fastener (bolt) for which Wilson's tool (the "gearbox") was designed would not be used in the future. **ECF No. 1-63 (under seal cover sheet); ECF No. 43 (sealed document)**. This statement was false. **ECF No. 1-64**.

215.    In August 2013, Kroll's officemate and Boeing employee, Fernando Hernandez requested additional proprietary information from Wilson, which Wilson supplied by telephone. Hernandez took photographs of tools during Wilson's visit to the 787 plant in Seattle. Hernandez, without explanation, stopped communicating with Wilson after the information was supplied.

216.    By November 2014, Boeing's Kroll, Carlson, Hernandez, and Brodhead received Technical Replication Awards. According to Hernandez's LinkedIn profile, the award was for replication of gearboxes across multiple airplane programs. **ECF No. 1-65**.

217.    In July 2020, one of Kroll's team members, James Brodhead, filed for a US Patent on an "Offset Torque Multiplier" which features PTM components that are protected by the 2012 PIA.  The other co-inventor listed on this patent is Dorin Nectarie Salcescu who is an engineer at RAD Torque Systems in Canada, a direct competitor of Wilson.  **ECF No. 1-66**.

218.    According to RAD Torque System's website, it provided all of the bolting tools for the 787 Dreamliner program, and also shares a joint patent with Boeing. Patent number US 11,105,398 B1 from Broadhead (Boeing) and Salcescu (RAD) is based on the offset torque tool technology and geartrain systems provided by Wilson in 2012/2013. **ECF No. 1-67**.

219.    Boeing's commercial aircraft division stole Wilson's intellectual property that was protected by a longstanding PIA Wilson entered into with Boeing on October 29, 2012.  In doing so, it followed a pattern similar to that followed by Boeing's ISS and SLS divisions whereby it sought and obtained Wilson's proprietary information holding out the promise of lucrative future work, then used such information and claimed ownership of Wilson's intellectual property after advising Wilson that it would not get the future work and after eliminating Wilson from Boeing's internal records to cover up the theft.

### 5.    *The Capture Latch*

220.    At Boeing's request in 2013, Wilson designed a soft capture latch for the nose of space vehicles which would allow them to connect to the ISS. **ECF No. 1-68**.

221.    Boeing requested that Wilson provide a video to demonstrate how the capture latch would work. On information and belief, this video and other information provided by Wilson was used by Boeing to demonstrate proof of concept to NASA without attribution to Wilson.

222.    Using some of Wilson's design, Boeing built an inferior capture latch for use on space vehicles which connect to the ISS. While Wilson's design had dual redundancy which permitted its capture latch to operate in the event of a motor failure, a feature that Boeing claimed was a critical safety function, Boeing's capture latch had no such redundancy. Boeing's capture latch used switches of quality inferior to those used in Wilson's design thereby increasing the risk of malfunction.  On information and belief, Boeing did not disclose to NASA that the capture latch NASA approved was the Wilson capture latch and not Boeing's inferior capture latch design.

223.    Boeing has been unjustly enriched by passing its inferior capture latch off to NASA and other space vehicle manufacturers as the one approved by NASA.

224.    On information and belief, Boeing has licensed an inferior capture latch design to other space vehicle companies whose vehicles attach themselves to the ISS.

### 6.    *The Switch Tester and Spring Compressor*

225.    While diligently working on the Capture Latch project for Boeing, Wilson demonstrated and showed Boeing two testing apparatus it created known as the Switch Tester and the Spring Compressor.

226.    As Wilson demonstrated to Boeing, the benefit of the Switch Tester was its capability of synchronizing the timing of limit switches on the Capture Latch in a way that is similar to the timing on an automobile engine. The Switch Tester was important because it would be used to ensure the safe operation of the Capture Latch on all space vehicles docking with the ISS.

227.    Following the demonstration, Wilson provided a physical prototype of the Switch Tester to Boeing, at Boeing's request.

228.    On or about the time of the Switch Tester demonstration, Wilson also demonstrated the Spring Compressor for the Capture Latch project to Boeing and provided Boeing with photographs of the product.

229.    In 2021, Boeing contacted Wilson with the request to purchase a Switch Tester and further advised the item was urgently needed. Wilson declined Boeing's request after conducting the Wilson Investigation and learning the scope of Boeing's rampant theft of Wilson's intellectual property. **ECF No. 1-69**.

230. After Wilson provided the live demonstration of the Spring Compressor to Boeing, several Boeing employees expressed significant interest in the product.

231. On information and belief, Boeing built a Switch Tester and Spring Compressor based on Wilson's designs.

### 7.    The Gearbox

232. Boeing contacted the Wilsons to manufacture a Gearbox for opening and closing the nose cone of CST-100 Starliner.

233. Boeing's specifications provided that the traceability identification on the Gearbox, which identifies Wilson as the manufacturer, be stamped using erasable ink as opposed to permanent epoxy marking.

234. Wilson manufactured the Gearbox strictly adhering to Boeing's specifications.

235. On information and belief, Wilson's name as manufacturer of the Gearbox was erased by Boeing and another name was substituted in Wilson's place.

## G.    Boeing Conceals its Misconduct and Attempts to Erase Evidence of and Expunge Records Showing Connections to Wilson

236. Boeing's culture of concealment extended throughout its ISS, SLS, and commercial aircraft divisions.

237. In the early 2000s, following the investigation of the Columbia crash that killed seven astronauts, Boeing devised a scheme to blame leaks on the ISS and on Columbia's final flight on Wilson by defaming Wilson and hiding its future work on NASA projects so as use Wilson as a scapegoat for Boeing's fraudulent testing procedure and false calibration instructions should they be discovered by NASA.

238. Hiding Wilson's work on NASA projects had the added illicit advantage to Boeing of eliminating the modest prices Wilson charged Boeing, enabling Boeing to charge excessively high prices to NASA without record of Boeing's costs.

239. Instead of using Wilson to manufacture the FFTD-1, Boeing gave Wilson's designs to Oakridge Tool & Engineering to build. Oakridge built at least five FFTD-1 type tools but Boeing falsified the paperwork to show that Wilson was the manufacturer of the counterfeit tools that bore Wilson's trademark and part number. **ECF No. 1-70 (under seal cover sheet); ECF No. 44 (sealed document)**. Since the tools were failing due to Boeing's fraudulent calibration procedure provided to the astronauts and ground crew as to how to tighten the fittings, Boeing shifted its blame for the poor performance to Wilson to discredit Wilson with NASA.

240. By expunging its records of Wilson's contribution to the FFTD-2, Capture Latch, Gearbox, and eventually the ISS project, Boeing was able to secure such projects from NASA by stealing Wilson's intellectual property while continuing to hold Wilson in low esteem with NASA in order to hide Boeing's torque miscalibration fraud and resulting fitting leaks on the ISS and the final Columbia flight.

241. Boeing falsely represented the FFTD-1 torque ratios to NASA and astronauts and covered up its misrepresentations by disparaging Wilson and its FFTD-1.

242. After successfully completing the FFTD-2 project, Boeing instructed Wilson to send the prototypes to a FedEx office in Huntsville, presumably to avoid a record of Wilson's involvement in the project. **ECF No. 1-71**.

243. When Boeing made its presentation to NASA in order to sell the FFTD-2, it showed several of Wilson's tools and took credit for the tools without identifying them as Wilson tools. **ECF No. 1-72 (under seal cover sheet); ECF No. 45 (sealed document)**. In a later report

to NASA regarding the FFTD-2, Boeing credited several companies for their contributions without so much as mentioning Wilson. **ECF No. 1-54 (under seal cover sheet); ECF No. 38 (sealed document).**

244.     In 2014, and at Boeing's request, Wilson provided a prototype of a capture latch for the ISS that enabled a soft capture of space vehicles to the ISS.   Wilson manufactured a capture latch for Boeing. Wilson invoiced Boeing $250,000 for a Wilson prototype unit and $342,725 for the manufacturing of a subsequent unit.   Both invoices were paid by Boeing. Boeing's internal paperwork reflected that Boeing purchased 250,000 units for one dollar each (the prototype) and 34,272,565 units for one cent each (the subsequent unit). On information and belief, Boeing used nominal pricing to avoid a record of Wilson's contribution to this project. **ECF No. 1-73 (under seal cover sheet); ECF No. 46 (sealed document)**.

245.     Boeing instructed Wilson to stamp its manufacturer identification information on the gearbox assemblies using erasable ink as opposed to using epoxy ink which is nearly impossible to erase. This allowed Wilson's name as manufacturer to be erased, to eliminate a record of Wilson's contribution to the project. **ECF No. 1-74 (under seal cover sheet); ECF No. 47 (sealed document)**.

246.     The capture latch project was managed at Boeing's secure building on the highly guarded Redstone Arsenal.  Dr. Wilson and his son (a Wilson engineer) were issued carefully controlled biometrically authorized security badges to access Boeing's facility. When the project was completed, Wilson was instructed by a Boeing agent, Mike Phillips, to return parts and carefully controlled security badges to his home address, in an apparent effort to hide Wilson's involvement on the project. **ECF No. 1-75**.

247.    Wilson designed and built proprietary support tools to be used with its capture latch at Boeing's instruction, Wilson was instructed by Boeing to sell the products to an intermediary, Cornerstone Supply, presumably to avoid making a record of Boeing's engagement of Wilson for the capture latch project. **ECF No 1-76**.

248.    In 2018, and at Boeing's request, Wilson manufactured a Gearbox and delivered it to Boeing at the Redstone Arsenal.  Boeing employee, Suzanne Young, guided Dr. Wilson and his wife and son in and out of the Arsenal bypassing security, apparently for the purpose of covering up Wilson's involvement in the project.

249.    When Wilson attempted to bid on the SLS project, even after providing at Boeing's request pricing information, Wilson was repeatedly told by Sophie Floyd and Greg Emmons that Boeing had no record of Wilson's involvement in Boeing's projects.  **ECF No. 1-77 (under seal cover sheet); ECF No. 48 (sealed document)**.

250.    Boeing's refusal to allow Wilson to bid on the SLS project occurred shortly after Wilson repeatedly refused to sign over its intellectual property rights to Boeing for the FFTD-3 and related tools.

251.    At Boeing's request, Caroline Wilson, Dr. Wilson's wife, sent detailed pricing information about the FFTD® to Boeing. Months later, Boeing's Sophie Floyd called Wilson in an attempt to have Wilson delete all electronic records of having sent such pricing information to Boeing from Wilson's computer. Wilson twice refused Ms. Floyd's request.

252.    Wilson later discovered that Boeing's internal records listed several people working for Wilson competitors as employees of Wilson with authority to make unauthorized management decisions for Wilson ("Ghost Employees").  **ECF No. 1-78 (under seal cover sheet); ECF No. 49 (sealed document).**

253.   The Ghost Employees were Lori Marks of Westwind, and Bruce Haskins of Richardson RFPD.  Both companies were recipients of Boeing's Silver Supplier Award.

254.   These Ghost Employees were used by Boeing to support Boeing's efforts to block Wilson's attempts to provide its superior products for the SLS project at a low cost.

255.   In 2017 and 2018, emails to Wilson from Boeing's Jay Edwards and Samuel Braun, reference was made to a fictitious Wilson-Boeing contract number that had never been signed or agreed to by Wilson. **ECF No. 1-79 (under seal cover sheet); ECF No. 50 (sealed document).**

256.   Wilson has identified 77 instances where Boeing's internal paperwork has subtly changed a digit or letter in product descriptions, part numbers, or supplier numbers in order to hide Wilson from NASA or auditors seeking traceability or information about prices charged to Boeing by its suppliers.

257.   In August 2019, Boeing's Mitchell Frye was so impressed with the quality of Wilson's products that he attempted to get Wilson qualified to work on the Air Force One project. Wilson never received any response to its attempts to contact the managers of such project, presumably because Wilson's record of having supplied high quality tools and parts to Boeing had been expunged from Boeing's records.

**H.    Boeing Licenses Third Parties**

258.   Beginning in 2014, Boeing published its business model for licensing its intellectual property. **ECF No. 1-80**.

259.   In 2018 Boeing acquired a tool company which uses, licenses, rents, or sells tools which, on information and belief, include Wilson's trade secrets **ECF No. 1-81**.

260.    On information and belief, Wilson's trade secrets are used in Boeing joint ventures such as the Airbus joint venture for maintenance on Chinook helicopters, Textron joint ventures for the V-22 Osprey program and, Lockheed Martin United Launch Alliance, Northrop Grumman SLS project, and Raytheon's project for the Saudi Air Force.

261.    On information and belief, Boeing has licensed Wilson's trade secrets to companies represented by the Bogus Boeing Employees and the Ghost Employees including Jacobs Engineering, United Launch Alliance, KBR (Kord), RS&H, Geocent, and Geologics.

## IV. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT

262.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

263.    Wilson is the author and sole legal owner of the exclusive copyrights in the computer source code associated with the FFTD-3 models ("FFTD-3 Source Code") and all derivative works relating thereto.

264.    The FFTD-3 Source Code and Technical Drawings were created and fixed in a tangible medium by Wilson in 2014, by virtue of their storage in computer memory.

265.    Wilson registered the FFTD-3 Source Code, as evidenced by U.S. Copyright Registration Nos. TXu 2-392-315 (the "'315 Work"), and TXu 2-443-952 (the "'952 Work") (collectively, the "Protected Source Code Works"), and the FFTD-3 Technical Drawings as evidenced by U.S. Copyright Registration No. VAu 1-532-967 (the "'967 Work") (the "Protected Technical Drawings Works").

266.    In 2014, Wilson created detailed models and specifications of the FFTD-3 and associated components in an encrypted CAD software package and technical drawings. Wilson

invested significant time, labor, and resources (technical, intellectual, and material) to design, compile, and present the CAD drawings and associated specifications in a particular format, generated by computer source code to yield this specific result as well as to prepare and present technical drawings. Therefore, the FFTD-3 Source Code and Technical Drawings-constitute original, creative works of authorship fixed by tangible expression that falls squarely within the scope of the copyright protection extended by 17 U.S.C. §§ 101 *et seq.*

267.    Also, under 17 U.S.C. § 103, any subsequent derivative works or compilations Wilson created that relate back to the copyrighted FFTD-3 Source Code and Technical Drawings are also protected by the prior source code and technical drawings copyright registrations.

268.    Under the protections of the 2014 PIA, Wilson shared proprietary information with Boeing that included the copyright protected FFTD-3 Source Code and Technical Drawings. By signing the 2014 PIA, Boeing acknowledged that Wilson was sharing confidential, proprietary information for the purpose of solving Boeing's engine installation problem on the SLS and that it was required to limit access to the confidential, proprietary information Wilson shared with it to only those Boeing employees who had a "need-to-know" the proprietary information to achieve the purpose. By signing the 2014 PIA, Boeing further understood that it was not receiving any right or license to copyrights or the like from Wilson.

269.    Specifically, the 2014 PIA did not grant Boeing any right to, or license in, the Protected Source Code Works and/or the Protected Technical Drawings Works.

270.    As set forth in the 2014 PIA, Boeing was limited to using the proprietary information Wilson shared with it for the purposes of review, evaluation, and possible use in the preparation and submission of a proposal to the U.S. government in connection with the SLS project.  Nothing within the 2014 PIA granted Boeing a right to copy Wilson's FFTD-3 Source

Code and/or Technical Drawings and disclose Wilson's proprietary information to third parties outside of Boeing.

271.    Despite the foregoing, Boeing downloaded and copied Wilson's FFTD-3 Source Code and/or Technical Drawings into its own computers. Thereafter, Boeing reproduced the copyrighted FFTD-3 Source Code and/or Technical Drawings in its entirety, thereby knowingly pirating the FFTD-3 Source Code and/or infringing the FFTD-3 Technical Drawings for use in commerce to advertise, market, describe, build, manufacture, and/or have manufactured a competing product.

272.    The exact derivative competing product Boeing wrongfully created was thereafter used by Boeing for its own economic gain.

273.    On information and belief, Boeing used the  FFTD-3 Source Code (the Protected Source Code Works) to create drawings of Wilson's tool which Boeing thereafter disclosed to third parties outside the U.S. government without Wilson's authorization in violation of the 2014 PIA, and such conduct encouraged, facilitated, caused, materially assisted, materially contributed to, and/or induced the reproduction and distribution of the FFTD-3 Source Code and/or derivatives thereof by third parties.

274.    On information and belief, Boeing used the FFTD-3 Technical Drawings Code (the Protected Technical Drawings Works) to create advertisements, marketing materials, and/or technical documents describing Wilson's tool which Boeing thereafter disclosed to third parties outside the U.S. government without Wilson's authorization in violation of the 2014 PIA, and such conduct encouraged, facilitated, caused, materially assisted, materially contributed to, and/or induced the reproduction and distribution of the FFTD-3 Technical Drawings and/or derivatives thereof by third parties.

275.     On information and belief, the drawings created from the Protected Source Code Works by Boeing and/or the Protected Technical Drawings Works that Boeing knowingly distributed to third parties without Wilson's authorization were without any confidential designation of clear and conspicuous marking indicating the information as being proprietary.

276.     Subsequently and without authorization, Boeing impermissibly reproduced Wilson's copyrighted works and/or prepared derivative works, including by improperly incorporating Wilson's FFTD-3 design to comport with Boeing's SLS 3D engine section model.

277.     Boeing also submitted a 62-page report entitled "Quarterly Performance Management Review" to NASA that included at least 100 incidents in which Wilson's copyrighted material was used without authorization and without full attribution to Wilson. **ECF No. 1-29 (under seal cover page); ECF No. 26 (sealed exhibit).**

278.     Boeing's infringement of Wilson's Protected Source Code Works and Protected Technical Drawings Works violated Wilson's exclusive rights under the Copyright Act, including Wilson's exclusive right to produce, reproduce, and distribute copies of the '315, '952 and '967 Works and their derivatives.

279.     Boeing's infringement was willful, knowing, and done with intent to financially gain from Wilson's copyright Protected Source Code Works and Protected Technical Drawings Works, without compensating Wilson or seeking Wilson's permission to do so. This is confirmed by Boeing's cancellation of Wilson from the SLS project without authorization and Boeing's false and reckless claim that Boeing has no record of Wilson's involvement in the SLS project or any other project with Boeing, despite full knowledge that Wilson was an active participant and provided the solution to the SLS engine installation dilemma facing Boeing.

280.    Boeing is responsible for the conduct of its employees in the scope of their employment, and Boeing failed to exercise its right and ability to supervise persons within its control to prevent infringement of Wilson's copyright Protected Source Code Works and/or Protected Technical Drawings Works. Boeing employees' actions of copyright infringement were done with the intent to further Boeing's financial interests, and Boeing wrongfully profited, both directly and indirectly, from the infringement. Therefore, Boeing directly, contributorily, and vicariously infringed Wilson's copyrighted work through the actions of various employees, as described herein.

281.    As a result of Boeing's infringement, Wilson has lost revenue and profits it would have otherwise earned and is entitled to actual damages as provided by 17 U.S.C. § 504(b).

282.    In addition, Wilson is entitled to recover Boeing's revenue attributable to the infringement of Wilson's copyrighted work, in an amount to be proved at trial, and all other relief allowed under the 17 U.S.C. U.S.C. §§ 101, *et seq.,* including an award of Wilson's attorney's fees and costs given the exceptional nature of this case.

283.    Boeing's knowing and willful infringement of Wilson's intellectual property by unauthorized reproduction and/or creation of derivative works of Wilson's FFTD-3 Source Code and/or Technical Drawings clearly resulted in wrongful profits from revenue Boeing gained *after* finally being able to successfully install the RS-25 engines on the SLS.

284.    But for Boeing's unauthorized use of Wilson's FFTD-3 Source Code and/or Technical Drawings, Boeing would not have gained the same gross revenue and wrongful profits from the SLS projected that it received from 2015 onward, after it passed the 2015 CDR.

285.    Thus, *all* revenue earned after Boeing's infringement of Wilson's copyright is tainted as wrongful profits and must be disgorged because it was earned entirely through the infringement of Wilson's copyrighted material.

286.    Allowing Boeing to wrongfully profit from its infringement of copyrighted material would be contrary to the purpose of copyright law, which exists "to promote the Progress of Science and the useful Arts[,]" U.S. CONST., art. I, § 8, cl. 8, along with Boeing's 2014 Senate testimony that admitted intellectual property theft constitutes "a crime" that must be deterred.

287.    Boeing's infringement has caused and continues to cause irreparable harm to Wilson, for which Wilson has no adequate remedy at law. Unless this Court restrains Boeing from continued infringement of Wilson's copyrighted material and derivative works, Wilson will continue to suffer injury. Therefore, Wilson is entitled to injunctive relief, as provided by 17 U.S.C. § 502, to force Boeing to immediately cease infringing Wilson's copyrighted material and derivative works.

## SECOND CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS
## FFTD-3
### *Brought under the Defend Trade Secrets Act and Washington Law*

288.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

289.    Wilson owns several trade secrets across many subject-matter areas relating to NASA's next generation launch vehicle(s) including but not limited to the Space Launch Program, as alleged above. Wilson's proprietary and confidential information is considered a "trade secret" under federal and Washington state law.

290.    The trade secrets are used in and for products intended for use and are actually used in interstate and foreign commerce.

291.    Boeing obtained access to Wilson's trade secrets pursuant to agreements that prohibit any use other than for review, evaluation, or in a program proposal. In sending materials to Boeing for the FFTD-3, Wilson provided numerous trade secrets (See **ECF No. 12 (sealed exhibit)**) to Boeing under the protections offered by the PIAs, namely that disclosure of this information did not provide any right or licenses to any trade secrets. These trade secrets included design materials, pricing information, computer code, manufacturing instructions, and information on how to manufacture the FFTD-3. **ECF No. 1-14 (under seal cover sheet); ECF No. 12 (sealed exhibit) (TS84-TS86, TS88, TS91, TS95, TS98, TS100, TS103-TS106, TS108, TS111, TS113, TS115, TS116, TS118, TS120, TS 121, TS123-TS126, TS128, TS131, TS133, TS135, TS137-TS139, TS141, TS143-TS146, TS148, TS151, TS153, TS155, TS157, TS158, TS161, TS163-TS166, TS168, TS171, TS173, TS175-TS177, TS179, TS181, TS183, TS184, TS185-TS217).**

292.    These trade secrets were designed, created, and owned by Wilson.

293.    Further, the trade secrets derived their own economic value, as evidenced by Boeing's improper use in violation of the PIAs and acknowledgement to NASA in 2015 that the FFTD-3 solution was "unique."

294.    Wilson took reasonable measures to protect its valuable trade secrets, which are set forth in detail above. Using encryption and secure locations, Wilson shared its trade secrets to Boeing only under the protection of the PIA, and Wilson acted in good faith and was entitled to believe that Boeing would honor the 2014 PIA, which Boeing drafted and signed. Boeing understood that Wilson's trade secrets were being transmitted; it drafted and signed the 2014 PIA

specifically to reassure Wilson that it could provide its trade secrets to Boeing without fear of Boeing misappropriating them.

295.    With respect to Washington Law, any trade secrets disclosed by the Wilson patent, U.S. Patent No. 10,926,381, for which the associated patent application was first published on March 2, 2017, are not included within this claim.

296.    Boeing gained access to and used the trade secrets through improper means, including misrepresentation, breach, and inducement of a breach of its duty to maintain secrecy as provided in the 2014 PIA.

297.    Boeing could not have obtained the trade secrets through any other means without improperly obtaining them. Indeed, Boeing acknowledged to NASA that Wilson's solution was "unique" in the 2015 Proposal, and in 2016, Mr. Baglioni admitted to Wilson in his email that Boeing still had a "pressing need" for the FFTD-3 that Wilson alone could provide. **ECF No. 1-37**.

298.    At no point did Boeing ever suggest or evidence any independent development of the FFTD-3. To the contrary, Boeing had spent years unsuccessfully trying to solve the problem of the engine installation on the SLS project, and it reached out to Wilson precisely because it could not solve the problem.

299.    When Boeing submitted its 62-page, "Quarterly Performance Management Review" to NASA in 2015, it identified Wilson as the creator of the solution, further confirming that Wilson was the owner of the trade secrets, not Boeing. **ECF No. 1-29**. Boeing's presentation was not marked with an appropriate restrictive legend to maintain Wilson's confidentiality as required by the 2014 PIA. **ECF No. 1-3**.

300.    When Wilson met with Boeing and those misrepresenting themselves to be Boeing employees, Wilson allowed those present at the meeting to handle, examine, and use the FFTD-3 for the purpose of garnering Boeing's interest in the FFTD-3 for use on the SLS project.

301.    For the alleged purpose of continuing its assessment of Wilson's technology, Boeing demanded model drawings for the FFTD-3, which Wilson complied with by sending the drawings via encrypted email using Boeing's "Message Courier" program. **ECF No. 1-18 (under seal cover sheet); ECF No. 16 (sealed document).**

302.    While engaging with Boeing regarding the SLS project, Wilson also provided a CAD drawing package that included Wilson's valuable trade secrets, including the material selected to build the device and a 21-page feasibility study. **ECF No. 1-19 (under seal cover sheet); ECF No. 17 (sealed document); ECF No. 1-14 (under seal cover sheet); ECF No. 12 (sealed exhibit) (TS185-TS2176).**

303.    After receiving Wilson's drawing package for the FFTD-3, Boeing sent Wilson a request for quotation for the FFTD-3 tooling kit. In response, Wilson submitted pricing. **ECF No. 1-14 (under seal cover sheet); ECF No. 12 (sealed exhibit) (TS184).**

304.    After submitting pricing for the FFTD-3 (**ECF No. 1-33**), Boeing sent Wilson an Authority to Proceed letter on December 18, 2015, directing Wilson to construct one of the contract line items: the high precision Torque Tester- to be used with the FFTD-3 tooling kit.

305.    After receiving the Authority to Proceed letter from Boeing and operating under the reasonable belief it had been awarded the Boeing contract, Wilson promptly commenced construction on the Torque Tester, to be used in conjunction with the FFTD-3 (to test and verify the torque being applied by the FFTD-3).

306.    On February 26, 2016, Boeing sent Wilson a stop work order along with an offer to purchase the incomplete Torque Tester parts from Wilson. Wilson rejected that offer. **ECF No. 1-36**.

307.    After its offer was rejected, Boeing refused to consider Wilson's FFTD-3 bid proposal, falsely and fraudulently claiming it had no record of Wilson within its system—a willfully false statement contradicted by repeated work orders and communications with Wilson.

308.    Boeing misappropriated Wilson's trade secrets through violation of Wilson's trade secret protections by improperly disclosing the proprietary information to Wilson's direct competitors: Kord Technologies, Geocent, Geologics, Jacobs Engineering, and United Launch Alliance. Boeing also misused the trade secrets by using them for its own purposes and on information and belief, circulating the trade secrets with other entities and individuals besides those named above.

309.    After accessing and utilizing Wilson's technology from Boeing, Kord's lead tool engineer for the engine assembly and its subsystem tubing engineers received awards for installation processes on the SLS engine section as outlined in the NASA publication, "A Case for Small Business." On information and belief, these installation processes were the direct result of having accessed and utilized Wilson's technology from Boeing. Kord was thereafter awarded several contracts, including ones for NASA valued in excess of $200 million. **ECF No. 1-82**.

310.    In addition, Boeing profited and generated billions of dollars in revenue from the trade secrets shared by Wilson. Boeing acted willfully by copying and stealing Wilson's trade secrets, and it did so for commercial gain, to the exclusion of Wilson.

311.     Boeing itself has declared that the theft of trade secrets "is a crime" and that we must "send a clear message" to those who steal trade secrets.[25] Boeing should be held to its own standard in this case, and Wilson is entitled to all remedies available under state and federal trade secrets law.

312.     Boeing has engaged in continuing violations of Wilson's trade secrets related to the FFTD-3 that began in 2015 and have continued to the present day as evidenced by Boeing finally completing the installation of four RS-25 engines for the Core Stage of the still ongoing SLS project on December 9, 2019 which Boeing, on information and belief, would not have been able to accomplish but-for its unauthorized utilization of Wilson's trade secrets related to the FFTD-3.

313.     With further regard to the SLS project, Boeing employee Ed Baglioni had access to the FFTD trade secrets by virtue of involvement as the Boeing Tooling Engineer working on procurement of the FFTD-3 (**ECF No. 1-31**) , where Mr. Baglioni went so far as to specifically request specific FFTD-3 trade secret material and lubricant specifications from Wilson (**ECF No. 1-32**).

314.     On March 3, 2016, Mr. Baglioni admitted Boeing had "*a pressing technical need*" for Wilson's FFTD-3, (**ECF No. 1-37**), mere days after Boeing had issued its stop work order on February 26, 2016 (**ECF No. 1-36**).

---

[25] Statement of Peter J. Hoffman, *Hearing of the Crime and Terrorism Subcommittee of the Senate Judiciary Committee, Economic Espionage and Trade Secret Theft*, FEDERAL NEWS SERVICE TRANSCRIPTS, 2014 WLNR 13068537 (May 13, 2014).

315.    A generic name for the FFTD-3 is "Self-Reacting Torque Tool." *See, for example,* **ECF No. 1-19** and **ECF No. 1-23** identifying the generic tool description of the FFTD-3 as a "Self-Reacting Torque Tool."

316.    Notably, on or about July 1, 2022, after the successful installation of the RS-25 engines for the Core Stage of the SLS project in December, 2019, Mr. Baglioni received an award in part for "Self-Reacting Torque Tools for B-nuts," the same type of tool as the FFTD-3 of Wilson. **ECF No. 1-41**.

317.    Mr. Baglioni had access to the trade secrets of Wilson, a pressing need to use the trade secrets of Wilson, and was later given an award for the same type of tool as covered by the trade secrets of Wilson, as such it is most likely the trade secrets of Wilson were used by Mr. Baglioni to implement the self-reacting torque tools for which he received his award in 2022.

318.    Additionally, on information and belief, the numerous leaks the SLS project experienced which delayed its eventual November 16, 2022 launch, would have necessarily required Boeing to use tools utilizing Wilson's FFTD-3 trade secrets in order for those leaks to be remedied.

319.    Given Boeing's "*pressing technical need*" for custom designed tools for the SLS project as well as its need for Wilson's 105 proprietary accessories (**ECF No. 1-24; ECF No. 1-19**) for use with the FFTD-3 in order to access the specific confined space envelopes on the SLS rocket, it is extremely doubtful that Boeing refrained from using any of Wilson's trade secrets related to the FFTD-3 after it abruptly and inexplicably sent a stop work order to Wilson in February of 2016 (**ECF 1-36**), then miraculously resolved the problems associated with the SLS project that prompted Boeing engaging Wilson in the first place.

320.    The ongoing, improper use of Wilson's trade secrets by Boeing is the but-for and proximate cause of damages to Wilson in an amount to be established at trial. In addition to or alternatively, the misuse of Wilson's trade secrets entitles Wilson to disgorge all revenues and profits earned by Boeing as a result of its misappropriation.

321.    Boeing's misappropriation of Wilson's trade secrets was willful and malicious. Boeing could not have reversed engineered or developed any of the trade secrets on its own without violating the 2014 PIA. Further, Boeing was explicitly aware that information disclosed under the 2014 PIA was a trade secret because it signed the agreement and asked that Wilson only disclose proprietary information if it "*constitutes a trade secret*." (emphasis added).

322.    Because Boeing's misappropriation was willful and malicious, Wilson is entitled to exemplary damages and attorneys' fees.

323.    Boeing's misappropriation of Wilson's trade secrets has caused Wilson to suffer damages, and Boeing has captured billions of dollars in revenue because of the infringement of Wilson's trade secrets. Thus, Wilson is entitled to recover its own damages and to disgorge all revenues and profits Boeing has obtained as a result of the misuse of Wilson's trade secrets.

### THIRD CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS
#### DREAMLINER BOLTING TOOL
***Brought under the Defend Trade Secrets Act and Washington Law***

324.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

325.    In September 2012, Boeing requested that Wilson design tools for installing bolts on the 787 Dreamliner during its assembly.

326.    The tools that Boeing was using were, at the time of the request, self-destructing due to the high torque required to install the bolts (the "Defective Tools").

327.     Wilson met with Boeing engineers in Seattle on September 20, 2012, to discuss the problem that Boeing was experiencing with the Defective Tools. After the meeting, Boeing supplied Wilson with Defective Tools along with bolt samples. **ECF No.  1-59**.

328.     On October 25, 2012, Ray Kroll of Boeing informed Wilson that it was not listed in Boeing's vendor system and that Casey Hanson, a Boeing buyer, was going to fast-track Wilson back into the system. **ECF No. 1-60**.

329.     Mr. Kroll informed Wilson that Boeing would have a need for 200 tools if they could fix this problem, which encouraged Wilson to design the new tools.

330.     Mr. Kroll further told Dr. Wilson that the development and production of these tools needed to be implemented quickly because Boeing had a critical need.

331.     A PIA dated effective October 29, 2012, was signed by Wilson and Boeing.

332.     By December 2012, Wilson designed and engineered a dual offset inline PTM and explained Wilson's approach and function to Boeing.

333.     In connection with a January 2, 2013, telephone conference, Mr. Kroll requested more information about Wilson's proprietary information.

334.     On January 12, 2013, Wilson provided internal concepts such as its analysis and explanation, along with a proposal for two torque tool concepts, to Mr. Kroll. **ECF No. 1-62 (under seal cover sheet); ECF No. 42 (sealed document); ECF No. 1-14 (under seal cover sheet); ECF No. 12 (sealed exhibit) (TS013–TS016).**

335.     After the foregoing information was provided to Mr. Kroll, Boeing cut off communications with Wilson, notwithstanding Wilson's repeated attempts to contact Mr. Kroll.

336.     On June 18, 2013, Mr. Kroll advised Wilson by email that the fastener for which Wilson's tool was designed would not be used in the future.

337.    In August 2013, Fernando Hernandez of Boeing requested additional proprietary information from Wilson, which Wilson supplied just as it had historically done throughout its working relationship with Boeing.   After receiving the additional proprietary information, Hernandez stopped communicating with Wilson.

338.    In 2014, Boeing's employees, including but not limited to Mr. Kroll and Hernandez, received Technical Replication Awards for replication of gearboxes across multiple airplane programs.

339.    Boeing has engaged in continuing violations of Wilson's trade secrets related to the Dreamliner Bolting Tool that began in 2012 and has continued to the present day.

340.    For example, in 2020, one of Mr. Kroll's team members, James Brodhead, filed for a US Patent on an "Offset Torque Multiplier" which features PTM components that are protected by the PIA Boeing entered into with Wilson. The other co-inventor listed on this patent is Dorin Nectarie Salcescu who is an engineer at RAD Torque Systems in Canada, a direct competitor of Wilson.   According to RAD's website, it provided all of the bolting tools for the 787 Dreamliner program. **ECF No. 1-67**.

341.    Boeing's commercial aircraft division stole Wilson's intellectual property that was protected by a PIA.   In doing so, it followed a pattern similar to that followed by Boeing's ISS and SLS divisions whereby it sought and obtained Wilson's proprietary information holding out the promise of lucrative future work, then used such information and claimed ownership of Wilson's intellectual property after advising Wilson that it would not get the future work and eliminating Wilson from Boeing's internal SQIS records to cover up the theft.

**FOURTH CLAIM FOR RELIEF: TRADEMARK INFRINGEMENT**

342.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

343.    Wilson is the owner of the federally registered FFTD and Fluid Fitting Torque Device trademarks (hereafter, the "Wilson Trademarks").

344.    Wilson's "FFTD" trademark is valid, legally protectable, and arbitrary with respect to Wilson's goods on which it is used.  Wilson's FFTD mark is the subject of United States Trademark Registration Number 6,489,905, registered on September 21, 2021, but it has been used in interstate commerce since as early as the 1990's and Wilson has secured trademark rights through usage of the mark in interstate commerce since as early as February 4, 1999 as indicated on the registration.

345.    Wilson's "Fluid Fitting Torque Device" trademark is valid, legally protectable, and distinctive with respect to Wilson's goods on which the trademark is used.  Wilson's Fluid Fitting Torque Device mark is the subject of United States Trademark Registration Number 7,470,602, registered on August 13, 2024, but it has been used in interstate commerce since as early as the 1990's and Wilson has secured trademark rights through usage of the mark in interstate commerce since as early as October 22, 1998 as indicated on the registration.

346.    Boeing sold, offered for sale, distributed, and/or had manufactured non-conforming reproductions, counterfeits, copies, and/or colorable imitations of one or more iterations of the Fluid Fitting Torque Device tools (hereafter, the "Infringing Tools") to/for NASA, bearing the Wilson Trademark, without the consent of Wilson, in connection with interstate commerce by virtue of the numerous projects for which Boeing was engaged by NASA

as a contractor, such projects which include, but are not limited to, the ISS and SLS projects, inter alia.

347.     A likelihood of confusion exists between Wilson's "FFTD" and "Fluid Fitting Torque Device" trademarks and Boeing's usage of the "FFTD" and "Fluid Fitting Torque Device" trademarks with regard to products sold by Boeing to NASA and possibly others.  The use by Boeing on inferior goods produced by Boeing's vendors of Wilson's trademarks has created a likelihood of confusion and resulted in at least one instance of actual confusion that has disparaged the "FFTD" trademark and has deceived consumers as to the origin, sponsorship, or affiliation with Wilson.  Boeing's use of "FFTD" and "Fluid Fitting Torque Device" is likely to cause consumers to believe, contrary to fact, that goods sold by Boeing to NASA originate from, or are sponsored or approved by, Wilson.  **ECF Nos. 1-47, 1-48.**

348.     Such unauthorized use constitutes Trademark Infringement under 15 U.S.C. § 1125(a).

349.     Despite having prior knowledge of Wilson's "FFTD" and "Fluid Fitting Torque Device" trademarks, Boeing had fraudulent products built by Oakridge Tool Company and others under both marks.  **ECF No. 1-70 (under seal cover sheet); ECF No. 44 (sealed exhibit).**

350.     Included among the Infringing Tools are various counterfeit tools that were manufactured by Oakridge, including a genuine 2nd Generation FFTD-1 (SN:008) which was delivered to Boeing in August 2019, that Boeing falsely claimed was manufactured by Oakridge Tool.

351.     Boeing ordered another 2nd Generation FFTD-1 to replace the SN: 008, which was provided to Boeing in August 2020. It was later discovered in documentation that was

withheld from Wilson at the time, that Boeing intended to use this tool for the SLS program because of a reference within the documentation. On information and belief, the tool was used on the SLS project after September 21, 2021, given the tool's useful lifespan of over 10 years.

352.     In addition, Boeing has used, in connection with the Infringing Tools, spurious designations that are identical with, or substantially indistinguishable from, the Wilson Trademarks, not only on the Infringing Tools themselves, but on packaging, containers, falsified shipping documents, and substitute manufacturer's instructions misrepresenting the tools' performance characteristics (collectively, the "Infringing Goods").

353.     Boeing has intentionally used these spurious designations in commerce in connection with the sale, offering for sale, distribution, and/or manufacture of the Infringing Goods for its own financial gain.

354.     Boeing's conduct is likely to cause and, upon information and belief, has caused consumers, such as NASA, to believe, mistakenly, that the Infringing Goods are either affiliated with, endorsed or authorized by, or somehow connected to Wilson, or that the Infringing Goods sold, offered for sale, distributed, and/or had manufactured by Boeing are genuine Wilson products.

355.     Indeed, fault for the November 18, 2015, trapped fitting incident aboard the ISS, in which one of the Infringing Tools, a counterfeit FFTD-1 tool, became stuck and was abandoned in place, was assigned to Wilson, since the Infringing Goods were furnished with the Wilson Trademarks. Boeing assigned blame to Wilson during the 2016 International Conference of Environmental Systems in Vienna, tarnishing the goodwill associated with the Wilson Trademarks, when, in fact, the Infringing Goods Boeing sold to NASA resulted in over-torqued Gamah fittings. These false and disparaging accusations were also parroted by NASA, which

attributed the trapped fittings caused by Boeing's Infringing Goods to Wilson and the goods bearing the Wilson Trademarks. **Exhibit 46, ECF No. 1-48, ECF No. 1-47**.

356.    On information and belief, the FFTD tool has been transported in interstate commerce.

357.    Further, the Wilson Trademarks are being infringed by virtue of their plausible use in assembling the SLS as suggested by Eric Howell of Boeing who admitted during a telephone conversation with Wilson that Boeing continues to maintain counterfeit FFTD tools manufactured by Oakridge Tool & Engineering at its Houston facility for potential use on the ISS.

358.    Additionally, Tim Tripp of Boeing stated during a telephone conversation with Wilson on September 2, 2021, that Boeing still required a Fluid Fitting Torque Device tool and "did not care where it came from" if Wilson did not want to manufacture one.  Based on this statement, it is plausible that the Infringing Goods were used to assemble the SLS.

359.    The Infringing Goods, which bear blatant and unauthorized reproductions of the Wilson Trademarks, were not manufactured, packaged, or approved for sale and/or distribution by Wilson, nor did Wilson authorize Boeing's use of the Wilson Trademarks to sell, offer for sale, distribute, and/or have manufactured Boeing's Infringing Goods.

360.    Moreover, at the time Boeing chose to sell, offer for sale, distribute the Infringing Goods and/or have the Infringing Goods manufactured, it was well aware of Wilson's long-standing, exclusive rights in the Wilson Trademarks.

361.    Nevertheless, Boeing sold, offered for sale, distributed, and/or had manufactured the Infringing Goods, despite having actual and specific knowledge of Wilson's rights in and prior use of the Wilson Trademarks under 15 U.S.C. § 1051.

362.    Further, Boeing did so knowing that the Infringing Goods provided by Boeing to NASA were counterfeits under 15 U.S.C. § 1051, with the intent that NASA would put the Infringing Goods to use upon receiving them and thereafter.

363.    Boeing's conduct is therefore willful and represents a conscious disregard for Wilson's rights in the Wilson Trademarks and a calculated decision to misappropriate the goodwill represented by the Wilson Trademarks. Further, the fact that Boeing continued its unlawful conduct by selling the Infringing Goods within months of receiving Wilson's written warnings demonstrates Boeing's intent to continue selling the Infringing Goods, without regard for Wilson's intellectual property rights. Boeing's conduct was and still is egregious, making this case exceptional within the meaning of 15 U.S.C. § 1117.

364.    Boeing's acts, as described herein constitutes trademark counterfeiting, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

365.    Upon the foregoing, Boeing's conduct has and continues to irreparably harm Wilson, causing Wilson to sustain significant damages, in an amount not yet determined, but for which Boeing is liable, including, but not limited to: (i) the damages suffered by Wilson, pursuant to 15 U.S.C. § 1117(a); (ii) all illicit profits that Boeing derived from infringing and/or counterfeiting the Wilson Trademarks, pursuant to 15 U.S.C. § 1117(a); (iii) treble damages pursuant to 15 U.S.C. § 1117(b); or, in the alternative, (iv) statutory damages of up to $2,000,000 per each instance that Boeing has sold, offered for sale, and/or distributed the Infringing Goods, pursuant to 15 U.S.C. § 1117(c); (v) pre- and post-judgment interest at the lawful rate; and (vi) Wilson's attorneys' fees and costs.

366.    Boeing's conduct, as alleged herein, also constitutes Unfair Competition in the form of passing off and false designation of origin under 15 U.S.C § 1125(a).  As a direct and proximate

71

cause of Boeing's infringement, Wilson has been substantially injured and its business including loss of goodwill, reputation, revenues, and/or profits.  Wilson's trademark rights are valid and subsisting and each of the "FFTD" and "Fluid Fitting Torque Device" trademarks are distinctive and have secondary meaning in association with Wilson's goods as evidenced by the registrations of both trademarks by the U.S. Trademark Office.

367.   On information and belief, Boeing used Wilson's Trademarks, with other vendors to refer to the Wilson tools.

368.   Plaintiff has no adequate remedy at law.

369.   Plaintiff is entitled to, among other relief, injunctive relief and an award of damages including Boeing's profits, enhanced damages, punitive damages, reasonable attorney's fees and costs of Wilson's actions under the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with pre-judgment and post-judgment interest.

## FIFTH CLAIM FOR RELIEF: CIVIL RICO
### Pursuant to 18 U.S.C. § 1962(c)

370.   Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

371.   This claim is brought by Wilson for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations under 18 U.S.C. § 1962(c).

372.   At all material times, Boeing was a "person" within the meaning of 18 U.S.C. § 1961(3) because it is capable of holding a legal or beneficial interest in property.

373.   Boeing conducted the affairs of an enterprise through an association-in-fact enterprise. The associated-in-fact enterprise included:

A.  Boeing,

B.  The Bogus Boeing Employees including David Grant, Charles Krampert, Dennis Lascola, James Murray, Paul Protos, Jason Allen, and John Salisbury,

C.  The Bogus Boeing Employees' respective employers including Geocent, LMI Aerospace Inc., Kord Technologies, Geologics Corporation, RS&H, and Jacobs Engineering,

D.  The Ghost Employees including but not limited to Lori Marks of Westwind Technologies, Inc. and Bruce Haskins of Richardson RFPD,

E.  The Ghost Employees' respective employers including but not limited to Westwind Technologies, Inc. and Richardson RFPD.

F.  Wilson Aerospace LLC of Missouri ("Wilson Missouri") and Chris Wilson;

G.  Dynetics;

H.  Oakridge Tool & Engineering Company;

I.  Dorin Nectarie Salcescu of RAD Torque Systems, a direct competitor of Wilson.


374.    The foregoing ("IP Theft Enterprise") constitutes an association-in-fact because they are group of persons associated together for a common purpose of engaging in a course of conduct. Here that common purpose was to work together steal the smaller companies' (like the Wilsons') intellectual property to: (1) avoid R&D expenses; (2) eliminate the smaller company as a competitor; (3) to conceal evidence of modest pricing of the smaller company so that the designs and products could be provided to NASA and other government entities at excessively high prices; and (4) conceal evidence of the misdeeds at Boeing's direction. Each of these persons directly or indirectly conducted and/or participated in the conduct of the IP Theft Enterprise.

375.    The members of the IP Theft Enterprise "perform[ed] different roles at different times" and there were "spurts of activity punctuated by periods of quiescence." *Boyle v. U.S.*, 556 U.S. 938, 948 (2009). Even with different entities taking on different roles and coming in and out of the Enterprise, the IP Theft Enterprise functioned as a continuing unit through the shared pursuit of the course of conduct with Boeing at the head – stealing and misappropriating intellectual property and then using misleading and fraudulent entities and supposed "employees" to cover up their joint misappropriation. Like a mob boss, Boeing directed and orchestrated its associates in the IP Theft Enterprise to take on different tasks from at least 2006 to the present.

376.    The IP Theft Enterprise's common purpose can be seen through Boeing maintenance of "the key relationship among the numerous entities associated with" the IP Theft Enterprise from at least 2006 to present. *George v. Urban Settlement Services*, 833 F.3d 1242, 1248 (10th Cir. 2016).

377.    At the ultimate direction of Boeing, each of the members of the IP Theft Enterprise took on different roles over a period of years to achieve the common purpose:

▪ Boeing: Boeing masterminded and coordinated the theft of Wilson's intellectual property, maintained the key relationships with the other members of the enterprise, and orchestrated the other members of the enterprise in their common purpose.

▪ The Bogus Boeing Employees including David Grant, Charles Krampert, Dennis Lascola, James Murray, Paul Protos, Jason Allen, and John Salisbury, and the Bogus Boeing Employees' respective employers including Geocent, LMI Aerospace Inc., Kord Technologies, Geologics Corporation, RS&H, and Jacobs Engineering,

  ○ Boeing and the Bogus Boeing Employees' employers (competitors of Wilson) arranged for the Bogus Boeing Employees to attend Wilson's October 2014

74

presentation and falsely suggested to Wilson that everyone in attendance was a Boeing employee and therefore subject to the 2014 PIA as discussed *supra*.

- o Boeing and the Bogus Boeing Employees deceptively used Boeing email addresses for these employees of Wilson's competitors to communicate with and mislead Wilson in order to induce the transfer of Wilson's confidential trade secret information related to the FFTD-3 to those competitors along with Boeing later in October 2014.

- o This misappropriation allowed Boeing to capture NASA work in 2015 and 2016 as described *supra*.

- The Ghost Employees including but not limited to Lori Marks of Westwind Technologies, Inc. and Bruce Haskins of Richardson RFPD.

- The Ghost Employees' respective employers including but not limited to Westwind Technologies, Inc. and Richardson RFPD.

- o The Ghost Employees were used as described *supra* to cover up Wilson's involvement in projects, including but not limited to the FFTD-1, by acting as intermediaries on the ISS and SLS projects.

- o According to Boeing's supplier portal, Lori Marks (who was really of Westwind Technology) provided the notification to Boeing that Wilson decided to withdraw its bid to provide Tools to the SLS Project without the knowledge or consent of Wilson.

- Wilson Aerospace LLC of Missouri ("Wilson Missouri"):

- o Wilson Missouri was formed by a current (then and now) Boeing employee, Chris Wilson, on February 25, 2017, right after Wilson was disqualified from supplying the FFTD-3 and 105 accessories to Boeing for the SLS project.
- o Wilson Missouri used the identical LLC name as that of Plaintiff: Wilson Aerospace LLC.
- o This was not merely coincidence; Wilson Missouri's online directory used part of Wilson's website text on its own website.
- o On information and belief, Boeing and Wilson Missouri then signed contracts for the very work that Wilson had previously done for Boeing.
- o Each of the aforementioned steps were taken to advance the Enterprise's concealment efforts. In 2016, NASA had recognized Wilson in its 2016 list of small business contributors to the SLS project that Boeing had arranged for. It can be inferred that Boeing used this newly created and similarly named Wilson Missouri to step into the shoes of Wilson—without any notifications to NASA—as the small business contributor to provide the FFTD-type tools to NASA.

- ▪ Dynetics:
  - o Dynetics is a contractor for Boeing for a portion of the mid-stage SLS project.
  - o One of Dynetics's locations is in an area known as the "Jetplex" which is a facility located at 29700 Indian Springs Road, Madison, AL 35756.
  - o According to Boeing employee Abby Salgado, when Wilson sent the FFTD-1 2nd Generation SN: 009 to Boeing, Boeing rerouted the Wilson's proprietary SN: 009 to the Jetplex facility where Dynetics is located.

76

- In August 2020 after the delivery of the SN: 009 to the Jetplex facilty, Chip Link, Wilson's' primary contact with Boeing on the ISS and SLS projects, went to work for Dynetics.

- On April 2, 2020, Boeing sent a letter to Wilson to the attention of David Wilson at Dynetics's address. Neither the Plaintiff nor David Wilson maintained such an address, neither did business with Dynetics, and neither has been to that location.

- It is plausible to infer that Dynetics was part of the effort to steal trade secrets from Wilson.

- Oakridge Tool & Engineering Company, a direct competitor of Wilson:

  - Boeing provided Oakridge with Wilson's designs for the FFTD-1. Oakridge Tool & Engineering built at least five FFTDs using Wilson's design as well as Wilson's trademark. Despite using Oakridge to build the products with Wilson's designs, Boeing falsified the paperwork for these tools to indicate that Wilson was the manufacturer.

  - Boeing and Oakridge undertook additional acts to conceal Wilson's involvement in design and building the FFTD-1 2nd Generation SN: 009 tool and the price that it charged Boeing as set out *supra*.

  - When issues with the counterfeit tool arose, Boeing blamed Wilson despite knowing that Boeing authorized Oakridge Tool & Engineering to manufacture a counterfeit tool using Wilson's trademark, part number, and drawing package.

- Dorin Nectarie Salcescu of RAD Torque Systems ("RAD"), a direct competitor of Wilson:

o   From 2013 to present, RAD worked with Boeing to steal Wilson's bolting tool trade secrets. With Wilson's technology, RAD and Boeing were able to eliminate Wilson as a competitive bidder and use RAD as the supplier for bolting tools for the Dreamliner project.

o   According to RAD's website, it provided all of the bolting tools for the Dreamliner project, and also shares a joint patent with Boeing based on the offset torque tool technology and geartrain systems provided by Wilson in 2012/2013.

378.   Boeing and its associated-in-fact enterprise comprised of the foregoing individuals and their respective employers went on to win numerous awards, file for U.S. Patents, and receive several lucrative contracts worth hundreds of millions of dollars.

379.   In 2014, Kord Technologies, Westwind Technologies, Geocent, and W.S. Wilson Corporation were recognized as Boeing Performance Excellence Award Recipients.

380.   The foregoing "persons" committed, orchestrated, coordinated, planned, directed, and implemented Boeing's plan to target smaller companies and entice them with the possibility of lucrative contracts only to steal the smaller companies' intellectual property, eliminate the smaller company as a competitor, conceal the modest prices to be charged for its designs and tools so that Boeing could provide the intellectual property and products to NASA and other government entities at exorbitant prices, and conceal evidence of the misdeeds. These were the very purposes for which the IP Theft enterprise exists.

381.   Specific to Wilson, the foregoing "persons" committed, orchestrated, coordinated, planned, directed, and implemented Boeing's plan to engage in the following predicate acts as those are defined under 18 U.S.C. § 1961(1) (enumerating specific indictable offenses that constitute "racketeering activity"):

- Theft of trade secrets (18 U.S.C. § 1832);
- Copyright infringement (18 U.S.C. § 2319);
- Trafficking counterfeit goods (18 U.S.C. § 2320); and
- Wire Fraud (18 U.S.C. § 1343).

382.     Boeing engaged in theft of trade secrets under 18 U.S.C. § 1832 because, with intent to convert a trade secret, the IP Theft Enterprise knowingly stole or without authorization appropriated Wilson's trade secrets, and obtained such information by fraud, artifice, or deception. The full extent of the Enterprise's theft of trade secrets is discussed in more detail, *supra* (second and third claims for relief).

383.     The IP Theft Enterprise engaged in willful criminal copyright infringement under 18 U.S.C. § 2319 because it violated 17 U.S.C. § 506(a)(1)(A) by willfully infringing a copyright for purposes of commercial advantage or private financial gain. The full extent of the Enterprise's willful copyright infringement is discussed in more detail, *supra* (first, second and third claims for relief).

384.     The IP Theft Enterprise engaged in trafficking counterfeit goods under 18 U.S.C. § 2320(a)(1) because it trafficked in goods or services and knowingly used a counterfeit mark on or in connection with such goods or services. It also trafficked in goods or service knowing that such good or service was a counterfeit military good or service the use, malfunction, or failure of which is likely to cause serious bodily injury or death under 18 U.S.C. § 2320(a)(3).

385.     The IP Theft Enterprise engaged in wire fraud under 18 U.S.C. § 1344 because it devised or intended to devise a scheme or artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted, or caused to be transmitted by means of e-mail communication in interstate of foreign commerce, emails for the purpose of executing such scheme or artifice. This includes but is not limited to the October

8, 2014 email from Steven Rice to Dr. David Wilson with the subject line "RE: Wilson Aerospace Tool Presentation: Request for 3D CAD geometry representation of tool designs", and corresponding email threads wherein Boeing and its "persons" concealed the real identity of the Bogus Boeing employees.

386.    These actions were taken as part of a concerted plan to target smaller companies and entice them with the possibility of lucrative contracts only to steal the smaller companies' intellectual property and conceal evidence of the misdeeds, for which The IP Theft Enterprise exists.

387.    Moreover, The IP Theft Enterprise engaged in additional and non-exhaustive predicate acts that, although unrelated to Wilson, align with the purpose of The IP Theft Enterprise and its modus operandi, including theft of trade secrets in violation of (18 U.S.C. § 1832) from Lockheed Martin (2006), Alabama Aircraft Industries Inc. (2008), and Aviation Finance Insurance Consortium (2018, as well as the $615 million settlement Boeing paid in 2006 to resolve criminal and civil allegations that it improperly used competitors' information to procure contracts for launch services worth billions of dollars from the Air Force and NASA.

388.    These repeated and similar acts show relatedness and that the theft of trade secrets from competitors and joint venturers has become engrained in Boeing's criminal corporate business culture and is now part of Boeing's routine business practices. The net result is an open-ended pattern of racketeering that will repeat itself yet again if not curtailed.

389.    Likewise, the sophistication of the IP Theft Enterprise's pattern of racketeering requires a civil RICO claim to curtail. Boeing is deeply embedded with the federal government as a defense contractor and exerts enormous lobbying and political influence across all levels of government. RICO is appropriately used given the damage that the IP Theft Enterprise's behavior

is doing to the American economy and to American national security. The IP Theft Enterprise's ability to hide its thefts under military secrecy makes it especially difficult to establish its conduct.

390.    The causation of injury to Wilson's business and property by the IP Theft Enterprise pattern of racketeering was both foreseeable to the IP Theft Enterprise and direct to Wilson. The IP Theft Enterprise knew that its criminal intellectual property theft would cost Wilson millions of dollars and decimate its future business—just as Boeing testified to Congress. Thus, the criminal theft of trade secrets is especially pernicious to smaller companies, like Wilson, and the IP Theft Enterprise's continued decimation of smaller rivals will continue unchecked unless civil RICO is used to end the IP Theft Enterprise's habitual intellectual property theft.

391.    But-for the IP Theft Enterprise's criminal intellectual property violations, Wilson would have enjoyed enormous financial success from government contracts and additional contracts with Boeing and other defense contractors. Because of the IP Theft Enterprise's disparagement and theft, however, Wilson has been sidelined and unable to participate in the upside it created. The full extent of its damages requires discovery, and Wilson also seeks injunctive relief under civil RICO to enjoin the IP Theft Enterprise from future intellectual property theft.

392.    Wilson is therefore entitled to an award of compensatory and treble damages and the costs of this suit, including attorneys' fees, all in amounts to be determined at trial.

**SIXTH CLAIM FOR RELIEF: CIVIL CONSPIRACY**

393.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

394.    Boeing's theft and infringement of Wilson's intellectual property was agreed to and facilitated by (1) Boeing's employees; (2) the Bogus Boeing Employees and their respective

81

companies, (3) the Ghost Employees who were falsely categorized in Boeing's records as being Wilson employees and their respective companies, and (4) others yet to be identified as co-conspirators (collectively, the "Conspirators").

395.     With respect to Boeing's employees, the Conspirators include but are not limited to the following persons: Ed Baglioni, Samuel Braun, James Brodhead, Brenda Carlson, Don Chippeaux, Timothy Ditch, Jay Edwards, Greg Emmons, Sophie Floyd, Larry Gamblin, Fernando Hernandez, Ray Kroll, Dwight "Chip" Link, Terry McGee, Mike Phillips, William Raby, Steven Rice, Bradley Schmidt, Timothy Tripp, Tanya Mitchell, Suzanne Young, Eric Howell, Craig Parsons, Savannah Perez, Aleksy Escalante, Tom Coleman, Lora Keiser, Karl Keiser, Craig Behel, Mark Henry, William Crutsinger, Billy Lawrence, and James Tansey.

396.     With respect to the Bogus Boeing Employees and their respective companies, the Conspirators include but are not limited to the following persons: David Grant, Charles Krampert, Dennis Lascola, James Murray, Paul Protos, Jason Allen, and John Salisbury, and their employers, including Geocent, LMI Aerospace Inc., Kord Technologies, Geologics Corporation, RS&H, and Jacobs ESTS Group. It is probable that Boeing conspired with the space industry companies who employed the Bogus Boeing Employees without there being an agreement pertaining to the development of the misappropriated Wilson intellectual property, which discovery will uncover.

397.     With respect to the Ghost Employees and their respective companies, the Conspirators include but are not limited to the following persons: Lori Marks of Westwind Technologies, Inc.; Bruce Haskins of Richardson RFPD; and Dorin Nectarie Salcescu of RAD Torque Systems, who was a direct competitor of Plaintiff Wilson Aerospace LLC. It is likely that

the employers of the Ghost Employees had an agreement in place regarding the SLS project, which discovery is needed to uncover.

398. The Conspirators entered into an agreement and conspired with Boeing to accomplish an unlawful goal of targeting smaller companies, such as Wilson, and enticing them with the possibility of lucrative contracts only to steal the smaller companies' intellectual property and conceal evidence of the misdeeds.

399. By actively assisting one another in carrying out the conspiracy, the non-Boeing Conspirators were able to bypass the time and expense associated with research and development, allowing them to develop cutting-edge tools using Wilson's technology at a fraction of the cost. There are likely contracts between Boeing and the non-Boeing Conspirators with regard to compensation for the designs or tools provided to Being by these co-conspirators. Co-conspirator Boeing would also benefit by receiving those cutting-edge tools manufactured by their co-conspirators for a significant discount when compared to what Boeing would have had to pay Wilson for the same product.

400. The Conspirators not only agreed to accomplish the goal of stealing Wilson's intellectual property, but actively assisted Boeing in acting in furtherance of the conspiracy. Thus, each committed an overt act in furtherance of the conspiracy.

401. By way of example, many of the Conspirators attended the live presentation at Boeing's facility in Huntsville, Alabama, during which time Wilson was deceived into allowing those present who were held out as Boeing personnel, to handle and operate Wilson's FFTD-3, while Wilson demonstrated and carefully described the tool's full capabilities and cutting-edge functionality. Any confidentiality agreement or lack thereof will be available through discovery.

402.    In furtherance of the agreement related to the conspiracy, none of the Conspirators revealed the true identity of those Bogus Boeing Employees who were in attendance at the live presentation to Wilson.

403.    Following the live presentation, the Conspirators brazenly and illegally used Wilson's intellectual property to build and sell Boeing the tools it was desperately in need of procuring at a fraction of the price for all of those involved.

404.    Following the theft and unauthorized utilization of Wilson's intellectual property, the Conspirators and their respective employers went on to win numerous awards, file for U.S. Patents, and receive several lucrative contracts worth hundreds of millions of dollars as a result of the conspiracy being carried out and executed as the Conspirators had intended. The existence of agreements between Boeing and its co-conspirators as to patent or trade secret licensing of the stolen intellectual property will require discovery.

405.    Due to the conspiracy being successfully carried out, Boeing also directed all future work on the SLS project to the Conspirators, many of whom were Wilson's direct competitors, even though the Conspirators spent no time or resources developing the solution Wilson alone had designed and created. There are undoubtedly agreements between Boeing and its co-conspirators for the purchase of goods and services which discovery will uncover.

406.    On information and belief, two of the Bogus Boeing Employees who took part in the conspiracy, Charles Krampert and Paul Protos of Kord Technologies, received awards for their contributions to installing the SLS tubing system.

407.    In 2015, after accessing and utilizing Wilson's technology from Boeing, Charles Krampert of Kord Technologies was honored as a Responsible Engineer for the SLS Engine Section subsystem tubing. **ECF No. 1-38**.

408.    In 2016, after accessing and utilizing Wilson's technology from Boeing, Paul Protos of Kord Technologies was named Lead Tool Engineer for the Engine Section Assembly and Integration on the SLS program.  **ECF No. 1-39**.

409.    Kord Technologies is a Boeing Silver and Gold Supplier and has been since 2012. **ECF No. 1-40**.

410.    In addition to the foregoing, Boeing similarly conspired with Oakridge Tool & Engineering to produce counterfeit FFTD-1 Second Generation tools to Wilson's detriment and also to infringe upon Wilson's trademark in connection therewith. There are most likely agreements between Boeing and Oakridge regarding the purchase and sale of the counterfeit tools.

411.    The Conspirators, including Boeing, benefited and profited from the conspiracy by gaining additional revenue and public recognition from its unauthorized use of the intellectual property that rightfully belonged to Wilson.

412.    The civil conspiracy proximately caused pecuniary injury and other general damages to Wilson for which Boeing is liable, including punitive damages, in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF: FRAUD

413.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

414.    In 1997, Boeing presented Wilson with a Statement of Work and ordered an FFTD-1 that would tighten 1" Gamah fittings on the ISS to a maximum of 69 ft/lbs which Wilson produced according to those exact specifications on which Wilson reasonably relied on in designing the tool.

415.    At the time Boeing ordered the FFTD-1 from Wilson, Boeing had been provided technical instructions for the installation of the fittings on the ISS by the Gamah fittings manufacturer, Stanley Aviation. **ECF No. 1-83 (under seal cover sheet); ECF No. 51 (sealed document).**

416.    With knowledge of the 69 ft/lb torque limitations, Boeing engineers, Chip Link and David A. Williams prepared an Acceptance Test Procedure (the "Procedure"). The Procedure instructed that the fitting be tightened to 69 ft/lbs <u>without the seal</u>. Since the torque on the fitting was 69 ft/lbs before adding the seal, the torque required to tighten it to the same nut to body gap with the seal inserted between the nut and body necessarily over torqued the fitting.  The amount of over torque would depend on the composition of the seal (e.g., rubber or steel).  In fact, the seals were made from stainless steel, which required up to 210 ft/lbs of torque being applied. **ECF No. 1-84 (under seal cover sheet); ECF No. 52 (sealed document).**

417.    On information and belief, the over torquing was necessary because of leaks experienced in Gamah fittings. **ECF No. 1-85 (under seal cover sheet); ECF No. 53 (sealed document).**

418.    As Boeing engineers, Chip Link and David A. Williams had reason to know the Gamah fittings would be dangerously over torqued using the Procedure they devised.

419.    On information and belief, Boeing's motive behind the Procedure was to avoid a redesign of Gamah fittings on the ISS which would delay the launch of the first US module of the ISS, which took place on February 7, 2001, which would risk Boeing's loss of bonuses or avoid penalties.

420.    On July 19, 2001, Chip Link prepared a calibration card that instructed that the FFTD-1 only generates torque in a ratio of 7:1 so that those using the tool during assembly and

in-flight would think that they were tightening the fittings to 69 ft/lbs when, in fact, they were tightening the fittings to 210 ft/lbs. Chip Link knew that the instructions were false because the Procedure correctly stated that the torque ratio of the FFTD-1 was 20:1.  Chip Link intentionally deceived the astronauts, technicians using the tool, and NASA ground control who had access to the Stanley Aviation technical instructions into believing that they were tightening the Gamah fittings to 69 ft/lbs according to the manufacturer's specifications when, in fact, they were applying 210 ft/lbs of torque. **ECF No. 1-53 (under seal cover sheet); ECF No. 37 (sealed document).**

421.    Wilson was likewise deceived when Boeing failed to disclose that the actual torque being applied to the Gamah fittings was 210 ft/lbs- the true cause of the incidents of trapped fittings.

422.    Throughout its communications with Wilson, Boeing repeatedly claimed that the trapped fitting incident on the ISS was the result of a design or manufacturing defect attributable to Wilson.

423.    For example, in 2015, Boeing employee Eric Howell personally advised Wilson, "I hate to burst your bubble, but your FFTD got stuck on the ISS" despite the fact that Mr. Howell knew the FFTD connected to the trapped fitting incident was actually manufactured by Oakridge Tool & Engineering.

424.    When Wilson then requested photographs of the FFTD involved in the trapped fitting incident in 2015, Boeing employee Chip Link falsely advised Wilson no such photographs existed.

425.    In 2018 and 2019, Boeing fraudulently represented to Wilson that the FFTD-1 tools that broke resulted from Wilson's defective design when the damage was caused by Boeing's false calibration that resulted in over torquing the tools and associated fittings.

426.    While accusing Wilson for defectively designing the FFTD-1 tools that broke, Boeing sent the FFTD-1 Second Generation tool bearing serial number S/N: 008 to Wilson in 2019 at which time Boeing employee, Chip Link told Wilson "your Stradivarius is playing like a cheap fiddle."

427.    In sending the FFTD-1 Second Generation tool bearing serial number S/N: 008 to Wilson in 2019, Boeing requested Wilson repair it which Wilson ultimately agreed to do at a financial loss believing Boeing's false accusations that it designed a defective product.

428.    Boeing made these representations to Wilson to induce Wilson to believe its tool did not perform, and to have Wilson perform repairs for Boeing at a drastically reduced rate knowing the FFTD-1 was Wilson's flagship product which its reputation in the aerospace industry was tied to.

429.    In reliance on Boeing's representations, Wilson committed countless hours of painstaking effort to determine the alleged cause of the defect. Wilson also refrained from marketing the tool and expended many hours and resources to redesign it in reliance on Boeing's representations.

430.    Boeing also made these representations with knowledge that the true reason for the FFTD-1 becoming trapped on a fitting on the ISS was not due to a defect in Wilson's design but rather Boeing's false calibration method which Boeing hoped would remain undiscovered. Boeing's false calibration method caused the FFTD-1 to over tighten fittings up to three times the maximum torque, causing the head of the nut on the fitting to become distorted and trapping

the tool and on information and belief, was the cause of leaks on the ISS and the Columbia. **ECF No. 1-85 (under seal cover sheet); ECF No. 53 (sealed document); ECF No. 1-86**.

431.    Wilson had no reason to know these statements were false because of its longstanding relationship with Boeing and also because Boeing refused to provide Wilson with the test procedure, a sample of the fitting, or the calibration card despite Wilson's repeated requests to Boeing's Chip Link.

432.    Boeing made these representations with the intent to hide from Wilson and NASA the true cause of the trapped fittings and the leaks.

433.    Boeing also represented to Wilson and others that the trapped FFTD-1 was manufactured by Wilson when it knew the trapped FFTD-1 was actually manufactured by Oakridge Tool & Engineering.

434.    Wilson relied on Boeing's representations in investigating the cause of the trapped fitting incident and also in redesigning the tool at great time and expense.

435.    Boeing knew this representation was false when it was made because the tools at issue were counterfeit tools that bore Wilson's trademark. Boeing knew of the statement's falsity because Boeing authorized Oakridge Tool & Engineering to manufacture a counterfeit tool using Wilson's trademark, part number and drawing package.

436.    Boeing also knew that the FFTD-1 trapped on the ISS was not a tool made by Wilson because Boeing possessed a picture of the tool in its trapped condition on the ISS which revealed that the tool was similar in design but not identical to the Wilson tool.

437.    Boeing made this representation with the intent that Wilson act on it by spending countless hours redesigning its flagship product rather than investigate alternative explanations for the trapped fitting incidents.

438.     Boeing further intended that its misrepresentation prevent Wilson from disclosing to NASA that the fittings on which the tool was used were dangerously overtightened and also to prevent Wilson from discovering Boeing's involvement in procuring counterfeit tools using Wilson's trademark, part number and drawing package.

439.     Boeing's intent is evidenced by its refusal to provide Wilson with a picture of the trapped tool, the method of calibrating torque using the tool and its refusal to disclose to Wilson the false torque ratios that Boeing provided to NASA.

440.     Wilson had no reason to know Boeing's statements were false without the benefit of knowing  (1) Boeing's false method of calibrating torque; (2) Boeing's undisclosed design change in the fitting's composition; and (3) Boeing's false instructions about how the FFTD-1 tool was used, Wilson was incapable of knowing what truly caused the tool to become trapped. The photograph was in Boeing's possession.

441.     Wilson had a right to rely on Boeing's misrepresentations because Boeing had unilateral access to all pertinent information which it refused to disclose to Wilson.

442.     Wilson continuously began to uncover Boeing's fraudulent representations over the course of several years, spanning from September 2019 to January 2021.

443.     As a direct and proximate cause of Boeing's fraudulent representations, Wilson has suffered losses and incurred damages, including the  (1) the expenditure of time, effort, monetary, and other pecuniary resources in repairing the FFTD-1 at a loss and attempting to rectify the fraudulent allegation of a defective design or manufacture of the FFTD-1; (2) its loss of reputation in the space industry due to Boeing's false publications to NASA that the trapped tool was designed and manufactured by Wilson; (3) Boeing's unjust enrichment by avoidance of the clawback provisions, (**ECF No. 1-87**), in the ISS contract, profits from its maintenance

contract for the ISS, and profits on the contract with NASA for the shuttle return to flight program following the Columbia disaster, (**ECF No. 1-88**); and (4) other past and future general and special damages in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION
#### *Plead in the Alternative to Plaintiff's Sixth Cause of Action*

444.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

445.    Boeing, in the course of its business and in the course of the transactions in which it had a pecuniary interest, supplied false information for the guidance of others in their business transactions.

446.    The false information Boeing supplied, as detailed in Wilson's sixth cause of action for fraud, *supra*, was that the Trapped Fitting incident on the ISS was attributable to Wilson's design or manufacturing defect with the FFTD-1.

447.    Boeing failed to disclose that the actual torque being applied to the Gamah fittings was 210 ft/lbs- the true cause of the incidents of trapped fittings.

448.    This deceit occurred under circumstances where a fiduciary relationship existed between Plaintiff and Defendant.

449.    In the alternative, and at the very least, the deceit occurred under circumstances where a quasi-fiduciary relationship existed between Plaintiff and Defendant because a special relationship of trust and confidence had been developed between the parties over the course of their longstanding business relationship.

450.    Throughout its communications with Wilson, Boeing repeatedly claimed that the trapped fitting incident on the ISS was the result of a design or manufacturing defect attributable

to Wilson. Wilson was relying on Boeing's representation in this regard because Boeing had knowledge of the material facts pertaining to the ISS that were not easily discoverable by Wilson.

451.    In 2018 and 2019, Boeing fraudulently and falsely represented to Wilson that the FFTD-1 tools that broke resulted from Wilson's defective design when the damage was caused by Boeing's false calibration that resulted in over torquing the tools.

452.    Boeing failed to exercise reasonable care or competence in communicating the information to Wilson.

453.    Boeing supplied the false information with the intention to influence Wilson's actions which prevented Wilson from disclosing to NASA the true cause of the trapped fitting. **ECF No. 1-45 (under seal cover page); ECF No. 34 (sealed exhibit)**.

454.    As a direct and proximate result of Boeing's supply of false information, Wilson suffered pecuniary loss as a consequence of Wilson's reliance upon the misrepresentation for which Boeing is liable.

455.    Additionally, or in the alternative, Defendant Boeing failed to disclose to Wilson a fact which Boeing knew may justifiably induce Wilson to act or refrain from acting in a business transaction.

456.    Specifically, Boeing failed to disclose its false method of calibrating torque to Wilson as well as its undisclosed design change in the fitting's composition.

457.    Boeing was under a duty to exercise reasonable care to disclose to Wilson the matters in question.

458.    As a direct and proximate result of Boeing's negligent nondisclosure of information, Wilson suffered pecuniary loss as a consequence of Wilson's reliance upon the misrepresentation for which Boeing is liable.

92

**NINTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE**

459.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

460.    An expectancy of business relationships exists between Wilson and the purchasers and prospective purchasers of Wilson's tools in the aerospace, commercial aircraft, defense, and other industries.

461.    These purchasers and prospective purchasers of Wilson's tools in the aerospace, commercial aircraft, defense, and other industries, include but are not limited to Lockheed Martin, United Space Alliance, and NASA. The commercial aircraft industry is provided with hundreds of tool kits to address FAA Air Worthiness Directives, many of which are provided by Boeing to commercial airlines through its Global Services Division.[26] When the Air Worthiness Directive identifying leaking fittings or improper torqued bolts were issued, Wilson would have had an opportunity to provide such torque tools and calibration equipment in place of inferior and mis-calibrated tools.

462.    Boeing had knowledge of and has intentionally and unjustifiably interfered with prospective business relationships between Wilson and these prospective customers of Wilson's services by violating Wilson's intellectual property rights; taking and encouraging others to take credit for Wilson's inventions and trade secrets; expunging its own records of Wilson's accomplishments; blaming Wilson for the trapped fitting; and otherwise disparaging Wilson and its products.

---

[26] *Boeing Tool Leasing Services,* Boeing https://services.boeing.com/maintenance-engineering/technical-engineering-services/tool-leasing-services (last visited Aug. 29, 2024)

463.   Specifically, Boeing has utilized Wilson's intellectual property, the FFTD mark, and Wilson's confidential pricing information related to the family of FFTD products to impede Wilson's business relationships within and outside the aerospace industry.

464.   Boeing's unlawful use of Wilson's intellectual property has resulted in the substantial loss of business Wilson would have otherwise realized given the large market for high quality tools that can tighten bolts and fittings which can be continuously tested for repeatability. Such tools, like the ones Wilson specializes in designing, creating, and manufacturing, can be used to replace defectively installed parts on space and military vehicles and also for building future vehicles used by NASA and the Department of Defense.

465.   Prospective end users of Wilson's properly designed, manufactured, and calibrated products like the Department of Defense and NASA would also realize a significant savings by reducing the prevalence of costly launch failures. Use of mis-calibrated, misassembled, or poorly manufactured tools can cause leaks from micro-galling of seals, distortion of tubing connected to fittings, and valve leaks. There are thousands of fluid fittings on space and military crafts as well as on commercial aircraft.

466.   Boeing's unlawful interference includes redacting any reference to Wilson's history of providing Boeing tools and critical flight support hardware for use on various aerospace projects which ultimately prevented Wilson from bidding on a tooling kit for NASA's SLS project due to what purported to be inadequate qualifications.

467.   Similarly, in 2018, Wilson manufactured a gearbox for Boeing to be used on the Starliner. When the gearbox was personally delivered to the Boeing facility at the Redstone Arsenal in Alabama, Boeing did not record or document Wilson's delivery or presence at the

facility for the apparent purpose of avoiding any record of Wilson having manufactured the product.

468.    In addition to these systematic acts of expunging Wilson's contributions to NASA projects, Boeing also convinced Wilson to always use Boeing as a conduit when transacting business with NASA.

469.    In convincing Wilson to only deal through it for work on NASA projects, Boeing also undermined Wilson's ability to become a direct competitor or work with another competitor to Boeing such as Lockheed Martin or United Space Alliance.

470.    Additionally, when Wilson commenced discussions with Boeing about products custom made for the SLS project, namely Wilson's FFTD-3 and its 105 accessories, Boeing doubled down on its expungement efforts by making slight alterations to its internal records on Wilson including: Wilson's supplier number, the identification numbers for Wilson products, and the names of the products themselves in order to prevent NASA auditors, using electronic search software, from finding Wilson's products.

471.    In total, there were 77 such instances of Boeing intentionally altering its internal records on Wilson.

472.    On information and belief, had NASA knew of the numerous high-profile products that Wilson designed and built for NASA, at comparably modest prices, NASA would have asked Wilson to submit a competitive bid to supply the products directly to it. The laws and regulations that enable small suppliers, like Wilson, to directly bid to NASA include the Small Businesses Act, 15 U.S.C. § 631 et seq.; the Federal Acquisition Regulation, 48 C.F.R. Part 19, and 48 C.F.R. Chapter 18; the Procurement Integrity Act, 41 U.S.C. § 2101 et seq. and the National Defense Authorization Act.

473.     Instead, by eliminating Wilson as a potential competitor, Boeing could hold itself out as a sole source supplier of its products and charge much higher prices, thereby exploiting NASA and consequently, the American taxpayer.

474.     Wilson has a history of supplying products to Lockheed Martin in the early 2000s. One such example is Wilson designing a tool for installing critical fittings used on the Gravity Probe B satellite in a joint project run by Lockheed Martin and Stanford University to prove Einstein's theory of relativity in space.

475.     Wilson also designed the RAD-1020 tool for Lockheed Martin which has been on display in the Smithsonian Air and Space Museum in Washington D. C. United Launch Alliance, which is jointly owned by Boeing and Lockheed, is also a potential customer.[27]

476.     Due to Boeing expunging Wilson's exemplary history of recent work including Wilson designing the FFTD-1 for the ISS, the FFTD-2 for the critical mission of changing out the oxygen concentration system on the ISS, the Capture Latch and testing system for the ISS docking system, the FFTD-3 and Torque Tester for the SLS, and the Gearbox for the CST-100 Starliner, Wilson was prevented from  providing Lockheed Martin examples of its post 2000s work history in the aerospace industry.

477.     Coupled with Boeing's false attribution of blame for the so called "Infamous" and Dreaded" FFTD tools, Boeing destroyed Wilson's ability to make a credible proposal to multiple current Lockheed Martin projects which have a considerable need for Wilson's tools including

_____

[27] *Tool, Right Angle Drive*, National Air and Space Museum https://airandspace.si.edu/collection-objects/tool-right-angle-drive/nasm_A20010316000. (last visited Aug. 29, 2024)

but not limited to: Naval ship support; the Hubble Space Telescope; as well as the Trident ICBM and F-117 Nighthawk – both of which have known Gamah fitting applications.

478.    Boeing engaged in the acts of interference set forth in this Complaint with a conscious desire to prevent business relationships between Wilson and prospective customers from being established and to provide Boeing with an unlawful competitive advantage within the aerospace industry.

479.    Boeing knew and was consciously aware that unlawful interference was certain or substantially certain to occur as a result of its conduct.

480.    Wilson has been damaged and continues to be damaged as a result of Boeing's unlawful interference.

## TENTH CLAIM FOR RELIEF: BREACH OF CONTRACT

481.    Wilson re-alleges and incorporates by reference the allegations in the preceding paragraphs.

482.    On August 29, 2014, Boeing entered into a non-disclosure and proprietary information agreement ("PIA") with Wilson with a choice of law provision in favor of Washington state.

483.    The 2014 PIA is a valid and enforceable contract under Washington law.

484.    As an enforceable contract, the PIA contained an implied duty of good faith and fair dealing.

485.    The implied duty of good faith and fair dealing required Boeing to cooperate with Wilson so that both Boeing and Wilson could obtain the full benefit of performance and also refrain from engaging in acts or omissions that would breach standards of decency, fairness, and reasonableness.

97

486.     Boeing breached the duty of good faith and fair dealing owed to Wilson by failing to refrain from the bad acts as alleged above that prevented Wilson from receiving the full benefit and protections promised under the 2014 PIA.

487.     Namely, Boeing breached the duty of good faith and fair dealing by stealing, infringing, and sharing Wilson's intellectual property without use of a confidentiality legend, including but not limited to:

- inviting persons employed by Wilson's direct competitors to a confidential meeting disguised as Boeing employees **ECF No. 1-26 (under seal cover sheet); ECF No. 24 (sealed document).**

- Requesting confidential and proprietary information from Wilson via email with persons employed by Wilson's direct competitors on the email thread disguised as Boeing employees with Boeing email addresses;

- Deliberately failing to inform Wilson the Bogus Boeing Employees were not employed by Boeing but were actually competitors of Wilson.

- Not maintaining proprietary and confidential status of Wilson's information as required by the 2014 PIA.

488.     Boeing's actions are contrary to principles of faithfulness to an agreed common purpose and inconsistent with the justified expectations of Wilson.

489.     The PIA stated: "This Agreement sets forth the rights and obligations of the parties with respect to the use, handling, protection, and safeguarding of Proprietary Information which is disclosed by and between the parties hereto relating to NASA's next generation launch vehicle(s) including but not limited to Space Launch Program . . . ."

490.    The Agreement defined "Proprietary Information" as "all information related to the purposes that are identified as Proprietary Information, including but not limited to, technical information in the form of designs, concepts, requirements, specifications, software, interfaces, components, processes, or the like."

491.    Boeing agreed to "limit access to [Wilson's] Proprietary Information it receives to its employees who have a 'need-to-know' the Proprietary Information for the purposes of the Program."

492.    Boeing agreed it would "copy Proprietary Information only as reasonably necessary for it to complete the purposes of this Agreement."

493.    The PIA expressly imposed a duty upon Boeing "to protect Proprietary Information from misuse or unauthorized disclosure by exercising reasonable care. Such care will include protecting Proprietary Information using those practices the receiving party normally uses to restrict disclosure and use its own information of like importance."

494.    In sum, Boeing agreed not to publish, disclose, or allow to be disclosed, any of Wilson's proprietary and trade secret information without Wilson's express written consent.

495.    Boeing breached the 2014 PIA by stealing Wilson's intellectual property, infringing Wilson's intellectual property, and sharing Wilson's intellectual property without authorization.

496.    All conditions precedent were satisfied by Wilson.

497.    As a result of Boeing's breach of contract, Wilson is entitled to damages, including actual damages in an amount to be proven at trial; past and future lost profits in an amount to be proven at trial; expenditures made in preparation for performance and/or in

performance in an amount to be proven at trial; and restitution or the restoration of any benefit conferred on Boeing to prevent unjust enrichment in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Wilson Aerospace, LLC, prays for judgment in its favor and against Defendant, The Boeing Company, as follows:

A) That Boeing's products and materials that infringe Wilson's copyright, as well as any other articles that contain or embody copies of Wilson's original work, be impounded pursuant to 17 U.S.C. § 503(a);

B) That Boeing's products and materials that infringe Wilson's copyright, as well as any other articles that contain or embody copies of Wilson's original work, be destroyed pursuant to 17 U.S.C. § 503(b);

C) That Boeing be required to provide a full accounting to Wilson for all profits derived from its use of Wilson's intellectual property in Boeing's production, reproduction, and preparation of derivative works based on, distribution, and of unauthorized FFTD-3 works in all media, from all sources;

D) That Boeing be ordered to pay Wilson damages related to every expenditure proximately caused by reliance of Boeing's misrepresentations which would not have otherwise been incurred;

E) That Boeing be ordered to pay Wilson all damages in an amount to be proven at trial, including future damages, that Wilson has sustained or will sustain as a result of the acts complained of herein, Wilson's lost earnings and profits, operating losses and expenses, and that Wilson be awarded any profits and sums unjustly derived by Boeing as a result of Boeing's infringement or misappropriation, or as determined by said accounting;

F) That Boeing be ordered to pay to Wilson punitive damages as a result of Boeing's deliberate and willful misconduct and to deter such conduct from occurring in the future;

G) That Boeing be ordered to pay to Wilson pre-judgment and post judgment interest and treble damages, as permitted by law;

H) That Boeing be ordered to pay to Wilson the costs and reasonable attorney's fees it has incurred in this action, as permitted by law;

I) That Boeing and all of its agents, officers, employees, representatives, successors, and assigns be permanently enjoined from:

    a.   Any and all further infringement of Wilson's tools identified and named herein;

    b.   Any and all further infringement of the FFTD tools, including promoting, distributing or selling counterfeit FFTD tools; and

    c.   Referring to counterfeit products made by Oakridge Tool or any other third party as a FFTD tool.

J) That Boeing be ordered to deliver up for forfeiture and destruction each and every counterfeit FFTD tool, item or related material that was produced, procured or obtained by Boeing; and

K) For any and all further relief as this Honorable Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff Wilson Aerospace, LLC, respectfully demands a trial by jury on all claims and issues so triable.

Respectfully submitted this Friday, August 30, 2024,

*/s/ Kenneth R. Friedman*

Kenneth R. Friedman (Bar # 17148)
FRIEDMAN RUBIN PLLP
1126 Highland Avenue
Bremerton, Washington 98337-1828
kfriedman@friedmanrubin.com

*/s/ Mel C. Orchard, III*
Mel C. Orchard, III (*pro hac vice*)
*/s/ Emily S. Madden*
Emily S. Madden (*pro hac vice*)
THE SPENCE LAW FIRM
15 S. Jackson St. / P.O. Box 548
Jackson, Wyoming 83001
orchard@spencelawyers.com
madden@spencelawyers.com

*/s/ Peter J. Flowers*
Peter J. Flowers (*pro hac vice*)
*/s/ Christopher J. Warmbold*
Christopher J. Warmbold (*pro hac vice*)
Meyers & Flowers, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
pjf@meyers-flowers.com
cjw@meyers-flowers.com

*/s/ Lance Astrella*
Lance Astrella (*pro hac vice*)
ASTRELLA LAW, P.C.
1600 Broadway, Suite 1070
Denver, Colorado 80202
lance@astrellalaw.com

*/s/ Rex Sharp*
Rex Sharp (*pro hac vice*)
SHARP LAW LLP
4820 W. 75th Street
Prairie Village, Kansas 66208
rsharp@midwest-law.com

*/s/ William W. Cochran*
William W. Cochran (*pro hac vice*)
COCHRAN FREUND & YOUNG LLC
2026 Caribou Dr, Ste. 201
Ft. Collins, Colorado 80525

102

billc@patentlegal.com

**CERTIFICATE OF SERVICE**

I certify that on August 30, 2024, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

*/s/ Christopher J. Warmbold*