1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILSON AEROSPACE LLC,

             Plaintiff,

   v.

THE BOEING COMPANY INC,

            Defendant.

CASE NO. 2:23-cv-00847-JHC

ORDER RE: MOTION TO DISMISS

**I**

**INTRODUCTION**

    This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint. Dkt. # 141. Plaintiff, Wilson Aerospace LLC (Wilson), alleges it provided Defendant, The Boeing Company Inc. (Boeing), with custom-built aerospace technologies and Defendant copied, stole, and counterfeited this intellectual property. Dkt. # 140. Plaintiff further alleges Defendant is the mastermind of a conspiracy to steal the intellectual property of smaller companies. *Id.* Plaintiff brings its claims under both federal and state law. *Id.* Defendant seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Dkt. # 141.  For the reasons discussed below, the Court GRANTS in part and DENIES in part the motion.

## II
### BACKGROUND

A.    Factual Background

This factual background is based on the allegations in the Third Amended Complaint (TAC), *see* Dkt. # 140, which the Court accepts as true on a Rule 12(b)(6) motion to dismiss.

Plaintiff designs and builds complex mechanisms for space and aerospace applications. *Id.* at 10.  And Defendant designs, manufactures, and sells airplanes, rockets, satellites, and other technology throughout the world.  *Id.* at 9.  Over the years, Plaintiff invented and built several tools for Defendant, "many of which were designed for use in tightening fittings and valves to the optimum degree of tightness as specified by the fitting manufacturer and approved by NASA to avoid unnecessary damage and the potential for dangerous leaks and releases of toxic and explosive fluids in aircraft and space vehicles."  *Id.* at 10.

On October 29, 2012, and August 29, 2014, the parties entered into non-disclosure and proprietary information agreements (PIAs) in which Defendant "agreed not to publish, disclose, or allow to be disclosed, any of Wilson's proprietary and trade secret information without Wilson's express written consent."  *Id.*; Dkt. # 1-2 (2012 PIA); Dkt. # 1-3 (2014 PIA).  Under the protection of the PIAs, Plaintiff "invented, designed, and created multiple tools that were used or intended for use in interstate commerce by Boeing, NASA, and other companies."  *Id.* at 12.

Among these tools are four iterations of a "specialty tooling lineup called the Fluid Fitting Torque Device" (FFTD), a "family of tools Wilson invented for the specific purpose of tightening and loosening fittings."  *Id.*  The FFTD is mainly used to tighten and loosen fittings in

difficult to access areas on spacecraft, like the International Space Station (ISS) and Boeing's Space Launch System (SLS). *Id.* Plaintiff also invented a Torque Tester, which "is used to verify and calibrate the torque on the FFTD-3[.]" *Id.* at 13. And Plaintiff designed and manufactured the Dreamliner Bolting Tool "to install bolts and fasteners on commercial aircraft," and the Gearbox, "an assembly for the nose cone cover of the Boeing CST-100 *Starliner*." *Id.* at 14.

On top of misusing the tools, Defendant stole Plaintiff's intellectual property. *Id.* at 11. Defendant has "followed a pattern throughout its SLS, ISS, and commercial aircraft divisions" to misappropriate Plaintiff's confidential information and reap millions of dollars in profit. *Id.* Defendant "routinely muscles around and takes advantage of smaller suppliers like Wilson by stealing and infringing their most sensitive intellectual property, using false pretenses and deception to gain access to their proprietary information." *Id.* at 7.

Defendant misused these tools. *See id.* at 20–47. Still, Plaintiff was blamed for a November 18, 2015 "trapped fitting incident" in which an FFTD-1 was stuck on an ISS Airlock Installation Kit and abandoned in place. *Id.* at 34–35. This incident occurred because Defendant "approved a non-conforming design and manufacturing change without Wilson's knowledge[.]" *Id.* Defendant and another company, Oakridge Tool & Engineering, also built counterfeit FFTDs using Plaintiff's design. *Id.* at 40. When issues arose with the counterfeit tools because they "were improperly assembled and were defectively manufactured," Plaintiff's design was blamed. *Id.* And Plaintiff's "trademark suffered negative publicity." *Id.*

On top of misusing the tools, Defendant stole Plaintiff's intellectual property. *Id.* at 11. Defendant has "followed a pattern throughout its SLS, ISS, and commercial aircraft divisions" to misappropriate Plaintiff's confidential information and reap millions of dollars in profit. *Id.* Defendant "routinely muscles around and takes advantage of smaller suppliers like Wilson by stealing and infringing their most sensitive intellectual property, using false pretenses and deception to gain access to their proprietary information." *Id.* at 7.

There were several instances when Defendant violated the PIAs or sought to undermine Plaintiff's work. For example, Defendant organized a live demonstration of the FFTD-3 in October 2014. *Id.* at 24. During the presentation, Plaintiff explained the tool's capabilities and allowed the attendees—"who were held out to Wilson as Boeing employees"—to use the FFTD.

*Id.*  Plaintiff only later learned that at least seven of the attendees were employees of Plaintiff's direct competitors (Bogus Boeing Employees).  *Id.*  This was initially concealed from Plaintiff, who would not have knowingly shared this information with its competition.  *Id.*  Plaintiff "later discovered" Defendant's "internal records listed several people working for Wilson competitors as employees of Wilson with authority to make unauthorized management decisions for Wilson ('Ghost Employees')."  *Id.* at 50.  Defendant used the Ghost Employees "to support Boeing's efforts to block Wilson's attempts to provide its superior products for the SLS project at a low cost."  *Id.* at 51.

B.    Procedural History

Plaintiff filed this case on June 6, 2023.  Dkt. # 1.  Defendant then filed its initial motion to dismiss.  Dkt. # 88 (redacted motion).  Rather than file an opposition, Plaintiff sought leave to file a First Amended Complaint (FAC), which the Court granted.  Dkt. ## 99, 100.  Plaintiff filed the FAC.  Dkt. # 102.  Defendant moved to dismiss the FAC.  Dkt. # 120 (redacted motion).  The Court granted in part and denied in part Defendant's motion to dismiss, and granted Plaintiff leave to file a Second Amended Complaint (SAC).  Dkt. # 132.

Following the Court's order, Plaintiff filed a motion for reconsideration.  Dkt. # 133.  And soon after, Plaintiff filed the SAC.  Dkt. # 136.  The Court granted the motion for reconsideration, and granted Plaintiff leave to file a Third Amended Complaint (TAC) so that it could replead the previously dismissed FFTD-3 trade secret misappropriation claim.  Dkt. # 138.

Plaintiff then filed its TAC, bringing 10 causes of action: (1) copyright infringement; (2) FFTD-3 trade secret misappropriation under the Defend Trade Secrets Act (DTSA) and Washington Uniform Trade Secrets Act (WUTSA); (3) Dreamliner Bolting Tool trade secret misappropriation under the DTSA and WUTSA; (4) trademark infringement; (5) violation of the civil Racketeer Influenced and Corrupt Organizations Act (RICO); (6); civil conspiracy; (7)

1    fraud; (8) negligent misrepresentation (pleaded in the alternative to fraud); (9) tortious

2    interference with prospective advantage; and (10) breach of contract.  Dkt. # 140 at 52–100.

3    Defendant moves to dismiss, contending that the Court does not have subject matter jurisdiction

4    over all the claims and the TAC fails to state a claim upon which relief may be granted.  *See* Fed.

5    R. Civ. P. 12(b)(1), 12(b)(6); Dkt. ## 141, 143.

### III

#### DISCUSSION

A.    Scope of Leave to Amend

Defendant first contends that Plaintiff's copyright and trademark infringement claims

must be dismissed because they exceed the scope of the Court's leave to amend.  Dkt. # 141 at

10.  Plaintiff maintains that it did not violate the Court's prior order, even though it has added

claims associated with new copyright registrations and trademarks, because it still alleges its

copyrights were violated under 17 U.S.C. §§ 101 *et seq.* and its trademarks were violated under

15 U.S.C. § 1114 and 15 U.S.C. § 1125.  Dkt. # 142 at 6–8.

Courts generally look to the language of the prior order when determining the scope of

leave to amend.  *Jameson Beach Prop. Owners Ass'n v. United States*, 2014 WL 4925253, at *3

(E.D. Cal. Sept. 29, 2014) (citing *Urista v. Bank of Am.,* 2012 WL 10596, at *3 (N.D. Cal. Jan. 3,

2012)); *see Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 900 (N.D. Cal. 2022) (collecting

cases about scope of leave to amend).  Here, the Court granted Plaintiff leave to file an amended

complaint and such leave was limited to "the causes of action already bought in the FAC."  Dkt.

# 132 at 39.  A "cause of action" refers to "the alleged invasion of 'recognized legal rights' upon

which a litigant bases his claim for relief."  *Davis v. Passman*, 442 U.S. 228, 237–38 (1979)

(quoting *Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682, 693 (1949)).

1      In both the FAC and TAC, Plaintiff's copyright infringement cause of action relates to

2  the FFTD-3 Source Code and derivative works fixed in a tangible medium of expression.

3  *Compare* Dkt. # 140 at 52 *with* Dkt. # 102 at 52.  But in the TAC, Plaintiff adds copyright claims

4  associated with new copyright registrations—the '952 Work and '967 Work.  Dkt. # 140 at 52.

5  Copyright registration is not a precondition to copyright protection.  17 U.S.C. §408(a).  So

6  copyright registration does not affect the alleged invasion of a plaintiff's legal rights.  Rather, it

7  affects a plaintiff's ability to institute a civil action for infringement of the copyrighted work.  17

8  U.S.C. § 411(a).  As a result, bringing claims under new copyright registrations does not mean

9  Plaintiff is alleging new causes of action because the alleged invasion of legal rights remains the

10  same.  Similarly, Plaintiff's trademark claim still relates to Defendant's alleged use of

11  "Infringing Tools" and "Infringing Goods" in commerce.  *Compare* Dkt. # 140 at 67 *with* Dkt. #

12  102 at 64.  Although Plaintiff adds a new trademark registration to its claims in the TAC, the

13  Lanham Act protects both registered and unregistered marks and the standard to plead trademark

14  infringement is the same for both registered and unregistered marks.  *Lahoti v. VeriCheck, Inc.*,

15  586 F.3d 1190, 1196 (9th Cir. 2009).  So the alleged invasion of trademark rights remains the

16  same as well.  Thus, these claims fall within the scope of the Court's prior order and they will

17  not be dismissed for exceeding the scope of leave to amend.

18      In addition, the Court will not limit the boundaries of its grant of leave to amend to the

19  specific works and marks alleged in the FAC because Defendant fails to show that these new

20  claims are "wholly specious" or that it is unduly prejudiced by these allegations.  *See Lamumba*

21  *Corp. v. City of Oakland*, 2006 WL 3086726, at *4 (N.D. Cal. Oct. 30, 2006).

22  B.    Copyright Infringement Claim

23      Defendant provides three reasons to dismiss Plaintiff's copyright infringement claim.

24  First, it says this claim must be dismissed under Rule 12(b)(1) because 28 U.S.C. § 1498(b)

deprives the Court of subject matter jurisdiction. Dkt. # 141 at 11–12. Second, Defendant says, even if the Court reads § 1498(b) to be an affirmative defense, the TAC establishes this defense. *Id.* at 16. Third, it says that the three-year limitations period in 28 U.S.C. § 1498 bars the claim. *Id.* Each of these arguments fails for the reasons below.

1.      Subject Matter Jurisdiction

Defendant raises a facial challenge to the Court's subject matter jurisdiction over Plaintiff's copyright infringement claim. *Id.* at 9. A facial challenge accepts the truth of the plaintiff's allegations but asserts that they "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004). A court resolves a facial challenge under Rule 12(b)(1) in the same way it would resolve a motion to dismiss under Rule 12(b)(6): "Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citing *Pride v. Correa,* 719 F.3d 1130, 1133 (9th Cir. 2013)).

According to Defendant, 28 U.S.C. § 1498(b) strips the Court of subject matter jurisdiction over Plaintiff's copyright infringement claim because the statute grants the Court of Federal Claims exclusive jurisdiction to hear these claims against government contractors. Dkt. # 141 at 4–5. Plaintiff responds that this statute does not create a jurisdictional bar, it merely creates an affirmative defense. Dkt. # 142 at 8–9. The statute provides:

> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement . . . .

28 U.S.C. § 1498(b).

Differentiating between a jurisdictional bar and affirmative defense is crucial because the Court has an unfailing obligation to police its own subject matter jurisdiction.  Fed. R. Civ. P. 12(h)(3); *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  In general, district courts have subject matter jurisdiction over copyright infringement claims.  28 U.S.C §§ 1331, 1338(a).  And the Federal Circuit and courts in the Ninth Circuit consistently find § 1498 serves as an affirmative defense when the plaintiff sues a private party.  *See, e.g.*, *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 970 (C.D. Cal. 2019) ("Section 1498 is an affirmative defense, not a jurisdictional bar.") (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990)); *Montgomery v. Etreppid Techs., LLC*, 2007 WL 1560338, at *3 (D. Nev. May 24, 2007); *Crater Corp. v. Lucent Tech., Inc.,* 255 F.3d 1361, 1364 (Fed. Cir. 2001).

Here, Plaintiff sued a private party.  So 28 U.S.C. § 1498(b) functions as an affirmative defense and does not divest the Court of subject matter jurisdiction over Plaintiff's copyright claim.  The Court does not dismiss this claim under Rule 12(b)(1).

2.    Affirmative Defense

Even so, "dismissal based on an affirmative defense is permitted when the complaint establishes the defense." *U.S. CFTC v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (emphasis removed).

Section 1498(b) only applies if Defendant was "acting for the Government and with the authorization or consent of the Government."  28 U.S.C. § 1498(b).  To establish an affirmative defense under § 1498(b) requires a "highly factual determination," in part because the authorization and consent of the Government may be express or implied.  *Saint-Gobain*, 369 F. Supp. 3d at 970 (citing *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365

(Fed. Cir. 2007)); *id.* at 971 (citing *Golden v. United States*, 137 Fed. Cl. 155, 175 (Fed. Cl. 2018)).  And because the Government can limit its authorization and consent by clauses in a contract.  *Golden*, 137 Fed. Cl. at 172; *Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct. Cl. 1976).

Defendant posits "at the very least" that the TAC alleges NASA impliedly authorized or consented to Defendant's use of Plaintiff's copyrighted works.  Dkt. # 141 at 15.  But this would require a factual finding.  *See Saint-Gobain*, 369 F. Supp. 3d at 970.  And, at this stage, the Court does not make factual findings; its analysis of the claims is limited to the allegations in Plaintiff's complaint.  *See. e.g.*, *Browne v. McCain*, 612 F. Supp. 2d 1125, 1130 (C.D. Cal. 2009).  The TAC includes no allegations about authorization and consent clauses in the contracts between Defendant and the Government.  *See generally* Dkt. # 140.  As a result, the TAC does not establish whether Defendant was "acting for the Government and with the authorization or consent of the Government" when it allegedly infringed Plaintiff's copyrights because the Government's authorization and consent may have been limited by contract.  *See* 28 U.S.C. § 1498(b).  Thus, the TAC does not show that § 1498(b) relieves Defendant from copyright liability.

### 3.    Statute of Limitations

Defendant also maintains that Plaintiff's copyright claim can be dismissed under the three-year statute of limitations of 28 U.S.C § 1498.  Dkt. # 141 at 16.  "[A] copyright infringement claim accrues—and the statute of limitations begins to run—when a party discovers, or reasonably should have discovered, the alleged infringement."  *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019).  Even the mere "suspicion" of copyright infringement "places upon the plaintiff a duty to investigate further into possible infringements of its copyrights."  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d

1042, 1048 (9th Cir. 2020) (quoting *Wood v. Santa Barbara Chamber of Com., Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983)) (cleaned up).

In *Oracle v. Hewlett Packard*, the court addressed whether Oracle's copyright infringement claims were barred by a three-year statute of limitations. 971 F.3d 1042, 1047 (9th Cir. 2020). The Ninth Circuit refused to accept Oracle's argument that it did not have actual knowledge of the defendants' wrongdoing because "constructive knowledge triggers the statute of limitations." *Id.* at 1048. And the court held that Oracle had constructive knowledge because it suspected infringement by the defendants. *Id.* Oracle conceded that it "had concerns" in 2010—five years before suing Hewlett Packard in 2015—and, crucially, made inquiries to the defendants in 2008 and 2011 after receiving reports of potential infringement. *Id.* As a result, the court concluded that Oracle had a duty to conduct a reasonable investigation by at least 2011, which it failed to do. *Id.* So even though Oracle claimed it had no actual knowledge of copyright infringement, the statute of limitations barred Oracle's claim because it did not file suit within three years of suspected wrongdoing. The doctrine of fraudulent concealment did not help Oracle either because the doctrine does not apply if the plaintiff has constructive knowledge of the facts giving rise to its claim. *Id.*

Here, Plaintiff alleges it entered PIAs with Defendant in 2012 and 2014. Dkt. # 140 at 10. Under the PIAs, Defendant "agreed not to publish, disclose, or allow to be disclosed, any of Wilson's proprietary and trade secret information without Wilson's express written consent." *Id.* This included Plaintiff's copyright protected information. *Id.* at 53. Plaintiff alleges it had no actual knowledge of infringement because it expected Defendant to honor these agreements. *Id.* at 22. And, unlike *Oracle*, the TAC does not concede that Plaintiff suspected, or had reason to suspect, that Defendant violated these agreements until January 2021. *Id.* at 31. While Defendant says this claim is barred because the alleged acts of infringement occurred in 2015

and 2016, it does not provide any argument to suggest that Plaintiff had actual or constructive knowledge of the alleged infringement at that time. Dkt. # 141 at 16. Without actual knowledge or a reason to suspect infringement before 2021, Plaintiff's copyright infringement claim did not accrue. But when Plaintiff suspected that Defendant might have been misappropriating its intellectual property in 2021—and the statute of limitations started to run—Plaintiff investigated this suspicion and sued in 2023. *See* Dkt. # 1. These allegations readily distinguish this case from *Oracle* and show 28 U.S.C. § 1498's statute of limitations does not bar Plaintiff's copyright infringement claim. *See also* Section III.D, *infra*.

C.     FFTD-3 Misappropriation Claim under the DTSA

In its prior order, the Court accepted that Plaintiff provided certain FFTD-3 trade secrets to Defendant and did not disclose those trade secrets in the tool's patent applications. Dkt. 132 at 16–17.[1] But the Court concluded that Plaintiff did not state a claim for relief under the Defend Trade Secrets Act (DTSA) because there were no plausible allegations that Defendant misappropriated these trade secrets after the enactment of the statute on May 11, 2016. *Id.* at 14–15. Defendant maintains that Plaintiff still has not plausibly alleged any trade secret misappropriation after the enactment of the DTSA.

*Legal Standards on Motion to Dismiss.*[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court accepts all factual allegations as true and construes them

---

[1] For the first time, Defendant argues in its reply brief that some of these trade secrets no longer warrant protection because they are now patented or because Plaintiff never alleges that they were provided to Defendant. Dkt. # 143 at 8. But the Court will not consider new arguments raised for the first time in a reply brief. *See State of Nev. v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990).

[2] These standards also apply in the sections below where the order addresses Defendant's arguments that other claims should be dismissed under Rule 12(b)(6).

in the light most favorable to the nonmoving party.  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).  But "[t]he court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008). (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)).

In the TAC, Plaintiff plausibly alleges Defendant's trade secret misappropriation continued after 2016.  According to Plaintiff, the FFTD-3 tool was needed to complete the SLS project.  Dkt. # 140 at 22.  Defendant's employees downloaded the FFTD-3 technical information and Defendant's employee, Ed Baglioni, had access to the FFTD-3 trade secrets due to his role as the SLS Tooling Project Manager.  *Id.* at 30, 54, 62.  And although Defendant issued a stop work order for the FFTD-3 in February 2016, it was still able to solve the engineering problem the tool was designed to fix—the RS-25 engines for the core stage of the SLS project were successfully installed in December 2019.  *Id.* at 62–64.  The plausibility of these allegations is further augmented because Ed Baglioni emailed Plaintiff in March 2016— after the stop work order was issued—and claimed Defendant still had "a pressing technical need" for the FFTD-3.  *Id.* at 62.  Baglioni then won an award for his work on the RS-25 engine installation for the same type of tool as the FFTD-3.  *Id.* at 63.  These allegations specify when and how Defendant allegedly misappropriated Plaintiff's trade secrets.  *See* Dkt. # 132 at 14. They also plausibly allege the trade secret misappropriation continued after the enactment of the DTSA in 2016 because the RS-25 engines were not installed until 2019.  Thus, Plaintiff has adequately stated a trade secret misappropriation claim under the DTSA.

Defendant's contrary arguments focus on factual issues—whether the FFTD-3 or Torque Tester was necessary for the installation of the RS-25 engines, whether Baglioni expressed a

need for the Torque Tester or the FFTD-3, and when Baglioni won his award.  Dkt. # 141 at 16–18.  But it would be premature to resolve these factual disputes at the pleading stage, and the Court must accept the TAC's well-pleaded allegations as true when deciding a Rule 12(b)(6) motion to dismiss.  *See Laborers Dist. Council Constr. Indus. Pension Fund v. Sea Ltd.*, 743 F. Supp. 3d 1083, 1099 (D. Ariz. 2024).

At the same time, the Court also concluded in its prior order that the information divulged in Plaintiff's 2014 and 2015 patent applications for the FFTD-3, which was made public in 2017, no longer qualifies as a trade secret.  Dkt. # 132 at 16.  This is still true, but Plaintiff now suggests the information exposed in the patent applications may have been misappropriated after the enactment of the DTSA but before the patent application was publicly available.  Dkt. # 142 at 11.  This allegation is not included in the TAC.  *See generally* Dkt. # 140.  Instead, Plaintiff bases this argument on two other allegations: (1) Baglioni expressed a need for the FFTD-3 only two months before the DTSA was enacted and (2) the FFTD-3 takes time to manufacture.  Dkt. # 142 at 11.  Even taking these other allegations as true and in the light most favorable to Plaintiff, this only supports the notion that Defendant misused Plaintiff's trade secrets after the DTSA was enacted.  These allegations do not support the claim that the trade secrets were misused before the patent applications were made public in 2017.  The Court does not accept this assertion because it is conclusory and is not supported by the allegations in the TAC.  *See Iqbal*, 556 U.S. at 663.

Thus, Plaintiff adequately states a claim for trade secret misappropriation under the DTSA, but only as to the trade secrets that were disclosed to Defendant and not included in the FFTD-3's patent applications that were made public in 2017.  *See* Dkt. # 132 at 15–16.

//

//

ORDER RE: MOTION TO DISMISS - 13

1    D.    Dreamliner Bolting Tool

2          The DTSA and WUTSA both impose a three-year limitations period.  18 U.S.C. §

3    1836(d); RCW 19.108.060.  Plaintiff alleges Defendant misappropriated the trade secrets related

4    to the Dreamliner Bolting Tool since 2012, but it did not file suit until 2023.  Dkt.  ## 1, 140 at

5    66.  So this trade secret misappropriation claim survives only if the statute of limitations was

6    tolled.

7          A motion to dismiss based on the running of the statute of limitations should be granted,

8    "only if the assertions of the complaint, read with the required liberality, would not permit the

9    plaintiff to prove that the statute was tolled."  *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d

10   117, 119 (9th Cir. 1980); (quoting *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir.

11   1980)).  In fact, "[g]enerally, the applicability of equitable tolling depends on matters outside the

12   pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is

13   limited to the complaint) if equitable tolling is at issue.  *Huynh v. Chase Manhattan Bank*, 465

14   F.3d 992, 1003–04 (9th Cir. 2006).  Thus, the court should not dismiss this claim unless "[t]he

15   facts necessary to determine the applicability of the discovery rule . . . clearly appear on the face

16   of the complaint."  *PTP OneClick, LLC v. Avalara, Inc.*, 413 F. Supp. 3d 1050, 1066 (W.D.

17   Wash. 2019) (quoting *Anderson v. Teck Metals, Ltd.*, 2015 WL 59100, at *2 (E.D. Wash. Jan. 5,

18   2015)).

19         It is not apparent from the TAC that Plaintiff's Dreamliner Bolting Tool claim is time

20   barred.  Plaintiff alleges that it provided Defendant with trade secrets related to a Gearbox tool in

21   2012.  Dkt. # 140 at 43.  Then Defendant abruptly stopped communicating with Plaintiff about

22   the tool in 2013 after Plaintiff was told that Defendant would no longer be using the type of

23   fastener the tool was designed for.  *Id.* at 44.  Based on this assertion, Plaintiff did not suspect

24   that Defendant was misappropriating its intellectual property until 2021.  *Id.* at 31.  And when

Plaintiff did have reason to suspect that Defendant may have been engaged in wrongdoing, it investigated and sued in 2023.  *Id.*  Although Defendant protests that Plaintiff characterizes Boeing's actions as "suspicious, predatory, and inexplicable," these allegations are not found in the TAC.  Dkt. # 141 at 19; *see* Dkt. # 140 at 44, 65-66.  Rather, Plaintiff's allegations are sufficient at this stage of the litigation, and it is not apparent from the face of the TAC that this claim is untimely.

E.      Lanham Act Violations

Plaintiff also claims Defendant violated the Lanham Act by counterfeiting and infringing its registered FFTD and Fluid Fitting Torque Device trademarks.  Dkt. # 140 at 68, 71; *see* 15 U.S.C. §§ 1114(1), 1125(a).

1.      Counterfeiting

The prohibition against counterfeiting in the Lanham Act protects only registered marks. 15 U.S.C. § 1141(1).  The FFTD mark was registered on September 21, 2021, and the Fluid Fitting Torque Device mark was registered on August 13, 2024.  It follows that Plaintiff must plausibly allege Defendant's conduct violated § 1141(1) after these marks were registered to adequately state a counterfeiting claim.  *See* Dkt. # 132 at 19; *Synergy Tech & Design Inc. v. Terry*, 2007 WL 1288464, at *4 (N.D. Cal. May 2, 2007) ("[T]here is no potential for [plaintiff] to recover [under § 1141] for federal trademark infringement for conduct that occurred prior to the registration of the subject marks.").

Plaintiff fails to meet this standard.  Although Plaintiff claims that Defendant used counterfeit FFTD tools to assemble the SLS, there are no allegations that would allow the Court to conclude it is plausible the infringing goods were used to assemble the SLS before its launch in November 2022 and after the FFTD mark was registered in September 2021.  *See* Dkt. # 140 at 68–70.  For one thing, it is still not clear when the alleged infringement occurred.  *See* Dkt. #

132 at 20.  For another, Plaintiff links the allegation that Defendant's employee required a Fluid

Fitting Torque Device and "did not care where it came from" only to the date the FFTD mark

was registered.  Dkt. # 140 at 70.  But Plaintiff does not allege Defendant's employee stated he

wanted to use the tool on the SLS or even that he wanted the tool after the FFTD mark was

registered.  *Id.*  It is similarly implausible for the Court to conclude that simply because

Defendant's employee called the tool a Fluid Fitting Torque Device it can be inferred that

Defendant used these marks in interstate commerce.  *Id.*  In addition, the TAC alleges Defendant

"continues to maintain counterfeit FFTD tools manufactured by Oakridge Tool & Engineering at

its Houston facility for potential use on the *ISS*."  *Id.* (emphasis added).  But a company

maintaining a tool in its own facility is not evidence of counterfeiting. *See* 15 U.S.C. § 1114(1)

(proscribing "use in commerce").  Besides, the SLS and ISS are different NASA programs so

this allegation does not support Plaintiff's theory the infringing goods were used to assemble the

SLS.  *See* Dkt. # 140 at 4.  The allegations about the Acceptance Data Package (ADP) similarly

fail because Plaintiff does not allege it has a registered trademark for the ADP, and § 1141(1)

only protects registered marks.  Because Plaintiff does not provide any plausible allegations that

Defendant violated § 1141(1) after its trademarks were registered, the counterfeiting claim must

be dismissed.

>     2.     Trademark Infringement

To state a claim for trademark infringement, Plaintiff "must demonstrate that it owns a

valid mark, and thus a protectable interest," and it must show that Defendant's "use of the mark

'is likely to cause confusion, or to cause mistake, or to deceive.'"  *Lahoti*, 586 F.3d at 1196–97

(quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596, 602 (9th Cir.

2005)).  A plaintiff can establish that it has a protectable interest in three ways: "(1) it has a

federally registered mark in goods or services; (2) its mark is descriptive but has acquired a

ORDER RE: MOTION TO DISMISS - 16

secondary meaning in the market; or (3) it has a suggestive mark, which is inherently distinctive and protectable." *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007). Under § 1125(a) of the Lanham Act, "the same standard applies to both registered and unregistered trademarks." *Lahoti*, 586 F.3d at 1196 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 n.3 (9th Cir. 2000)).

Courts have clarified these requirements. The registration of a trademark and the accompanying presumption of secondary meaning "operate only prospectively from the date of registration[.]" *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1117 (Fed. Cir. 2018); *Peninsula Cmty. Health Servs. v. Olympic Peninsula Health Servs. PS*, 2023 WL 2555498, at *13 (W.D. Wash. Mar. 17, 2023) ("The presumption of validity that attends trademark registration . . . begins only as of the date of registration and confers no presumption before the date of registration."). This is because trademark registration "confers a presumption of secondary meaning from that point in time . . . but at the time of registration the PTO is not asked to determine whether secondary meaning had been acquired at some previous date, and therefore registration cannot support a presumption for the period before registration." *Converse*, 909 F.3d at 1117–18.

Moreover, marks that are simply descriptive of a product are not inherently distinctive and cannot be protected because "they do not inherently identify a particular source[.]" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). But a descriptive mark may be protected if it "has become distinctive of the applicant's goods in commerce." *Id.* (internal citations omitted). This acquired distinctiveness is also called "secondary meaning." *Id.* (internal citations omitted). On the other hand, "suggestive" marks are inherently distinctive and are entitled to protection without the need to acquire secondary meaning. *Lahoti*, 586 F.3d at 1197 (citing *Two Pesos*, 505 U.S. at 768). Suggestive marks require "imagination" or a "mental

leap" to "reach a conclusion as to the nature of the product being referenced." *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.,* 198 F.3d 1143, 1147 n.3 (9th Cir. 1999) (quoting *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 911 (9th Cir. 1995)).  But descriptive marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005) (quoting *Surfvivor Media, Inc. v. Survivor Productions,* 406 F.3d 625, 632 (9th Cir. 2005)).  The "primary criterion" to differentiate between a descriptive and suggestive mark "is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product." *Lahoti*, 586 F.3d 1198 (quoting *Self–Realization Fellowship Church*, 59 F.3d at 911).

Plaintiff misreads this caselaw.  It argues that "Wilson is entitled to a presumption that the FFTD and Fluid Fitting Torque Device marks are inherently distinctive, and have been eligible for trademark protection under 15 U.S.C. § 1125(a) since each mark's first use in commerce."  Dkt # 142 at 18.  Plaintiff further contends these marks are eligible for protection from their first use in commerce because the PTO issued registrations on the principle register for these marks.  *Id.*  But the protectable interest established by federal registration runs from the date of the registration—not from the first use in commerce.  *Converse*, 909 F.3d at 1117. Except for the trademark infringement allegations related to the SLS project—which the court has already rejected, *see* Section III.E.1, *supra*—there are no other allegations that Defendant infringed Plaintiff's trademarks after September 2021, when the earliest mark was registered. Dkt. # 140 at 68–70.  Thus, Plaintiff cannot state a claim for trademark infringement under the § 1125(a) of the Lanham Act based on its trademark registrations because those registrations were not filed when the marks were allegedly infringed.

The Court can also conclude Plaintiff did not have a protectable interest in the FFTD or Fluid Fitting Torque Device marks before September 2021 because these marks are descriptive and never acquired secondary meaning.  FFTD is simply an acronym for Fluid Fitting Torque Device.  *Id.* at 2.  And Fluid Fitting Torque Device is a descriptive mark because it defines a particular characteristic of the product—its function.  *See Yellow Cab*, 419 F.3d at 927.  Based on the name of the tool, there is no imagination or mental leap required to understand that the tool torques (i.e., tightens or loosens) fluid fittings.  Descriptive marks are also eligible for trademark protection only if they have acquired secondary meaning, but the TAC does not allege these marks ever obtained this acquired distinctiveness.  *See* Dkt. # 140 at 67–72; *see also* Dkt. # 142 at 18.  As a result, Plaintiff has not established that it had a protectable interest in these marks when they were allegedly infringed so the trademark infringement claim must be dismissed.

F.      RICO

Plaintiff further alleges Defendant has violated the Racketeer Influenced and Corrupt Organization Act (RICO) under 18 U.S.C. § 1962(c) and § 1964.  Dkt. # 140 at 72.  To demonstrate a violation of § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  Defendant contends that this claim fails because Plaintiff does not allege the existence of an enterprise or a pattern of racketeering activity.  Dkt. # 141 at 22–29.

1.      Enterprise

Plaintiff claims Defendant is the mastermind of an association-in-fact enterprise that has conspired to steal the intellectual property of smaller companies.  Dkt. # 140 at 73.  An association-in-fact enterprise is "a group of persons associated together for a common purpose of

engaging in a course of conduct." *Odom*, 486 F.3d at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). To establish the existence of this sort of enterprise, plaintiff must provide "both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *Id.* (quoting *Turkette*, 452 U.S. at 583).

### a.    Common Purpose

The Court can conclude Plaintiff sufficiently alleges Defendant and its co-conspirators—Plaintiff calls them the IP Theft Enterprise—were associated for "a common purpose of engaging in a course of conduct." *Id.* (quoting *Turkette*, 452 U.S. at 583); *see* Dkt. # 132 at 23. According to Plaintiff, this common purpose was to steal the intellectual property of smaller companies so the IP Theft Enterprise could avoid R&D expenses, eliminate competition, obscure the price of designs and products so these items could be provided to government entities at higher prices, and to conceal evidence of wrongdoing. Dkt. # 140 at 73.

### b.    Ongoing Organization

Ongoing organization does not mean the enterprise needs to have a formal structure or organization. *See Boyle v. United States*, 556 U.S. 938, 948 (2009). Instead, the plaintiff must show the enterprise was simply "a vehicle for the commission of two or more predicate crimes." *Odom*, 486 F.3d at 552 (quoting *United States v. Cagnina*, 697 F.2d 915, 921–22 (11th Cir. 1983)). But, importantly, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.* at 549 (quoting *Turkette*, 452 U.S. at 583).

Plaintiff fails to show the IP Theft Enterprise had ongoing organization outside the alleged predicate acts. Plaintiff levels the fervid allegation that "[l]ike a mob boss, Boeing directed and orchestrated its associates in the IP Theft Enterprise to take on different tasks from at least 2006 to the present." Dkt. # 140 at 74. But there is no allegation in the TAC that shows

the IP Theft Enterprise had *any* organization separate from the activities Defendant allegedly directed.  For example, there is no allegation the non-Defendant members of the IP Theft Enterprise communicated or interacted with each other.  Nor is there any allegation that a non-Defendant member of the enterprise acted of its own volition to steal another company's intellectual property.  Rather, according to Plaintiff, Defendant orchestrated all the enterprise's activities, and each entity coordinated its conduct only with Defendant.  *Id.*  In other words, "[t]he alleged racketeering activity is the only apparent connection among the defendants, which is not sufficient to establish the existence of an enterprise."  *Bredberg v. Middaugh*, 2022 WL 2662878, at *1 (9th Cir. July 11, 2022) (unpublished); *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1341 (W.D. Wash. 2021) (dismissing RICO claim where plaintiff did "nothing but allege that the enterprise is the association of individuals involved in the predicate acts.").

In addition, Plaintiff says, "At the ultimate direction of Boeing, each of the members of the IP Theft Enterprise took on different roles over a period of years to achieve the common purpose" and "Boeing masterminded and coordinated the theft of Wilson's intellectual property, maintained the key relationships with the other members of the enterprise, and orchestrated the other members of the enterprise in their common purpose."  Dkt. # 140 at 74.  Plaintiff essentially concedes that Defendant was the only member of the IP Theft Enterprise that had any role in directing the affairs of the enterprise.  This confirms that the enterprise did not have ongoing organization because it shows the non-Defendant members did not participate—as this word is understood in the context of 18 U.S.C. § 1962(c)—in the affairs of the enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) ("In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs.") (quoting 18 U.S.C. § 1962(c)); *see Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (applying *Reves* to association-in-fact enterprises).

Plaintiff's allegation that all members of the IP Theft Enterprise "committed, orchestrated, coordinated, planned, directed, and implemented Boeing's plan to target smaller companies" and steal their intellectual property does not save this claim. Dkt. # 140 at 78. Nor does the allegation that all members "directly or indirectly conducted and/or participated in the conduct of the IP Theft Enterprise." *Id.* at 74. These conclusory statements do not find support in the TAC. *See id.* at 72–81. And it is further telling that Plaintiff says, "The TAC provides additional detail on how each member of the IP Theft Enterprise directly or indirectly conducted or participated in the conduct thereof," but then cites no portion of the TAC to support this argument. Dkt. # 142 at 20. The Court is not bound to accept as true these legal conclusions couched as fact when evaluating a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In sum, Plaintiff does not sufficiently allege the existence of an association-in-fact enterprise because the IP Theft Enterprise lacked ongoing organization. *Odom*, 486 F.3d at 552. Likewise, Plaintiff does not sufficiently allege a violation of § 1962(c) because there was no enterprise. *Id.* And with no violation of § 1962(c), Plaintiff cannot recover under § 1964. 18 U.S.C. § 1964.

G.    Civil Conspiracy

Plaintiff also brings a claim for civil conspiracy. Dkt. # 140 at 81. The Court assesses whether the claim is preempted before assessing the merits.

1.    Preemption

Defendant says that Plaintiff's civil conspiracy claim is preempted by the WUTSA because both claims are based on the same underlying facts. Dkt. # 141 at 29. And Plaintiff responds that the Court should instead apply an elements-based test, which shows the WUTSA is not preemptive. Dkt. # 142 at 27.

The WUTSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret." RCW 19.108.900(1). But the statute does not displace "[c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret[.]" RCW 19.108.900(2)(a). So if a plaintiff brings a civil liability claim and a claim under the WUTSA, the Court must determine whether the WUTSA preempts the civil claim. *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1195 (W.D. Wash. 2019).

Granted, some courts have applied the facts-based test from *Thola v. Henschell*, 140 Wn. App. 70, 76, 164 P.3d 524, 528 (2007), and others have applied the elements-based test from *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 48, 738 P.2d 665, 674 (1987). But the Court agrees with the thoughtful analysis in *SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.*, 5 Wash. App. 2d 496, 427 P.3d 688 (2018), and *Bombardier*, 383 F. Supp. 3d at 1195–96 that it must apply the elements-based test. *See also Inteum Co., LLC v. Nat'l Univ. of Singapore*, 371 F. Supp. 3d 864, 871 (W.D. Wash. 2019) ("The controlling case on [WUTSA preemption] is the Washington Supreme Court's decision in *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 738 P.2d 665 (1987).").

Under the elements-based test, "a common law claim is not preempted if the elements require some allegation or factual showing beyond those required under the [W]UTSA." *Convoyant LLC v. DeepThink, LLC*, 2021 WL 5810638, at *6 (W.D. Wash. Dec. 7, 2021) (quoting *SEIU Healthcare*, 5 Wash. App. 2d at 506). To adequately state a claim under the WUTSA, "a plaintiff must plead (1) the existence of a protectable trade secret, and (2) facts constituting misappropriation." *Inteum Co.*, 2017 WL 6611961, at *4. But to adequately state a civil conspiracy claim a plaintiff must plead "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the

conspirators entered into an agreement to accomplish the object of the conspiracy." *Wilson v. State*, 84 Wash. App. 332, 350–51, 929 P.2d 448 (1996) (citing *Corbit v. J.I. Case Co.*, 70 Wash. 2d 522, 528–29, 424 P.2d 290 (1967)). These differences show that a civil conspiracy claim requires additional allegations—an unlawful purpose or unlawful means and an agreement between the conspirators—that a WUTSA trade secret misappropriation claim does not. Thus, the WUTSA does not preempt Plaintiff's civil conspiracy claim.

        2.     Merits

To state a civil conspiracy claim, a plaintiff must allege "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy." *Id.* (citing *Corbit*, 70 Wash. 2d at 528–29). "A finding that a conspiracy exists may be based on circumstantial evidence, although the 'circumstances must be inconsistent with a lawful or honest purpose and reasonably consistent only with [the] existence of the conspiracy.'" *Sterling Bus. Forms, Inc. v. Thorpe*, 82 Wash. App. 446, 451, 918 P.2d 531, 533–34 (1996) (quoting *Corbit*, 70 Wash. 2d at 529). And "[m]ere suspicion or commonality of interests is insufficient to prove a conspiracy." *Young v. Rayan*, 27 Wash. App. 2d 500, 518, 533 P.3d 123, 133 (2023).

Defendant says this claim must be dismissed because Plaintiff admits that there was no agreement between Defendant and the Bogus Boeing Employees. Dkt. # 141 at 29. Defendant also says this claim must be dismissed because Plaintiff does not allege the company conspired with the Ghost Employees to accomplish "an unlawful purpose" or employed "unlawful means." *Id.* at 30. Plaintiff responds that it sufficiently alleges there was an agreement between Defendant and its co-conspirators because the Bogus Boeing Employees had their true roles as employees of Plaintiff's competitors concealed by Defendant and because the Ghost Employees

ORDER RE: MOTION TO DISMISS - 24

were listed in Defendant's internal records as Plaintiff's employees with decision making authority.  Dkt. # 142 at 29.

The Court can readily conclude from the allegations that there was no civil conspiracy between Defendant and the Bogus Boeing Employees.  This is because the TAC admits "[i]t is probable that Boeing conspired with the space industry companies who employed the Bogus Boeing Employees *without there being an agreement* pertaining to the development of the misappropriated Wilson intellectual property, which discovery will uncover."  Dkt. # 140 at 82 (emphasis added).  So Plaintiff essentially concedes there was no agreement between Defendant and the Bogus Boeing Employees.  Without an agreement between Defendant and the Bogus Boeing Employees, there can be no civil conspiracy.  *Wilson*, 84 Wash. App. at 350–51.

The Court can reach the same conclusion about the Ghost Employees.  The TAC alleges "[i]t is likely that the employers of the Ghost Employees had an agreement in place regarding the SLS project, which discovery is needed to uncover."  Dkt. # 142 at 82–83.  But "an agreement in place regarding the SLS project" shows the agreement was intended to serve a lawful purpose— the SLS project.  *Id.* at 83.  An agreement to serve a lawful purpose does not support a civil conspiracy claim between Defendant and the Ghost Employees.  *See Sterling Bus. Forms*, 82 Wash. App. at 451.  What is more, other than civil conspiracy, the only "unlawful purpose" or "unlawful means" the Ghost Employees are alleged to have participated in is with respect to Plaintiff's RICO claim.  *See generally* Dkt. # 140.  But the Court is dismissing the RICO claim. *See* Section III.F, *supra*.  Thus, the civil conspiracy claim against the Ghost Employees fails for this reason as well.

H.      Fraud

The heightened pleading standard under Federal Rule of Civil Procedure 9(b) applies when fraud is an essential element of the claim or the claim is "grounded in" fraudulent conduct.

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The complaint "must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1057 (9th Cir. 2023) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  To meet this standard, the plaintiff's "[a]verments of fraud *must* be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)) (emphasis added).

The Court looks to state law to determine whether the elements of fraud have been pleaded to state a cause of action.  *Id.* at 1105–06.  In Washington, the elements of fraud are:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stiley v. Block*, 130 Wash. 2d 486, 505, 925 P.2d 194, 204 (1996).

Defendant asserts that all of Plaintiff's fraud claims must be dismissed for failing to plead "when and where" the alleged fraud took place.  Dkt. # 141 at 30–31.  Defendant also says the 2015 statement from Eric Howell that the FFTD got stuck on the ISS is not actionable because Plaintiff learned in 2016 that the FFTDs at issue were manufactured by another company, so Plaintiff had no reason to rely on this statement when it made repairs in 2019.  *Id.*  The allegation Chip Link told Plaintiff that no photographs of the stuck FFTD existed is also non-fraudulent, according to Defendant, because Plaintiff does not allege that it relied on this statement to take any action.  *Id.* at 31.  Finally, Defendant contends Chip Link's "Stradivarius" comment is not a

1    fraudulent statement because it does not indicate the source of the alleged defect in the tool and

2    is a statement of opinion, which cannot sustain a fraud allegation. *Id.* at 31–32.

3          Plaintiff responds that its allegations comply with Rule 9(b) and are detailed enough to

4    "provide Boeing with adequate notice for it to defend the charge." Dkt. # 142 at 30. Plaintiff

5    also says it relied on the 2015 statement from Eric Howell because Defendant represented the

6    issues were from a design—not manufacturing—defect. *Id.* Plaintiff maintains the

7    "Stradivarius" comment is an actionable factual representation because it was made to induce

8    Plaintiff to act, the relevant information was not readily available to Plaintiff, and because the

9    circumstances suggested Plaintiff was entitled to rely on the representation as a fact. *Id.* at 30–

10   31.

11         The Ninth Circuit provided greater instruction on how fraud claims should be evaluated

12   in *Kearns v. Ford*, which illustrates that a plaintiff *must* meet certain particularity requirements

13   to satisfy Rule 9(b). There, Kearns alleged he was exposed to a fraudulent course of conduct

14   because Ford's national advertising campaign led him to believe certain Ford CPO vehicles were

15   subject to more rigorous inspections and therefore safer. *Kearns v. Ford Motor Co.*, 567 F.3d

16   1120, 1125–26 (9th Cir. 2009). Those claims were dismissed because Kearns did not allege

17   what the advertisements specifically stated or when he was exposed to these advertisements. *Id.*

18   at 1126. The plaintiff also claimed that he was specifically told that "CPO vehicles were the best

19   used vehicles available as they were individually hand-picked and rigorously inspected used

20   vehicles with a Ford-backed extended warranty." *Id.* And these claims were also dismissed

21   because Kearns did not "specify who made the statement or when this statement was made." *Id.*

22   So, because plaintiff "failed to articulate the who, what, when, where, and how of the misconduct

23   alleged," his claims were dismissed. *Id.*

24

Similarly, Plaintiff's new fraud allegations do not comply with the pleading requirements that are set out in *Kearns*. Plaintiff first alleges "in 2015, Boeing employee Eric Howell personally advised Wilson, 'I hate to burst your bubble, but your FFTD got stuck on the ISS[.]'" Dkt. # 140 at 87. Plaintiff next alleges that when it "requested photographs of the FFTD involved in the trapped fitting incident in 2015, Boeing employee Chip Link falsely advised Wilson no such photographs existed." *Id.* And Plaintiff finally alleges "Boeing employee, Chip Link told Wilson 'your Stradivarius is playing like a cheap fiddle.'" *Id.* at 88. On their face, these allegations fail to articulate the "who, what when, where, and how of the misconduct alleged" because they do not describe where or how the statements were made. *Kearns*, 567 F.3d at 1126. These allegations also prevent Defendant from fully responding to the purported misconduct because it is unclear which employee or employees heard the statements. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (holding that a complaint did not satisfy Rule 9(b) because it "d[id] not specify *which* plaintiff received which prospectus, or *which* plaintiff(s) made purchases through the stockbroker defendants" (emphases added)). Instead, the TAC generally alleges the statements were directed to "Wilson" (i.e., Wilson Aerospace LLC). Dkt. # 140 at 87–88; *see id.* at 77 (differentiating between Plaintiff (i.e., Wilson Aerospace LLC) and employee David Wilson). It is reasonable to expect the employee or employees who heard these statements would know the "where" and "how" of the purported fraud, and that those details would be included in the TAC. *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010). Thus, Plaintiff does not satisfy Rule 9(b) because it does not allege fraud with the required particularity.

I.   Tortious Interference

A party alleging tortious inference in Washington must prove five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wash. 2d 342, 351, 144 P.3d 276 (2006) (quoting *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 157, 930 P.2d 288 (1997)). A "valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Greensun Grp., LLC v. City of Bellevue*, 7 Wash. App. 2d 754, 768, 436 P.3d 397, 405 (2019) (quoting *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp. Inc.*, 114 Wash. App. 151, 158, 52 P.3d 30 (2002)). And Washington courts only require a plaintiff to show its "future business opportunities are a reasonable expectation and not merely wishful thinking." *Id.* at 768–69 (quoting *Life Designs Ranch, Inc. v. Sommer*, 191 Wash. App. 320, 337, 364 P.3d 129 (2015)).

Defendant says that it has not interfered with Plaintiff's prospective business relationships. Dkt. # 141 at 32. And Defendant maintains this claim fails because Plaintiff does not allege Boeing interfered with, or knew about, Wilson's relationship with NASA. *Id.* Defendant further contends that the TAC shows NASA was aware of Plaintiff's involvement in the SLS project, so it is not plausible that Defendant prevented Plaintiff from dealing directly with NASA. *Id.* Defendant also says Plaintiff's allegations fail because they do not explain how the company persuaded Plaintiff not to bid directly on NASA projects. *Id.* For similar reasons, Defendant asserts the allegations about Plaintiff's prospective relationship with Lockheed Martin fail too. *Id.* at 33.

Plaintiff responds that the TAC shows Defendant knew about the potential relationship between NASA and Plaintiff. Dkt. # 142 at 31. According to Plaintiff, the TAC includes specific allegations and reasonable inferences that support the conclusion Defendant knew about

this relationship, particularly because there are laws and regulations that allow small suppliers to bid directly to NASA. *Id.* Plaintiff similarly states Defendant was aware of Plaintiff's relationship with Lockheed Martin and intentionally interfered with this relationship. *Id.* at 32.

The Court agrees with Defendant. The TAC fails to show that Defendant interfered with a prospective business relationship between Plaintiff and NASA. The allegation "had NASA [known] of the numerous high-profile products that Wilson designed and built for NASA, at comparably modest prices, NASA would have asked Wilson to submit a competitive bid to supply the products directly to it" shows the potential relationship between Plaintiff and NASA was wishful thinking. Dkt. # 140 at 95. Read in the light most favorable to Plaintiff, this allegation only supports the notion that Plaintiff missed out on the opportunity to bid to enter a business relationship with NASA, not that Plaintiff had a reasonable expectation of a business relationship with NASA. Similarly, Plaintiff's claim that it was convinced to only deal with Defendant, instead of directly with NASA, is implausible because Plaintiff also alleges there are "laws and regulations that enable small suppliers, like Wilson, to directly bid to NASA[.]" *Id.* And Plaintiff includes no allegations that support the inference Defendant prevented Plaintiff from using these laws and regulations. The TAC also fails to show Defendant interfered with a prospective business relationship between Plaintiff and Lockheed Martin. Plaintiff does not allege Defendant knew about the relationship between Wilson and Lockheed Martin, so the TAC does not state a valid claim for tortious interference under Washington law.[3] *Pac. Nw. Shooting Park Ass'n*, 158 Wash. 2d at 351.

---

[3] In its opposition, Plaintiff argues "the allegation that Boeing did convince Wilson—when accepted as true and viewed in the light most favorable to Plaintiff—satisfies Rule 8's pleading standard and sufficiently states a claim for relief." Dkt. # 142 at 31. And Plaintiff similarly argues the allegation "Boeing had knowledge of and has intentionally and unjustifiably interfered with prospective business relationships between Wilson and [Lockheed Martin]" satisfies Rule 8. Dkt. # 142 at 32. But the Court does not consider these allegations because they are legal conclusions couched as fact. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see* Section III.F.1.B, *supra*.

1

## IV

### CONCLUSION

For all these reasons, the Court GRANTS in part and DENIES in part the motion to dismiss as follows:[4]

- As to Wilson's copyright infringement claim, the Court DENIES the motion.

- As to Wilson's FFTD-3 trade secret misappropriation claim under the DTSA, the Court GRANTS in part and DENIES in part the motion.  The Court GRANTS the motion and DISMISSES with prejudice the claim related to the trade secrets included in the 2017 FFTD-3 patent.  The Court DENIES the motion as to the trade secrets that were disclosed to Defendant but not included in the 2017 FFTD-3 patent.

- As to Wilson's Dreamliner Bolting Tool trade secret misappropriation claim, the Court DENIES the motion.

- As to Wilson's Lanham Act claim, the Court GRANTS the motion and DISMISSES the claim with prejudice.

- As to Wilson's RICO claim, the Court GRANTS the motion and DISMISSES this claim with prejudice.

- As to Wilson's civil conspiracy claim, the Court GRANTS the motion and DISMISSES the claim with prejudice.

- As to Wilson's fraud claim, the Court GRANTS the motion and DISMISSES the claim with prejudice.

---

[4] Plaintiff did not seek leave to further amend its complaint and was provided three opportunities to present its initial pleadings, so the dismissed claims are dismissed with prejudice.  *See* Dkt. # 140. Further amendment of these pleadings will be permitted only with Defendant's written consent or the Court's leave.  *See* Fed. R. Civ. P. 15(a)(2).

- As to Wilson's tortious interference with prospective advantage claim, the Court GRANTS the motion and DISMISSES the claim with prejudice.

Dated this 14th day of March, 2025.

John H. Chun
United States District Judge